UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

| | |
|---|---|
| CHRIS SLAUGHTER | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) CIVIL ACTION NO. 3:14-cv-00281-CRS-CHL |
| | ) |
| LAKEVIEW CENTER, INC. | ) |
| d/b/a GULF COAST ENTERPRISES | ) |
| | ) |
| Defendant, | ) |

\* \* \* \* \* \*

### AFFIDAVIT OF BILL VANCLEAVE

Comes the Affiant, Bill VanCleave and after having been first duly sworn, states as follows:

1. I am employed by Lakeview Center, Inc. d/b/a Gulf Coast Enterprises, as the Human Resources Generalist. I held this position during the period of time in which Mr. Slaughter was employed by Gulf Coast Enterprises.

2. I have personal knowledge of the information contained in this affidavit.

3. On November 1, 2011, Chris Slaughter, began his employment as a general maintenance worker with Gulf Coast Enterprises ("GCE") at Ft. Knox. Mr. Slaughter qualified to work at GCE because of his hearing impairment.

4. As part of his GCE orientation, Mr. Slaughter signed a Code of Conduct Training form (**Exhibit 1**), Creating Respect in the Workplace form (**Exhibit 2**), an Employee Handbook Acknowledgment form (**Exhibit 3**) and Workplace Etiquette Training form (**Exhibit 4**).

5. The essential functions of Mr. Slaughter's position included performing general grounds

**EXHIBIT E**

repair, electrical and plumbing repairs and other building repair needs.

6. Mr. Slaughter's supervisors were employed by The Ginn Group ("TGG").

7. Between April 23, 2012 and April 27, 2012, I met with Mr. Slaughter on three separate occasions. The purpose of the meetings was to review specific incidents relating to Mr. Slaughter's work performance.

8. On April 25, Mike Johnson (a TGG employee) reported he had verbally warned Mr. Slaughter about wearing ear plugs and listening to music while working. Mr. Johnson noted that wearing ear plugs was against TGG's policy as it poses a potential safety hazard.

9. On April 26, 2012 Mr. Slaughter came to my office to complain of a confrontation with a TGG employee, Mike Clemons, who was Mr. Slaughter's immediate supervisor.

10. Mr. Slaughter explained that his duties involved scraping a floor, but Mr. Clemons yelled at him 2-3 times to stop scraping and instead work at putting mud on the wall. When Mr. Slaughter began work on the wall, Mr. Clemons informed him that he was applying the mud too thick. According to Mr. Slaughter, Mr. Clemons believed he was "stupid" and treated him different than other workers.

11. In response to Mr. Slaughter's concerns, I assured him that I would discuss the issues with Mike Johnson, Mr. Slaughter's manager at the time.

12. I called Mr. Johnson to discuss the alleged confrontation between Mr. Slaughter and Mr. Clemons. According to Mr. Johnson, Mr. Clemons explained to Mr. Slaughter numerous times that he was not properly applying mud to the wall. As a result, Mr. Slaughter became upset. I mentioned to Mr. Johnson that in order to get Mr. Slaughter's full attention you must get close to and make eye contact with him. I told this to Mr. Johnson as I wanted to make certain the TGG supervisors were aware of this fact. Mr.

Johnson agreed to meet with Mr. Slaughter in an effort to resolve any issue.

13. On April 27, 2012, I held another meeting to address personnel issues pertaining to Mr. Slaughter. Mr. Slaughter had complained that Mr. Clemons was "picking" on him and that as a result he was unable to continue working with Mr. Clemons.

14. In order to resolve any personality conflicts, on April 30, 2012, Steve Parks, the TGG supervisor who was present for the April 27, 2012 meeting, decided to transfer Mr. Slaughter to the Roads and Grounds Department, so he would be managed by a different supervisor.

15. In his new position, Mr. Slaughter earned the same hourly wage rates as he did in his previous position with the Structures Department.

16. On July 2, 2012 an incident occurred while Mr. Slaughter was working on the road crew laying asphalt. Mr. Slaughter was working with James Hare (TGG employee), James Rogers (TGG employee) and Jeremy Lowe (GCE employee) that day.

17. James Hare, James Rogers and Jeremy Lowe provided firsthand accounts of the events with Mr. Slaughter on July 2, 2012. In short, Mr. Slaughter failed to lower the bed of a truck containing asphalt while he was moving the truck to a different location. The individuals mentioned above tried to get Mr. Slaughter's attention to avert spillage of the asphalt. Mr. Slaughter got into a confrontation with the individuals and threatened Mr. Lowe. See attached statements of Mr. Lowe (**Exhibit 5**), Mr. Rogers (**Exhibit 6**) and Mr. Hare (**Exhibit 7**).

18. An investigation conducted by TGG concluded that Mr. Slaughter was at fault for creating a hazard for serious injury and/or possible death. (**Exhibit 8**). It was discovered that the reason Mr. Slaughter was unable to hear was because he had the windows up in the truck, the air conditioning fan on high and the radio playing. (Id.). In addition, Mr.

Slaughter was not wearing his hearing aids.

19. On July 3, 2012, I held a meeting with Betty Marcum, Human Resources assistant and Mr. Slaughter related to the previous events. Mr. Slaughter recounted his version of events, including that the bed of the truck was elevated and that he did tell Mr. Lowe to meet him at Dodge's after work.

20. Mr. Slaughter provided a written statement which is attached hereto as part of **Exhibit 8.**

21. During the meeting, Mr. Slaughter admitted that his actions were wrong.

22. As a result of this incident, Mr. Slaughter was suspended with pay so that GCE could conduct an investigation.

23. It was discovered that the reason Mr. Slaughter was unable to hear was because he had the windows up in the truck, the air conditioning fan on high and the radio playing.

24. Mr. Slaughter was terminated on July 9, 2012 due to his actions on July 2, 2012 when he threatened violence toward another employee on a jobsite. A copy of his employee separation notice is attached hereto as **Exhibit 9** which documents his termination for violation of company policy: "Violence in the Workplace."

25. Mr. Slaughter filed an EEOC charge for unfair treatment and alleged Equal Pay Act violations for his alleged failure to receive Davis-Bacon pay during his employment at GCE. Upon termination, Mr. Slaughter filed an addition charge with the EEOC for discrimination alleging a retaliatory discharge in violation of the American Disabilities Act. The EEOC did not substantiate any of Mr. Slaughter's claims and issued a Dismissal Notice which is attached hereto as **Exhibit 10.**

FURTHER AFFIANT SAYETH NAUGHT.

                                                       _____
                                                       Bill VanCleave

STATE OF KENTUCKY      )
                                  ) SS
COUNTY OF HARDIN      )

Subscribed and sworn to before me by Bill VanCleave this the 9th day of July 2015.

_____
NOTARY PUBLIC - STATE AT LARGE

My Commission Expires: 5/27/19

Revised 03/08



# CODE OF CONDUCT TRAINING

Employee Name: __Chris Slaughter__
(Please Print)

Position _____

Work Location: _____

I have received, read, and understand the Code of Conduct, or have had the Code of Conduct read to me. I understand that compliance is a condition of employment and I also understand that GCE will take appropriate disciplinary action, including termination, for the violation of the principles and practices set forth in the Code of Conduct handbook.

Employee Signature: _____

Date: __11-1-11__

**EXHIBIT 1**

Revised 03/08



# CREATING RESPECT IN THE WORKPLACE
## NON-HARASSMENT TRAINING

I, __Chris Slaughter__, have received training and written
(Please Print)
materials on preventing and reporting harassment, including sexual harassment, in the workplace.

Employee's Signature: _____

Date: 11-1-11

**EXHIBIT 2**



# Employee Handbook Acknowledgment

I have received a copy of the GCE Employee Handbook. I understand that it is my responsibility to read and comply with the provisions of this handbook as well as any changes, additions, and/or deletions that are issued in writing and made part of the handbook during my employment with GCE.

I am fully aware that my supervisor, manager, and/or a Human Resource Representative of GCE are all willing to explain any portion of the handbook, which I may wish to discuss, or about which I have a question.

Employee's Name (printed): __Chris Slaughter__

Employee's Name (signature): __[signature]__

Date: __11-1-11__

Org. 1/14/02
Rev. 12/02, 5/10

**EXHIBIT 3**



## Workplace Etiquette Training

I, __Chris Slaughter__, have received training and written
(Please Print)

materials on proper workplace behaviors and etiquette.

Employee's Signature: _____

Date: __11-1-11__

**EXHIBIT 4**

On July 2, James H; James R; Chris S & myself was doing pot holes at 7th Armor near Brunsfield. We had already laid 1½ tons or so when we asked Chris to move the truck to the next section of the hole, he went & jumped in the truck and put it in gear to move it after shutting his door (leaving the window up). James H & R and myself started yelling his name & doing hand/arm motions to get Chris' attention because the bed was still raised with 3½ tons or so of asphalt still in the bed N-H once did he look or could hear us over the noise of the truck, AC & Radio being on, not to mention he wasn't wearing his hearing aids. Chris got the truck backed over to the next spot with only loosing a little asphalt, as he opened the door he finally heared my last yell and proceeded to get angry and started to tell me, "Not to talk to me like I'm F-ing Stupid Cause I'm Not. You Do It All The Time," have only worked with him on a couple other jobs & keep any conversation to a minimum. "You Don't Need to talk to me like that I aint Stupid." I started to explain I wasn't the only one yelling to get his attention and that I wasn't talking to him like he was/is stupid but that the bed of the truck needed to be lowered to keep from loosing the asphalt. Chris went on to tell me Shut the F up and kept on going to finally say he would be at Dodges Chicken after work if we needed to settle this or any issue. I attempted to explain one more time what the situation was & why he heard me but he didn't want to hear it so I kept my mouth shut and didn't say another word to or towards him the rest of the afternoon.

Jeremy Lowe

**EXHIBIT 5**

was doing potholes with James Here, Jeremy Lowe, Chris Slaughter. We asked Chris Slaughter to pull asphalt truck foreward to next place and he didnt let bed down and started pulling foreward all of us was yelling and motioning for him to let bed down so he wouldnt spill the asphalt. Jeremy yelled last time a little louder and Chris got out of truck and told Jeremy not to talk to him like he was stupid. Jeremy said he was only trying to get him to let the bed down and Chris told him to shut his F---ing mouth Jeremy said that was uncalled for Chris told him he wasn't getting into it there but that he stopped at Dodge's gas station every afternoon and if he had anything else to say Jeremy could meet him there to tell him. And the windows on truck were up, A/C on and door shut. Also Chris was not wearing his hearing aids

7-3-12

James Rogers   2259

**EXHIBIT 6**

On 2 July 2012, myself, Chris Slaughter, Jeremy Lowe JH and James Rogers were putting asphault on 7th Armor D.V cut off Rd. Chris was in the vehicle preparing to move it to the next spot. We noticed he had the bed up which could have possibly spilled out. We attempted to get Chris' attention to lower the bed by yelling at him and using hand signals to stop. Chris did not hear us and continued to drive. Jeremy finally made eye contact with Chris and told him to put the bed down. Chris got out of the vehicle and confronted Jeremy. Chris said he wasn't a "fucking" kid and did not want to be talked to like that. The confrontation continued for a few minutes JH between Chris and Jeremy. I got in the truck and went back to putting asphault down, which prevented me from hearing the rest of the confrontation.

James Hare
James Hare

///END OF STATEMENT///

**EXHIBIT 7**

# First Report of Incident/Nearmiss

☐ OCCUPATIONAL INJURY      ☐ NON-OCCUPATIONAL INJURY

| ☐ Injury | ☐ Property Damage | ☐ First Aid | ☒ Nearmiss | ☐ Process Interruption |
|---|---|---|---|---|
| ☒ The Ginn Group | | ☐ Subcontractor: | | |

| Date Reported 7/2/2012 | Time Reported 2:45 | Date Occurred 7/2/2012 | Time Occurred 2:30 | Date Investigated 7/3/2012 |
|---|---|---|---|---|

### Reporting Person Information

| Name: Gary Matthews | Position: SARG Supervisor | Telephone #: 502-626-2638 |
|---|---|---|
| Department SARG | Supervisor | Manager S. Parks |

### Person Involved in Incident

| Name: James Hare—TGG James Rogers—TGG Jeremy Lowe—Lake View Chris Slaughter—Lake View | Position: GMW GMW GMW GMW | Job ID Number 2263 2259 |
|---|---|---|
| Department SARG | Supervisor Gary Matthews | Manager Steve Parks |
| Severity of Incident | ☒ Major  ☐ Minor  ☐ Unknown | |
| Person Involved Location | ☒ Workplace  ☐ Home  ☐ Hospital | |

If Property Damage, list GSA Vehicle Number:

**Brief Description of What Occurred:**
While performing pothole repair on 7th Armor Division Rd. Chris Slaughter got into the driver's seat of GSA Vehicle number G71-00320 to reposition the vehicle in order to continue filling a large pothole. While pulling the vehicle forwards James Hare, James Rogers, and Jeremy Lowe was at the rear of the vehicle attempting to get Chris's attention to stop and lower the truck bed. The bed of the truck was elevated which impedes the vision of the driver as well as creates a high potential spilling the asphalt on the roadway/shoulder. All three technicians attempted to get Chris's attention by moving to the side of the truck in clear line of sight with the side rear view mirrors. The technicians began yelling for Chris to stop the vehicle. Chris finally made eye contact with Jeremy and stopped the vehicle. Chris exited the vehicle and began to argue with Jeremy about the yelling.
All three technicians noted in their witness statements that Chris had the windows up, air

TGGFK-S4.08 Rev: 00

**EXHIBIT 8**

# First Report of Incident/Nearmiss

conditioning fan on high and the radio was playing. The technicians stated that Chris was not wearing his hearing aids.

| QHSE Department | | | | |
|---|---|---|---|---|
| General Classification | ☐ Accident | ☐ First Aid | ☒ Nearmiss | ☒ Incident |
| Investigator Assigned<br>Gary Nichols | ID Number<br>0951 | Date Assigned<br>7/2/2012 | Suspense Date | Case Number<br>TGGNM7031201 |

TGGFK-S4.08 Rev: 00



# Employee Statement of Events

Claim # T66NM703120I

| Employee's Name: | Employee ID Number: | Company: | Date Event Occurred: |
|---|---|---|---|
| James Roper | 2259 | | 7-2-12 |

Was doing onthilos with James Hare, Jeremy Lowe, Chris Slaughter, Chris was asked to pull truck foreword when he did he didn't let bed down and all of us was trying to get Chris to let bed down and windows were up, A/C on, door shut, Jeremy yelled last time loud to let bed down and Chris got out mad mouthing to Jeremy and Chris didn't have hearing aids in

My signature represents the above information is factual and true to the best of my knowledge.

Employees Signature

Date: 7-3-12

03/15/07   Page 1 of 1   TGGFK-S4.27 Rev: 00



# Employee Statement of Events

Claim # T66NM703201

| Employee's Name: | Employee ID Number: | Company: | Date Event Occurred: |
|---|---|---|---|
| Jeremy Lowe | 701780 | GCE | 3 July 2012 |

Was doing asphalt on 7th Armor near Brumfield. Chris jumped in truck to reposition when doing so he left the bed up with 3½ tons of loose asphalt. James R & James H and myself were yelling to get his attention to lower the bed before dumping the asphalt in grass or on road away from hole. Myself & James R moved so that we could be seen in sideview mirrors while still yelling his name & motioning for him to lower bed he never looked proceeded to pull forward & then reverse not once did he look until he was stopping. When he finally stopped the truck & got out, radio and AC where still on windows were up with door shut, with bed raised it limits visibility out of mirrors. I also noticed that Chris wasn't wearing his hearing aids when we first got to job site.

My signature represents the above information is factual and true to the best of my knowledge.

Employees Signature: Jeremy Lowe

Date: 3 July 2012

03/15/07    Page 1 of 1    TGGFK-S4.27 Rev: 00



# Employee Statement of Events

Claim # T66NM7031201

| Employee's Name: | Employee ID Number: | Company: | Date Event Occurred: |
|---|---|---|---|
| James Hane | 2263 | TGG | |

2 July 2012, myself, James R., Jeremy S., and Chris S. were putting hot asphault on the road. Chris S. was in the vehicle. He was getting ready to move the truck when we seen he had the bed up. This could have resulted in spilling the asphault. We tried yelling at Chris to put the bed down. He did not respond. We also made hand signals for him to lower the bed which he still did not respond. Finally Jeremy S. made eye contact with him to stop the vehicle and lower the bed before moving again.

My signature represents the above information is factual and true to the best of my knowledge.

| Employees Signature: James Hane | Date: 3 July 2012 |
|---|---|

03/15/07  Page 1 of 1  TGGFK-S4.27 Rev: 00



# Employee Statement of Events

Claim # TGGNM7031201

| Employee's Name: | Employee ID Number: | Company: | Date Event Occurred: |
|---|---|---|---|
| Chris Slaughter | | GCF | 7/2/2012 |

We were doing aspault out on the range and I was moving the dump truck and Jeremy Lowe was giving me directions and since his hearing is impaired he was hollering at the top of his lungs. I parked the truck and told him don't holler at me like that I'm not stupid. I guess he thought I wasn't watching him in the mirror.    7-3-12

*(signature)*

My signature represents the above information is factual and true to the best of my knowledge.

| Employees Signature: | Date: |
|---|---|

03/15/07      Page 1 of 1      TGGFK-S4.27 Rev: 00



# EMPLOYEE SEPARATION NOTICE

Employee Name: **Chris Slaughter**   Date of Separation: **07/09/2012**
Job Title: **General Maintenance Worker**   ☒ Contract Location: **TFM - Fort Knox**
ID#: **701785**   AU#: **6090**

*ALL FINAL PAY CHECKS WILL BE DIRECT DEPOSITED*

## VOLUNTARY RESIGNATION

To be completed by employee: (Please check the appropriate reason(s) for your separation)

- [ ] Dissatisfied with Benefits
- [ ] Seeking Better Pay
- [ ] Career Advancement
- [ ] Conflict with Lakeview values
- [ ] Further Education
- [ ] Other: _____
- [ ] Different Field of Work
- [ ] Same Field of Work
- [ ] Job Burnout
- [ ] Personal Reasons
- [ ] Competitive Employment
- [ ] Retirement
- [ ] Relocation
- [ ] Supervisor
- [ ] Work Schedule/Hours

_____  _____
Employee Signature                Date

*SUPERVISOR SHOULD NOTIFY HR UPON EMPLOYEE'S SUBMITTAL OF RESIGNATION AND SEND NOTICE TO HR*

## INVOLUNTARY RESIGNATION
(Employee is terminated by GCE)

*Must be pre-approved by Employee Relations*

- [ ] Attendance
- [ ] Breach of Confidentiality
- [ ] Job Abandonment
- [ ] Poor Performance
- [ ] Layoff
- [x] Violation of Company Policy/ Standards of Performance
- [ ] Other: _____
- [ ] Training Non-Compliance

Specific policy/standard violated: **Violence in the Workplace**

_____  **7/10/12**
Supervisor Signature                Date

## For HR USE ONLY

Date Received by HR: **7-10-12**
HR Signature: **TB**

Eligible for rehire? ___ Yes  **X** No
Vacation Payout? ___ Yes  ___ No
If yes, how many hours? _____

**EXHIBIT 9**

EEOC Form 161 (1/09)  U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

To: Mr. Christopher Slaughter
P.O. Box 1102
Mt. Washington, KY 40047

From: Louisville Area Office
600 Dr. Martin Luther King, Jr. Pl. Suite 268
Louisville, Kentucky 40202-2285

[ ] *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 474-2012-00645 | Alan W. Anderson | 502-582-5826 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

[ ] The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

[ ] Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

[ ] The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

[ ] Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

[X] The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

[ ] The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

[ ] Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_Joni Ahl_ for Marcia Hall – Craig, Area Director    11/27/12 (Date Mailed)

Enclosures(s)

cc: Gulf Coast Enterprises (Craig Johnson)

**EXHIBIT 10**