Deposition of Chris Steven Slaughter     Date: 10/29/2014

---

**Page 1**

1     UNITED STATES DISTRICT COURT
2     WESTERN DISTRICT OF KENTUCKY
3     LOUISVILLE DIVISION
4
5 CHRIS SLAUGHTER,
6
7       PLAINTIFF,
8
9 V.      CIVIL ACTION NO. 3:14-cv-0028-CRS
10
11 LAKEVIEW CENTER, INC.
12 d/b/a GULF COAST ENTERPRISES,
13
14       DEFENDANT.
15 _____
16
17    DEPOSITION FOR THE DEFENDANT,
18     LAKEVIEW CENTER, INC.
19     d/b/a GULF COAST ENTERPRISES:
20
21   The Deposition of Chris Steven Slaughter, taken
22 in the above-styled matter at Whonsetler & Johnson,
23 PLLC, 11901 Brinley Avenue, Louisville, Kentucky, on
24 the 29th day of October, 2014, beginning at 10:00 a.m.
25

---

**Page 2**

1      A P P E A R A N C E S
2
3 FOR THE PLAINTIFF, CHRIS SLAUGHTER:
4   MICHAEL L. BOYLAN, ESQUIRE
5 THE BOYLAN LAW OFFICE
6   807 West Market Street
7   LOUISVILLE, KENTUCKY 40202
8
9 FOR THE DEFENDANT, LAKEVIEW CENTER, INC.
10 d/b/a GULF COAST ENTERPRISES:
11   CRAIG L. JOHNSON, ESQUIRE
12   WHONSETLER & JOHNSON, PLLC
13   11901 Brinley Avenue
14   LOUISVILLE, KENTUCKY 40243
15
16
17
18
19
20
21
22
23
24
25

---

**Page 3**

1     INDEX TO EXAMINATION
2
3         PAGE
4 EXAMINATION BY MR. JOHNSON     4
5
6
7
8     INDEX TO EXHIBITS
9
10        PAGE
11 EXHIBIT 1       80
12 EXHIBIT 2       82
13 EXHIBIT 3       83
14 EXHIBIT 4       85
15 EXHIBIT 5      180
16
17
18
19
20
21
22
23
24
25

---

**Page 4**

1 DEPOSITION OF CHRIS STEVEN SLAUGHTER
2      OCTOBER 29, 2014
3 CHRIS STEVEN SLAUGHTER, called on behalf of
4 the Defendant, Lakeview Center, Inc. d/b/a Gulf
5 Coast Enterprises, after having first been duly
6 sworn, is examined and testifies as follows:
7 EXAMINATION
8 BY MR. JOHNSON:
9   Q. Mr. Slaughter, my name is Craig Johnson.
10 I represent Gulf Coast in the lawsuit that you have
11 filed against them.
12   We're here today to take your deposition.
13 Have you ever given a deposition before today?
14   A. Yes, sir.
15   Q. In what setting have you given a
16 deposition?
17   A. It was about nineteen-ninety -- I
18 mean, 1984 due to a car wreck.
19   Q. All right. Were you a party to that case,
20 or were you a witness?
21   A. I was a party.
22   Q. Were you the one injured in the car
23 wreck?
24   A. Yes, sir.
25   Q. All right. Have you given any other

---

**EXHIBIT F**

Page 5

1  depositions?
2  A.  No, sir.
3  Q.  Have you given any other testimony?
4  A.  No, sir; not -- not that I recall.
5  Q.  Okay.  My purpose here today is to find
6  out about you, some background information, and
7  then about the claim that you have presented.
8  You've indicated to me before we started that you
9  have a hearing impairment, so I'm --
10  A.  [nods head]
11  Q.  -- going to do my best to speak slowly so
12  you can watch my lips, and also to speak loudly.
13  If at any time I ask you a question that you
14  don't hear or that you don't understand, just stop
15  me and say, "Craig, I didn't hear you or didn't
16  understand you.  Could you please repeat it," and
17  I'll do so; okay?
18  A.  Yes, sir.
19  Q.  If you'll make certain that all your
20  answers are verbal?  Stay away from the shaking
21  or nodding your head or the "uh-huhs" or the
22  "huh-uhs."
23  I can see what your answer may be or hear
24  what your answer may be now, but our court
25  reporter is going to transcribe everything, and we

Page 6

1  want to make certain that we have everything down
2  on the record accurately; okay?
3  A.  Yes, sir.
4  Q.  If you let me complete my question before
5  you start your answer, I'll allow you to complete
6  your answer before I start my next question just,
7  again, so there's only one of us speaking at a
8  time, which makes it easy on Ms. Rose Mary.
9  A.  Yes.
10  Q.  If you need to take a break at any time,
11  you let me know.  I'll be happy to accommodate
12  your request when we get to a -- a stopping spot
13  within a question or two; okay?
14  A.  Okay.
15  Q.  All right.  If you could please state your
16  full name for us.
17  A.  My name is Chris Steven Slaughter.
18  Q.  Steven is a V or PH?
19  A.  With a t-e-v-e-n.
20  Q.  And your date of birth and Social Security
21  number.
22  MR. JOHNSON:  And I'm going to ask
23  Rose Mary not to put that on the record.
24  THE WITNESS:  Okay.
25  [WHEREUPON, Deponent's Social Security

Page 7

1  number and date of birth are stated off the
2  record.]
3  BY MR. JOHNSON:
4  Q.  Mr. Slaughter, did you give me your date
5  of birth and Social Security number while we were
6  off the record?
7  A.  Yes, I did.
8  Q.  Thank you.  Your current address, please.
9  A.  It's 233 West Avenue, Apartment 3, Mount
10  Washington, Kentucky 40047.
11  Q.  How long have you lived at that address?
12  A.  Right at four years, about four years and
13  a month.
14  Q.  Does anyone live with you there?
15  A.  No, sir.
16  Q.  Has anyone lived with you the entire time
17  you've been there?
18  A.  I get my son every other weekend.
19  Q.  Okay.  Where did you live prior to that
20  address?
21  A.  I lived at 156 John Court, Mount
22  Washington 40047 before I divorced.
23  Q.  All right.  How long have you lived in
24  Mount Washington?
25  A.  I've lived in Mount Washington since

Page 8

1  2005, which would be, what, nine years.
2  Q.  Where did you live before moving to
3  Mount Washington?
4  A.  Before living in Mount Washington, I lived
5  in Valley Station at 10812 Beatrice Way.
6  Q.  Okay.  Are you originally from the Valley
7  Station area?
8  A.  No, I'm from the south end.
9  Q.  Okay.  Approximately how long did you
10  live in Valley Station?
11  A.  I lived there about eight years.
12  Q.  And then prior to that, where did you
13  live?
14  A.  I lived in the --
15  Q.  And you can just give me the area of town
16  or the city.
17  A.  -- south end right off of Southside Drive.
18  Q.  And how long did you live there?
19  A.  For -- since I was 3.
20  Q.  Okay.  Where did you attend high school?
21  A.  Iroquois High School.
22  Q.  And did you graduate?
23  A.  Yes, sir.
24  Q.  And what year?
25  A.  1984.

Deposition of Chris Steven Slaughter                                        Date: 10/29/2014

**Page 9**

1   Q.  Do you have any additional schooling
2  beyond high school?
3   A.  I went to truck driving school, and I took
4  welding in vocational school.
5   Q.  When did you go to truck driving school?
6   A.  That would have been in September 2012.
7   Q.  Do you have your CDL?
8   A.  Yes, sir.
9   Q.  And did you get that in September of '12?
10   A.  Well, about October.
11   Q.  Okay.  Is that the first time you had your
12  CDL?
13   A.  Yes, sir.
14   Q.  All right.  When did you attend the
15  welding?
16   A.  I took it in 1982 until the time I
17  graduated, but I never used it.
18   Q.  All right.  Have you attended any other
19  vocational school?
20   A.  I go to vocational rehabilitation for my
21  hearing impairment.
22   Q.  Okay.  How about -- how about school,
23  like, for welding or any other vocational activities?
24   A.  No, I was -- I was wanting to.
25   Q.  All right.  Are you married?

**Page 10**

1   A.  No, divorced.
2   Q.  Okay.  How many occasions have you
3  been married?
4   A.  Twice.
5   Q.  All right.  What was your first wife's
6  name?
7   A.  Lynn Michelle Fer --
8   Q.  Lynn -- Lynn --
9   A.  Lynn Michelle Ferry [phonetic]
10   Q.  Approximately what period of time were
11  you married to Ms. Ferry?
12   A.  1988 to 1995.
13   Q.  And where was that divorce filed, in
14  Jefferson County or Bullitt County?
15   A.  Jefferson County.
16   Q.  Do you know where Ms. Ferry lives now?
17   A.  She lives in Fern Creek.  I don't know her
18  dre -- address.
19   Q.  Is her last name still "Ferry"?
20   A.  No, it's Masterson.
21   Q.  Were any children born of your marriage
22  to Ms. Ferry?
23   A.  Yes, sir.
24   Q.  Okay.  What children?
25   A.  Twin daughters.

**Page 11**

1   Q.  Okay.  What are their names?
2   A.  Cassie and Carissa.
3   Q.  Spell those for us again.
4   A.  C-a-s-s-i-e, Cassie; Carissa,
5  C-a-r-i-s-s-a.
6   Q.  How old are they?
7   A.  26.
8   Q.  Where do they live?
9   A.  Carissa lives with her mother and Cassie
10  lives in Simpsonville.
11   Q.  Does Cassie work anywhere?
12   A.  Yes.
13   Q.  Where does she work?
14   A.  She works at Applebee's as a bartender.
15   Q.  Which one?
16   A.  On Bardstown Road in Fern Creek.
17   Q.  Okay.  And then how about Carissa?
18   A.  Carissa works at Backyard Burgers on
19  Bracken -- Blankenbaker, right there on
20  Blankenbaker.
21   Q.
22   A.  I don't believe it's Blankenbaker.  It's off
23  Blankenbaker.
24   Q.  I know where it is, just in the industrial
25  park.

**Page 12**

1   A.  [nods head] Right.
2   Q.  Okay.  All right.  Who was your second
3  wife?
4   A.  Second wife, Brandi Michelle Steiger.
5   Q.  Spell "Steiger" for us.
6   A.  S-t-e-i-g-e-r.
7   Q.  And what period of time were you married
8  to Ms. Steiger.
9   A.  I was mis -- married to Ms. Steiger, let
10  me see, 1996 to 2008.
11   Q.  And where was that divorce filed?
12   A.  That divorce filed -- was in Bullitt
13  County.
14   Q.  Were any children born of your marriage
15  to Ms. Steiger?
16   A.  Yes.  Yes, sir.
17   Q.  How many?
18   A.  Just one son.
19   Q.  All right.  And what's his name?
20   A.  C.
21   Q.  And is he a -- a "junior"?
22   A.  No.
23   Q.  Okay.
24   A.  C.D.
25   Q.  How old is C.?

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

**Page 13**

1  A.  C. is 15.
2  **Q.  Where does he attend school?**
3  A.  Male.
4  **Q.  Okay.  Do you have any other children?**
5  A.  No, sir; not that I know of.
6  **Q.  Are your parents still living?**
7  A.  My mother and a stepfather.
8  **Q.  Okay.  What's your mom's name?**
9  A.  My mother's name is Mary Rose Beeler.
10  THE REPORTER:  I'm sorry.  The last
11 name --
12  THE WITNESS:  Mary Rose Beeler,
13 B-e-e-l-e-r.
14  THE REPORTER:  Thank you.
15 BY MR. JOHNSON:
16  **Q.  Okay.  And where does Ms. Beeler live?**
17  A.  They live at 253 Cammi Drive in
18 Shepherdsville.
19  **Q.  Okay.  And what's her husband's name?**
20  A.  Thomas.
21  **Q.  Does your mom work?**
22  A.  Yes.
23  **Q.  Where does she work?**
24  A.  For Housing and Urban Department.
25  **Q.  And where is she physically located?**

**Page 14**

1 Where is her office?
2  A.  At the Federal Building.
3  **Q.  Downtown.**
4  A.  Yes.
5  **Q.  Here in Louisville.**
6  A.  Yes.
7  **Q.  What does she do for HUD?**
8  A.  She is a financial analyst, I believe.
9  **Q.  And how about your stepfather?  Does he**
10 **work anywhere?**
11  A.  He's retired.
12  **Q.  Where did he retire from?**
13  A.  Bryant-Burnett Heating & Cooling.
14  **Q.  All right.  Do you have any brothers or**
15 **sisters?**
16  A.  Yes.
17  **Q.  Who's the oldest in your family?**
18  A.  My brother Allen.
19  **Q.  Is his last name Slaughter?**
20  A.  Yes.
21  **Q.  Where does Allen live?**
22  A.  Allen lives in PRP right there behind
23 Kmart on Dixie.
24  **Q.  What does Allen do for a living?**
25  A.  He's an upholsterer -- upholsterer, does

**Page 15**

1 upholstery.
2  **Q.  Oh, okay.  Does he work for someone or**
3 **does he do that --**
4  A.  Yeah, he --
5  **Q.  -- on his own?**
6  A.  -- works for someone.
7  **Q.  Okay.  Is Allen married?**
8  A.  No.  No.
9  **Q.  Divorced.**
10  A.  Divorced.
11  **Q.  Okay.  What was his wife's name?**
12  A.  Linda.  I don't know what her maiden
13 name is.
14  **Q.  Okay.  Does Linda work anywhere, to your**
15 **knowledge?**
16  A.  Not that I know.  I -- I. . .
17  **Q.  And do you have any other brothers or**
18 **sisters?**
19  A.  I have a lot of sisters; yes.
20  **Q.  Okay.  Who's next?**
21  A.  My sister Debbie -- Debra.
22  **Q.  What's Debra's last name?**
23  A.  Lewis.
24  **Q.  Where does Debra live?**
25  A.  I'm sorry?

**Page 16**

1  **Q.  Where does Debra live?**
2  A.  She lives in Gainesville, Florida.
3  **Q.  All right.  We won't hold that against her;**
4 **okay?**
5  How long has she been in Gainesville?
6  A.  She lived there and came back, and I -- I
7 couldn't be specific.
8  **Q.  Okay.  Do you know what Debra does for**
9 **a living?**
10  A.  She's a waitress.
11  **Q.  Okay.  All right.**
12  A.  I think.
13  **Q.  Who's -- who's next?**
14  A.  Then I have a stepsister named Regina.
15  **Q.  What's Regina's last name?**
16  A.  Her -- Carnell.
17  **Q.  C-a-r-n-e-l-l.**
18  A.  Yeah.
19  **Q.  Where's Regina live?**
20  A.  She lives off Weaver Run out in Valley
21 Station.
22  **Q.  Does Regina work anywhere?**
23  A.  Yes.
24  **Q.  Where does she --**
25  A.  Knob Creek Gun Club.

**Page 17**

1  Q.  Fern Creek Gun Club.
2  A.  Knob.
3  Q.  Knob Creek; okay.  And what does she do
4  there?
5  A.  I couldn't tell you.
6  Q.  Okay.  Is Regina married?
7  A.  Yes,
8  Q.  What's her husband's name?
9  A.  Thomas.
10  Q.  What's Thomas do?
11  A.  He works over in Riverport at Balfour.
12  Q.  Okay.  Do you have any other brothers,
13  sisters, half-brothers --
14  A.  I have a --
15  Q.  -- half-sisters?
16  A.  -- a -- a half-sister --
17  Q.  Okay.
18  A.  -- named Lori.
19  Q.  L-o-r-i.
20  A.  Yes.
21  Q.  And what's Lori's last name?
22  A.  Harvey.
23  Q.  And where does Lori live?
24  A.  Lori lives off Fegenbush.
25  Q.  All right.  Is Lori -- does Lori work

**Page 18**

1  anywhere?
2  A.  She's on disability.
3  Q.  Okay.  Any other siblings that you have?
4  A.  No.
5  [WHEREUPON, off-the-record remarks are
6  made.]
7  BY MR. JOHNSON:
8  Q.  Okay.  What did you do to prepare for
9  your deposition today?
10  A.  Not much I had to do.  I just thought I had
11  to answer questions.
12  Q.  Okay.  Did you review any documents to
13  prepare for today?
14  A.  I looked over my suit.
15  Q.  Okay.  And when you say you looked over
16  your "suit," tell me what -- what it was that you
17  looked over.
18  A.  I just looked over, you know, the
19  specifics of, you know, why -- why I'm suing.
20  Q.  Okay.  What was it that you looked at?
21  A.  Just a -- you know -- you know, my
22  hearing impairment and the problems, you know,
23  why.
24  Q.  Okay.  And -- and I'm trying to figure out
25  what -- what paper it was that you looked at or

**Page 19**

1  what papers.
2  A.  Oh, it was one that I was -- I believe I
3  received from you --
4  Q.  Okay.
5  A.  -- the inter -- terrogatories.
6  Q.  The interrogatories; okay.
7  A.  Okay.  And then the suit itself.
8  Q.  Okay.  The complaint, the lawsuit.
9  A.  Yeah, the complaint.
10  Q.  All right.  Did you review anything else?
11  A.  No.
12  Q.  All right.  Is there anything that is
13  prohibiting you from answering my questions
14  today?
15  A.  Not that I know of.
16  Q.  Okay.  You're not taking any medications
17  that would limit your ability to understand me and
18  to give me accurate testimony.
19  A.  I don't believe so.
20  Q.  Okay.  All right.  You talked about having
21  a hearing impairment.  How long have you had that
22  impairment?
23  A.  I started losing my hearing probably
24  about 20 years old.
25  Q.  And what brought that on?

**Page 20**

1  A.  Hereditary.
2  Q.  Okay.  Are there other members of your
3  family that suffer from the same impairment?
4  A.  Yes,
5  Q.  And who is that?
6  A.  My mother, my brother, my grandfather,
7  my little sister Lori.
8  Q.  Okay.  Is -- does -- is Lori on disability
9  because of her hearing impairment?
10  A.  Several, several disabilities.
11  Q.  Okay.  What other disabilities does she
12  have?
13  A.  She was born with a cleft palate.  She
14  had numerous birth defects.
15  Q.  Okay.  And then you mentioned Allen has
16  a hearing impairment, as well.
17  A.  Yes, he was born with his.
18  Q.  And then your mom --
19  A.  My mom.
20  Q.  -- does she have one, as well?
21  A.  Yes.
22  Q.  Okay.  Was your hearing normal up until
23  about age 20?
24  A.  Yeah, I believe so.
25  Q.  All right.  And was there any precipitating

Deposition of Chris Steven Slaughter                                          Date: 10/29/2014

| Page 21 | Page 23 |
|---|---|

**Page 21**

1 event that caused you to start losing your hearing?
2    A.   I was in a car wreck in 1984, and -- but
3 they never checked my hearing.  And it was a head
4 injury to my right side.
5    Q.   Did you begin to lose your hearing after
6 that?
7    A.   I -- to be specific, I -- I really can't tell
8 you, you know.
9    Q.   Okay.
10    A.   I just know it's gotten worse.
11    Q.   All right.  Tell me about your hearing
12 impairment.  Do you wear hearing aids?
13    A.   Yes, sir.
14    Q.   Do you wear those all the time?
15    A.   Yes.
16    Q.   All right.  What is -- do you know what
17 the level of your hearing impairment is?
18    A.   I know they told me I have high-frequency
19 hearing loss.  It's nerve deafness.
20    Q.   Okay.  Are you able to hear if you don't
21 have your hearing devices in?
22    A.   Yes.
23    Q.   What does that do to your ability to hear
24 if you don't have your devices in?
25    A.   If I'm in a quiet setting, like a doctor's

**Page 22**

1 office or a -- a dentist's office, you know, where --
2 where the -- maybe a receptionist speaks soft, I
3 might hear everything you say.  I might not be able
4 to hear what she says.  It all depends on the base
5 of your voice.
6    Q.   Okay.  What if it's not in a quiet setting?
7    A.   It's -- it's -- it's really not something you
8 can pinpoint, you know.  It's -- it's just sometimes
9 I -- I can -- might be able to hear you.
10    Q.   Okay.  Who do you go to for your hearing
11 impairment?
12    A.   Avado [sic] -- Avado Hearing & Balance.
13    Q.   And I -- they may have several offices.
14 Which one do you --
15    A.   On Bre -- on Blankenbaker.
16    Q.   Okay.  How long have you gone to that
17 office?
18    A.   Probably since 2011, and before that I
19 went to Hear in Kentucky.
20    Q.   And where was their office located?
21    A.   Valley Station.
22    Q.   And why did you switch?
23    A.   I received new hearing aids through
24 vocational rehabilitation, and that's where they
25 sent me.

**Page 23**

1    Q.   Okay.  Why did you get new hearing aids
2 in about 2011?
3    A.   They were better.
4    Q.   Okay.  Had something changed in your
5 condition that required you to get new hearing
6 aids?
7    A.   Yeah, the old ones weren't strong
8 enough.
9    Q.   Okay.  Tell me about hearing aids.  Give
10 me a little education.  What -- what's your
11 understanding of how it works and how it helps you
12 to hear better?  Is -- are there different settings
13 that you can make on your aid?
14    A.   They can program them to kind of -- for
15 your surroundings, for -- you know, if you're in
16 quiet setting, loud setting, you know.  I'm new to
17 wearing hearing aids.  I haven't wore hearing aids.
18 First time, you know, that I got hearing aids was
19 2003, so at that time my hearing wasn't as bad.
20    Q.   Okay.  When you say they can be
21 programmed, do you program them or does the
22 audiologist program them?
23    A.   The audiologist.
24    Q.   All right.  Are you able to -- to control
25 them at all?

**Page 24**

1    A.   I can turn them up and down.
2    Q.   Okay.
3 [WHEREUPON, off-the-record remarks are
4 made.]
5 BY MR. JOHNSON:
6    Q.   And when you say you can turn them up
7 and down, just the volume.
8    A.   Yes.
9    Q.   Have you seen any facility other than
10 Hear in Kentucky and Avada?
11    A.   No.
12    Q.   Okay.  Have you ever seen any doctor for
13 your hearing impairment?
14    A.   No.
15    Q.   Who originally referred you to Hear in
16 Kentucky?
17    A.   Myself.
18    Q.   Okay.  Has anyone told you the degree of
19 hearing loss that you have?
20    A.   Yes.
21    Q.   Okay.  And -- and what have they
22 described for you?
23    A.   That I have a high-frequency hearing
24 loss.
25    Q.   Okay.  And is that what they told you at

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

**Page 25**

1  Hear in Kentucky?
2  A.  Probably both.
3  Q.  And -- and at Avada.
4  A.  Yes.
5  Q.  Okay.  Who -- who's the audiologist you
6  see currently?
7  A.  Mike Mullin.
8  Q.  Okay.  And how long do you see -- how
9  frequently do you see him?
10  A.  About every six months.
11  Q.  Okay.  Do you have any other
12  impairments or disabilities other than your hearing
13  impairment?
14  A.  I have a rotator cuff tear.
15  Q.  Okay.
16  A.  It's irreparable.
17  Q.  Right side or left?
18  A.  Right.
19  Q.  And when did that occur?
20  A.  2004 the first time, I believe.  2002.  I
21  can't be specific.
22  Q.  All right.  And how did that occur?
23  A.  Work.
24  Q.  Has -- has any physician told you that
25  you are disabled as a result of that rotator cuff

**Page 26**

1  tear?
2  A.  I have a percentage of disability.
3  Q.  Okay.  And what percentage is that?
4  A.  11.
5  Q.  Okay.  And who assigned that percentage
6  to you?
7  A.  That is Dr. Gladstein.
8  Q.  All right.  Was he the orthopedic surgeon
9  that --
10  A.  No.
11  Q.  Okay.
12  A.  Dr. Loeb.
13  Q.  Tom Loeb.
14  A.  Yeah.
15  Q.  Did he do the surgery?
16  A.  Two of them.
17  Q.  Okay.
18  Q.  Is Dr. Gladstein the workers' comp
19  doctor?
20  A.  Yeah.
21  Q.  Okay.
22  A.  Yes.  I'm sorry.
23  Q.  That's all right.  Where were you working
24  at the time you had that claim?
25  A.  Lear Corporation.

**Page 27**

1  Q.  Lear.
2  A.  Lear, L-e-a-r -- a-r -- L-e-a-r.
3  Q.  Did you file a workers' compensation
4  claim against them?
5  A.  Yes.
6  Q.  Okay.  And was that claim filed in
7  Kentucky?
8  A.  Yes.
9  Q.  How did that injury occur?
10  A.  I picked something up out of a bin, a -- a
11  track -- a seat track.  And I had to -- I did scrap.
12  And when I pulled it up, it was about chest level,
13  and I thought I pulled a muscle.  And down the
14  road it was determined I had a torn rotator cuff.
15  Q.  Okay.  Do you have any other
16  impairments or disabilities?
17  A.  No.
18  Q.  With respect to the rotator cuff injury, did
19  you actually have to file a workers' compensation
20  claim?
21  A.  Yes.
22  Q.  Did -- did you get an attorney to help you
23  with that?
24  A.  No, they -- they paid for it --
25  Q.  Okay.

**Page 28**

1  A.  -- but I did get an attorney down the
2  road.
3  Q.  Okay.  Did you give a deposition in --
4  A.  No.
5  Q.  -- in the workers' comp case?
6  A.  No.
7  Q.  Then you mentioned that you also filed a
8  lawsuit with respect to an automobile accident.
9  A.  Yes.
10  Q.  And you believe that was in approximately
11  when?
12  A.  1984.
13  Q.  And was that case filed in -- in Jefferson
14  County?
15  A.  Yes.
16  Q.  Was that case settled?
17  A.  Yes.
18  Q.  Okay.  Have you filed any other lawsuits
19  other than that one and this one?
20  A.  No, sir.
21  Q.  Have you filed any claims; meaning you
22  were seeking some type of damages but the case
23  settled before a suit was filed?
24  A.  With my rotator cuff, I filed for the
25  percentage of disability, and they prorate it.

Deposition of Chris Steven Slaughter                                      Date: 10/29/2014

Page 29

1   Q.  And -- and that was for workers'
2   compensation.
3   A.  Yes, sir.
4   Q.  Okay.  All right.  And you've only filed
5   that one workers' compensation claim against
6   Lear.
7   A.  Yes, but they had to fix it.  They went
8   back to -- I had two surgeries.
9   Q.  Okay.
10  A.  So it would have been -- same claim, I
11  guess, that --
12  Q.  Okay.  You may have had to reopen the
13  claim.
14  A.  Right.
15  Q.  Okay.
16  A.  Right.
17  Q.  All right.  Same injury, same claim.
18  A.  Right.
19  Q.  All right.  And that's been the only
20  workers' comp claim that you've filed.
21  A.  Right.
22  Q.  Only lawsuits that you have filed were for
23  the auto accident in  84 and this case.
24  A.  This one right here.
25  Q.  All right.  And no other claims that were

Page 30

1   settled prior to suit that you're aware of.
2   A.  Not that I recall.
3   Q.  All right.  I know that you filed an EEOC
4   claim against Gulf Coast.
5   A.  Yes, I did.
6   Q.  Okay.  And the EEO -- well, what's your
7   understanding of what the EEOC found?
8   A.  Say -- please say it again.
9   Q.  Sure.  What's your understanding of what
10  the EEO -- EEOC concluded regarding your claim?
11  A.  The EEOC said that Gulf Coast hired
12  people with disabilities, and that -- you know, that
13  I would have to take it upon myself.
14  Q.  Is it your understanding that the EEOC
15  did not substantiate your claim?
16  A.  Yes.
17  Q.  Do you remember who you spoke with at
18  the EEOC?
19  A.  Allen Anderson.
20  Q.  On how many occasions did you speak
21  with Mr. Anderson?
22  A.  Oh, four or five.
23  Q.  Okay.  Did he assist you in preparing
24  your charge or your complaint with the EEOC?
25  A.  No.

Page 31

1   Q.  Who helped you with that?
2   A.  My mother.
3   Q.  Okay.  Is that something that your mom
4   had knowledge about?
5   A.  Yes.
6   Q.  Where did she obtain that knowledge?
7   A.  From her own -- from her own problems
8   with her hearing.
9   Q.  Has -- has your mom filed EEOC
10  complaints?
11  A.  I can't tell you if she has.
12  Q.  All right.  Tell me what you recall about
13  your conversations with Mr. Anderson.
14  A.  I just described some problems that I
15  had.  And at that time he just said, you know, that
16  they were a company that hired people with
17  disabilities, and that, you know, that would be the
18  turning point.
19  Q.  All right.  Did he tell you anything else?
20  A.  No, not that I recall.
21  Q.  Have you ever filed any other EEOC
22  complaints?
23  A.  No.
24  Q.  Okay.  Have you ever filed for
25  unemployment benefits?

Page 32

1   A.  Yes.
2   Q.  On how many different occasions?
3   A.  We would get laid at Lear weeks, months
4   at a time, and I can't tell you specifically how
5   many.  And I filed one after Gulf Coast.
6   Q.  Okay.  Was Lear seasonal work?
7   A.  No, it's just with Ford not selling
8   vehicles, you know, we shut down because of
9   them.
10  Q.  Okay.  And then they would lay you off,
11  and you'd file for unemployment.
12  A.  Yeah.
13  Q.  Would you always receive it every time
14  you filed --
15  A.  Yes.
16  Q.  -- while with Lear?
17  A.  Yes.
18  Q.  Okay.  Did you file for unemployment with
19  any other employer than Lear and Gulf Coast?
20  A.  Not that I recall.
21  Q.  Okay.  And did you receive unemployment
22  when you filed with Gulf Coast?
23  A.  Yes, I did, after I went in an appeals
24  hearing.
25  Q.  Okay.  Do you recall what amount you

Page 33

1 received?
2   A.  About -- let's see, about six, seven
3 month's worth.
4   Q.  Six to seven months.
5   A.  Worth of unemployment.
6   Q.  And how often would you get a check?
7   A.  Every two weeks.
8   Q.  And do you know what the amount of the
9 check would be when you would get it?
10   A.  It would be 415 a week minus my child
11 support, $100.
12   Q.  Okay.  So would it be 830?
13   A.  About 800 -- no, it would only be
14 about 630 or something.
15   Q.  Okay.  Because there would be $200
16 taken off --
17   A.  Coming out.
18   Q.  -- for child support.
19   A.  Yes.
20   Q.  Okay.  Were there child support payments
21 being withdrawn from your check at Gulf Coast?
22   A.  No, I paid it on my own.
23   Q.  Okay.  And why did child support come
24 out of your unemployment?
25   A.  At Lear I had it where it'd come out of my

Page 34

1 check.  And so when I was on unemployment, it
2 automatically came out.  So I didn't have to bother
3 paying.
4   Q.  All right.  And were you under a court
5 order to pay child support?
6   A.  Yeah.
7   Q.  And was that out of Bullitt County?
8   A.  I've had to pay child support on my twins
9 before and my son --
10   Q.  Okay.
11   A.  -- so two different counties.
12   Q.  And I -- I assume child support that was
13 taken out of your unemployment was for your son.
14   A.  Yes, for both.  You know, up to their right
15 age.  That's when --
16   Q.  Right.
17   A.  Okay.
18   Q.  Okay.  And have you had any criminal
19 actions filed against you at all?
20   A.  You mean "filed," explain what you. . .
21   Q.  Whether any charges have been filed
22 against you.
23   A.  Yes.
24   Q.  Okay.  On how many different occasions?
25   A.  Just a couple.

Page 35

1   Q.  Okay.  Tell me about those.
2   A.  I was charged with drunk driving.
3   Q.  Okay.  And where was that?
4   A.  That was in Jefferson County.
5   Q.  Approximately what year?
6   A.  2009.  It was dismissed.
7   Q.  Okay.  And was that the first offense?
8   A.  Yes.
9   Q.  Okay.  And do you know why it was
10 dismissed?
11   A.  Yes, I went to the diversion.
12   Q.  Okay.  All right.  Any other --
13   A.  And -- and in 2010, my exwife took a -- a
14 DVO out, which never was physical.  And she text
15 me and called me, and I text her back once.  And
16 she went down and said I text her back.
17   So I pleaded guilty to texting her, so and they
18 charged me with violating a DVO.
19   Q.  What county was that in?
20   A.  That is Jefferson County.
21   Q.  Why did she originally take out the
22 domestic violence order against you?
23   A.  We divorced, and she -- she wanted to
24 keep trying to make it work.  And it just got to be
25 one game after another, so we didn't -- never been

Page 36

1 physical, just arguments.
2   Q.  Did she ever allege any physical acts
3 against you?
4   A.  No, sir.
5   Q.  Okay.  It was just all arguments.
6   A.  Arguments only.
7   Q.  And which wife would that have been?
8   A.  That's Brandi.
9   Q.  Okay.  And what's Brandi's last name
10 now?
11   A.  Chamberlain.
12   Q.  Has she remarried?
13   A.  Yes.
14   Q.  And do you know when you pled guilty to
15 the -- violating the DVO, what --
16   A.  Yeah, I had text her.
17   Q.  Okay.  Was -- was that a misdemeanor or
18 a felony?
19   A.  Misdemeanor.
20   Q.  Okay.  And that was in Jefferson County.
21   A.  Yes.
22   Q.  Okay.  Any other criminal charges or
23 complaints filed against you?
24   A.  I was arrested in 1986 for PI, public
25 intoxication.

Page 37

1   Q.   And where was that?
2   A.   That was Iroquois Park, Jefferson County.
3   Q.   Jefferson County.  And did you plead
4 guilty on that.
5   A.   Yes, I paid a fine.
6   Q.   Okay.  Any others?
7   A.   No, sir; not that I recall.
8   Q.   All right.  Do you belong to any clubs,
9 groups, organizations, or churches?
10   A.   No, not that I recall that I do.
11   Q.   Okay.
12   A.   A union, United Auto Workers Union I --
13   Q.   All right.
14   A.   -- belong to.
15   Q.   And which one?
16   A.   47-3.
17   THE REPORTER:  I'm sorry.  Forty --
18   THE WITNESS:  47-3.
19   THE REPORTER:  Thank you.
20 BY MR. JOHNSON:
21   Q.   And how long have you been a member of
22 the UAW?
23   A.   I had been for over 20 years and 7
24 months.
25   Q.   Okay.  And are you still a member there

Page 38

1 now?
2   A.   No, no.
3   Q.   When did that expire?
4   A.   December 2010.
5   Q.   Okay.  Let's talk about your employment
6 history.
7   A.   Okay.  I was 16, I worked for Virgin Auto
8 Parts.
9   Q.   Say it again.
10   A.   Virgin Auto Parts.
11   Q.   All right.
12   A.   Then I went to D.J. Incorporated; then I
13 went to Fortune Plastics; and then I went to Lear
14 Corporation.
15   Q.   All right.
16   A.   From there I went to Gulf Coast.
17   Q.   All right.  After Gulf Coast, where did you
18 go?
19   A.   I went to work for Zachry Holdings, and at
20 this time I'm unemployed.
21   Q.   All right.  All right.  Approximately what
22 period of time did you work for Virgin Auto Parts?
23   A.   I worked for Virgin Auto Parts from 1983
24 to 1984.  I worked -- then I went from there to D.J.
25   Q.   Okay.  Hang on one second.  Tell me what

Page 39

1 you did for Virgin Auto Parts.
2   A.   I delivered parts and sold parts.
3   Q.   And where was that located?
4   A.   Fairdale.
5   Q.   And were you still in school at that time?
6   A.   Yes.  And then I graduated, and I worked
7 for them until November, from May to November
8 after I graduated.
9   Q.   All right.  And do you recall what your
10 salary was or hourly -- hourly rate was with them?
11   A.   Yeah, and I think I made about $4 an
12 hour.
13   Q.   Okay.  And then you went to be D.J.
14 Incorporated.  And --
15   A.   It's injection molding.
16   Q.   And how long did you work for them?
17   A.   I worked there for three years -- about
18 three and a half years.
19   Q.   All right.  So about  84 to somewhere
20 in  88.
21   A.   84 to 1988.
22   Q.   Okay.  And what did you do for them?
23   A.   I was a molder.
24   Q.   Okay.  Tell me what that means.
25   A.   I ran injection molding machines.  I made

Page 40

1 plastic parts.
2   Q.   All right.  And where was D.J.
3 Incorporated located?
4   A.   Fairdale.
5   Q.   All right.  Is it still in business?
6   A.   No.
7   Q.   All right.  Who was your supervisor
8 there?
9   A.   Mark Dell.
10   Q.   And did you work full-time there?
11   A.   Yes, full-time.
12   Q.   And what was your rate of pay or salary
13 there?
14   A.   I made 6.65, I believe, when I left, $6.65,
15 I believe.
16   Q.   Okay.  All right.
17   A.   A long time.
18   Q.   And then you went to Fortune Plastics.
19   A.   Yes.
20   Q.   Why did you leave D.J. Incorporated?
21   A.   Fortune Plastics paid more.
22   Q.   All right.  Did you leave D.J. Incorporated
23 on your own?
24   A.   D.J. Incorporated, I was training a guy on
25 third shift.  I was responsible for training, and a

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 41

1 mold got damage.  And they fired me on Friday
2 the 13th, 1988.  I was responsible for him.
3 Q.  Okay.  And why did they fire you?
4 A.  I was responsible for someone I was
5 training, and a mold got damaged.
6 Q.  Did he damage the mold or did you?
7 A.  The mold got damaged.
8 Q.  How did the mold get damaged?
9 A.  Well, parts get stuck in it.  And it's soft
10 metal.  And you take a brass rod and kind of chip
11 it out; but some injection pins got damaged, and it
12 was a mold that they had been trying to get right
13 for a while.
14 Q.  All right.  So -- so you didn't leave D.J.
15 for Fortune because Fortune paid more.  You
16 left --
17 A.  No.  Right.
18 Q.  -- D.J., because --
19 A.  Right.
20 Q.  -- you got --
21 A.  Right.
22 Q.  -- fired.
23 A.  Right, been a long time.
24 Q.  When did you start working for Fortune?
25 A.  Fortune, I worked for them that month,

Page 42

1 the first of June, two weeks later.
2 Q.  June of 88.
3 A.  Yes.
4 Q.  Through when.
5 A.  I'm sorry.
6 Q.  Through when.
7 A.  Until February 1990.
8 Q.  And what did you do for Fortune Plastics?
9 A.  I was a material handler.
10 Q.  And what was your pay there?
11 A.  7.50 an hour.
12 Q.  And did you work full-time?
13 A.  Yes.
14 Q.  Who was your supervisor there?
15 A.  Dave McQueen.
16 Q.  And why did you leave Fortune?
17 A.  I -- I left Fortune -- I worked 8 at night
18 to 8 in the morning, three days off, three days.
19 And I watched my children in the morning when I
20 got off work, you know, on the days that I worked.
21 And it got to be too much.  And I was on -- like I
22 said, working nights, and I resigned.
23 Q.  Okay.  So you left that position
24 voluntarily.
25 A.  Yes.

Page 43

1 Q.  Did anybody ask you to leave?
2 A.  No.
3 Q.  All right.  And when did you begin
4 working for Lear?
5 A.  I started working for Lear in --
6 May 7th, 1990.
7 Q.  So were you off about three months in
8 between Fortune and --
9 A.  Yes.
10 Q.  -- Lear?
11 A.  Yes, I was.
12 Q.  Did you draw unemployment during that
13 time?
14 A.  No.
15 Q.  Okay.  And how long did you work for
16 Lear?
17 A.  I worked for Lear for 20 years and 7
18 months.
19 Q.  So through December of 10.
20 A.  De -- December the 16th, 2010.
21 Q.  And what position did you have at Lear?
22 A.  I had numerous positions.  I started
23 material handling.  I went to assembly.  I went
24 back to material handling.  And the last ten I
25 finished as a quality control inspector.

Page 44

1 Q.  Who was your supervisor at the time you
2 left?
3 A.  I've had numerous -- oh, the time I left?
4 Mike Ferree.
5 Q.  Mike Free.
6 A.  Mike Ferree, F-e-r-r-e-e.
7 Q.  And what was your rate of pay at the time
8 you left?
9 A.  19.81 an hour.
10 Q.  And where is Lear located?
11 A.  Lear's located at 2000 Stanley Gault,
12 right down the road --
13 Q.  All right.  And why did you leave Lear in
14 December of '10?
15 A.  Plant closure.
16 Q.  Did you have any issues with your hearing
17 impairment while working at Lear?
18 A.  No, I did not.  They accommodated me.
19 Q.  Okay.  And how did they accommodate
20 you?
21 A.  They knew I was hearing impaired, and
22 they always made sure -- they went out of their
23 way to ask people, you know, to make sure I heard
24 the directions and watch out for me.  "Make sure
25 you tell Chris -- make sure he hears what" -- you

Deposition of Chris Steven Slaughter                                Date: 10/29/2014

Page 45

1  know.
2  **Q.  Okay.**
3  A.  They treated me very well.
4  **Q.  All right.  All right.  After you left Lear, I**
5  **know that you went to work for Gulf Coast.**
6  A.  Yes.
7  **Q.  And -- and when did you start with Gulf**
8  **Coast?**
9  A.  I started with Gulf Coast 11/1/11.
10 **Q.  Okay.  What did you do for approximately**
11 **those 10 or 11 months after you left Lear and --**
12 A.  I looked for work.
13 **Q.  Okay.  Did you draw unemployment during**
14 **that period of time?**
15 A.  Yes, I did.
16 **Q.  Okay.  And do you recall any of the other**
17 **places that you looked other than Gulf Coast?**
18 A.  Now, say it again, please.
19 **Q.  Sure.  Do you recall any of the places**
20 **where you looked for work other than Gulf Coast?**
21 A.  Do I recall them?
22 **Q.  Yes, sir.**
23 A.  Several of them:  Ford, General Electric,
24 Brown-Forman, Jim Beam.  All -- I -- I applied for
25 so many, a couple a day.

Page 46

1  **Q.  Okay.  All right.  How did you eventually**
2  **land with Gulf Coast?**
3  A.  Vocational rehabilitation.
4  **Q.  Okay.  And was that the -- the state**
5  **vocational rehabilitation?**
6  A.  Yes, sir.
7  **Q.  And where did you go for that?**
8  A.  I went to Shepherdsville.  Ebony Williams
9  is my counselor.
10 **Q.  Okay.  So did Ms. Williams assist you in**
11 **finding the -- the position at Gulf Coast?**
12 A.  Yes.  Yes, she did.
13 **Q.  Did she try to assist you in finding**
14 **employment at other locations, as well?**
15 A.  Yes.
16 **Q.  All right.  We'll come back to Gulf Coast**
17 **in a minute; okay?**
18 A.  Okay.
19 **Q.  After you left Gulf Coast -- I believe your**
20 **last day there was July 9, 2012.**
21 A.  7/9/12.
22 **Q.  Yes.**
23 A.  Yes.
24 **Q.  You mentioned that you worked for Zachry**
25 **Holdings?**

Page 47

1  A.  Zachry Holdings.
2  **Q.  When did you begin working there?**
3  A.  1/28/13.
4  **Q.  And where are they located?**
5  A.  They are in San Antonio, Texas.
6  **Q.  What type of business are they?**
7  A.  Construction.
8  **Q.  Where did you physically work?**
9  A.  I physically worked at Mill Creek at the
10 LG&E plant in Valley Station.
11 **Q.  How long were you employed by Zachry?**
12 A.  Eighteen months.
13 **Q.  When was your last day there?**
14 A.  My last day was July 31st, 2014.
15 **Q.  And why was that your last day?**
16 A.  I quit.  I resigned.
17 **Q.  Ask why did you resign?**
18 A.  I worked 7 days/12 hours one week; 6
19 days/12 hours the next week.  And it got to be too
20 many hours.
21 **Q.  So you'd have one day off every two**
22 **weeks.**
23 A.  Yes.
24 **Q.  What was your rate of pay there?**
25 A.  My rate of pay?  When I left it was 23,

Page 48

1  but I started at 16 an hour.
2  **Q.  How long was your pay 16 an hour before**
3  **you received an increase?**
4  A.  16.10.
5  **Q.  Okay.  How long was it 16.10 before you**
6  **received an increase?**
7  A.  Two months they gave me a raise.
8  **Q.  Okay.  And what was that raise?**
9  A.  18.40.
10 **Q.  Where -- how long did you have that?**
11 A.  And then about three months they took me
12 to 20.
13 **Q.  Okay.  How long were you at 20?**
14 A.  I was at 20 until about seven months,
15 maybe, and they give me a $1 raise.  I went to 21.
16 **Q.  Okay.  And then how long at 21?**
17 A.  21 for about five months, and then they
18 took -- gave me a $2 hour, and it took me to 23.
19 **Q.  And how long were you at 23?**
20 A.  About three months.
21 **Q.  Okay.**
22 A.  And I'm. . .
23 **Q.  And did you -- I'm sorry.  Go ahead.**
24 A.  Not being specific, you know.  I don't
25 know exactly.

Deposition of Chris Steven Slaughter                                                                  Date: 10/29/2014

Page 49

1   Q.  Just approximates.
2   A.  Approximate, right.
3   Q.  Did you have other benefits there, as
4   well?
5   A.  No.
6   Q.  Okay.  No health insurance.
7   A.  No.
8   Q.  Okay.  Any vacation time?
9   A.  Yes, you get vacation time.
10  Q.  Okay.
11  A.  And -- and I said benefits meaning
12  insurance --
13  Q.  Okay.
14  A.  -- and paid holidays, which you didn't
15  get.
16  Q.  Okay.  And if you had not resigned that
17  position at the end of July of this year, to your
18  knowledge, would you still be working there?
19  A.  Yes.
20  Q.  Okay.  And they still had plenty of work
21  and -- you weren't intending to --
22  A.  Plenty of work.  It -- it is a project.  It's,
23  like, a six-year project, you know.
24  Q.  Okay.  How far along were they into the
25  project?

Page 50

1   A.  About three years in.
2   Q.  Okay.  Who was your supervisor when you
3   left?
4   A.  When I left, Louis Bazan.
5   Q.  Do you know how to spell his last name?
6   A.  I'm sorry.
7   Q.  Do you know how to spell his last name?
8   A.  Yeah, B-a-z-a-n.
9   Q.  Was he the only supervisor you had --
10  A.  No.
11  Q.  -- at Zachry?
12  A.  No.  I had numerous are supervisors.
13  Q.  How long was Mr. Bazan your supervisor?
14  A.  Everybody's your supervisor that is a
15  supervisor, you know.  So you're working in
16  different areas, so --
17  Q.  Okay.
18  A.  -- you have numerous supervisors.
19  Q.  If you had to -- excuse me -- report to
20  somebody --
21  A.  Louis.
22  Q.  -- it would be Mr. -- Mr. Bazan.
23  A.  [nods head]
24  Q.  All right.  Does he still work there?
25  A.  Yes.

Page 51

1   Q.  What were you actually doing for Zachry?
2   A.  I started in concrete.  I was a concrete
3   finisher; did that about a month.  They moved me
4   to carpentry.  I did that for about two months, and
5   they moved me to equipment operator.
6   Q.  What kind of equipment?
7   A.  I'm sorry.
8   Q.  What kind of equipment?
9   A.  I drove for them.  I drove a school bus, a
10  water truck, a fuel truck.  That's -- I said school
11  bus; didn't I?
12  Q.  Yeah.
13  A.  And a -- a road sweeper.
14  Q.  And how long did you do that?
15  A.  I did that for about a year and three
16  months, approximate.
17  Q.  Okay.  Is that what you were doing at the
18  time you left?
19  A.  Yes.  Yes.
20  Q.  Okay.  Why did they move you from
21  concrete to carpentry?
22  A.  Something I had a little bit more -- I had
23  experience in, you know, concrete.  I had done a
24  little bit of it, not a lot.
25  Q.  Why did they move you from carpentry to

Page 52

1   equipment operator?
2   A.  I was having -- they have Hispanics.  And
3   it is -- they have an accent, and I was having
4   trouble hearing them.
5   So they put me -- the -- my supervisor in
6   concrete was Hispanic, and I was having trouble
7   understanding him.  So they moved me with an
8   American man, Bobby Overton, but that's why they
9   moved me.
10  Q.  Okay.  Did -- did you then have issues
11  with your hearing impairment at Zachry?
12  A.  I'm sorry.
13  Q.  It sounds as if you had issues with your
14  hearing impairment at Zachry in understanding
15  some of the individuals you worked with.
16  A.  Yeah, hearing.  Yeah, being able to hear.
17  Q.  Okay.
18  A.  Hearing people with an accent.
19  Q.  Did vocational rehab help you find the
20  position with Zachry?
21  A.  I found it myself, but they did give me
22  paperwork so they got a tax break.
23  Q.  Okay.
24  A.  They treated me very well.
25  Q.  You're talking about Zachry or vocational

Deposition of Chris Steven Slaughter                                      Date: 10/29/2014

Page 53

1  rehab?
2   A.  Zachry.
3   Q.  Okay.  Can you list for me what-all
4  positions you applied for after you left Gulf Coast
5  in July of 2012?
6   A.  I applied for numerous.  I could not tell
7  you.
8   Q.  Okay.  List the ones for me that you do
9  recall.
10   A.  Name one that I did.
11   Q.  List -- list all the ones you do recall.
12   A.  I applied for -- what's the name of the
13  place?  They do survey -- underground surveying
14  out here in Bluegrass Industrial Park.  I -- I can't
15  tell you specifically.
16   I applied for CSX.  I applied for the
17  distilleries.  I applied for some jobs at Fort Knox.
18  I applied for a job with the State Transportation
19  Department.  Numerous jobs daily.  I looked for
20  work daily.
21   Q.  What jobs did you apply for at Fort Knox?
22   A.  Just like -- what's the name of the place?
23  Wolverine or -- Wolverine, I believe it is.  I can't
24  recall the names, but, you know, for working out
25  there.

Page 54

1   Q.  Did you submit these applications on your
2  own or did you do those through vocational rehab?
3   A.  I've done both.
4   Q.  All right.  Did you keep copies of the
5  applications you submitted?
6   A.  No, sir.
7   Q.  Did you have any job interviews?
8   A.  Yes, I had.
9   Q.  Who did you interview with?
10   A.  With the State Transportation
11  Department.
12   Q.  Okay.  And -- and what branch or garage
13  did you interview with?
14   A.  This was in Elizabethtown, plowing
15  highways and repairing highways.
16   Q.  Okay.  And do you recall when you had
17  that interview?
18   A.  No.
19   Q.  Okay.  Do you know why you did not get
20  that job?
21   A.  They offered me the job.  I -- I turned it
22  down.
23   Q.  Okay.  And why did you turn that down?
24   A.  They didn't pay nothing.
25   Q.  Okay.  What was the rate of pay?

Page 55

1   A.  I think it was 10.80, or something like
2  that, an hour.
3   Q.  When were you offered that job?
4   A.  Within that seven months that I was off
5  work due to Gulf Coast -- after Gulf Coast.
6   Q.  Do you have any documents which would
7  reflect when that job offer was made?  Did
8  somebody send you an email or. . .
9   A.  Now that I -- now that you ask me, I was
10  already working at Zachry when they offered me
11  the job.  And they told me at that time -- I asked
12  her the rate of pay, and she said it would -- I
13  wouldn't never make that kind of money at that --
14  at the Highway Department, so I stayed at Zachry.
15   Q.  Okay.  So the state did not offer your job
16  prior to you working for Zachry.
17   A.  I applied while I was unemployed, and
18  they called me right when I started at Zachry.
19   Q.  Okay.  All right.  Did you have any other
20  interviews?
21   A.  Yes, I did.
22   Q.  With whom?
23   A.  At Tower Automotive in Bardstown.
24   Q.  And what position were you applying for
25  there?

Page 56

1   A.  Material handling.
2   Q.  And did you receive a job offer there?
3   A.  No.
4   Q.  And do you know why?
5   A.  No.
6   Q.  Okay.  Any other interviews?
7   A.  I interviewed at Jim Beam.
8   Q.  Okay.  For what position?
9   A.  A bottler.  I'm -- I'm not for, sure but I
10  think it was a bottler.
11   Q.  And were you offered a job there?
12   A.  No.
13   Q.  Do you know why not?
14   A.  No.
15   Q.  Were you offered any jobs other than with
16  the state and Zachry?
17   A.  Not that I can recall.
18   Q.  Okay.  To your knowledge, would
19  vocational rehab have on file the applications that
20  they helped you submit?
21   A.  They give [sic] me a case worker.  And
22  I -- there is another place that just come [sic] back
23  to me, now that you said that.  That was American
24  Synthetic.  I had interviewed through them, but I
25  believe I didn't receive it for my hearing

Deposition of Chris Steven Slaughter                                                        Date: 10/29/2014

Page 57

1  impairment, because it's a -- it's down there in
2  Rubbertown. And I -- some people I worked with
3  got hired, and I didn't.
4    Q.  But does the case worker keep a list of
5  applications that you've made?
6    A.  They'll keep a list. She gives you
7  some -- some reference; you know, some ideals of
8  jobs. And -- and if you really look for work
9  they kind of -- kind of put you on the
10 back burner, because you're trying to get a job and
11 they help people that don't try.
12   Q.  Okay. So does -- I guess, in your
13 situation, would Ms. Williams, or whoever the case
14 worker was, give you leads or places that are
15 looking for employees as opposed to her helping
16 you complete applications?
17   A.  Ms. Williams helped me get Gulf Coast,
18 but she referred me to Options Unlimited, which
19 they do some training on interviews with people
20 with disabilities. They help you -- like I said, if
21 you're really gung ho, like I was, trying to look for
22 work, they kind of let you do your thing and kind of
23 help you when it comes time for an interview or
24 something and back you up as a reference.
25   After I went to work for Gulf Coast, after that

Page 58

1  they gave me a lady. And I don't know her name.
2  Ebony referred me to her.
3    I found the job at Gulf -- at Zachry Holdings,
4  and the lady, I told her I was working. And she
5  gave me some papers to give to them, so they got
6  a tax break.
7    Q.  Now, tell me what Options Unlimited is?
8    A.  Options Unlimited is -- Willy Burd runs
9  the place, and it's a group of people with
10 disabilities that help you with your interview, you
11 know. And you can take interviews and how to
12 dress.
13   And -- and -- and he'll call them and tell them
14 that you're hearing impaired, and please be aware
15 of and -- and help you in any way they can. Good
16 company, good place.
17   Q.  Are you receiving unemployment benefits
18 now?
19   A.  No.
20   Q.  All right. Have you filed for
21 unemployment?
22   A.  No.
23   Q.  Okay. Are you currently looking for
24 work?
25   A.  Yes.

Page 59

1    Q.  And where are you looking now?
2    A.  I'm looking at driving.
3    Q.  Over the road.
4    A.  No, hopefully not. Since -- since Zachry,
5  I applied for Jefferson County School Board and
6  was hired. And I did the three weeks of training,
7  but when they went to give me a route, it was only
8  seven hours a day. And they take escrow out to
9  pay you during the summer.
10   And at that time, I told Ms. Jones that this job
11 wasn't going to be adequate enough for me, the
12 pay. It -- it wasn't what I needed, what I wanted,
13 you know, and I resigned.
14   Q.  What was the hourly rate of pay?
15   A.  16.20.
16   Q.  When did you do your three weeks of
17 training?
18   A.  I started August the 18th, which I already
19 had the CDL with the school bus, but I had to train
20 with the others that didn't. And I did that for
21 about three weeks.
22   Q.  Have you had any other employment since
23 you left Zachry?
24   A.  No. I had an interview with FedEx about
25 three weeks ago.

Page 60

1    Q.  Okay. And have you received a call back
2  from them?
3    A.  Yes, I received back -- a call back.
4    Q.  And -- and are you -- have you been
5  offered a position with them?
6    A.  No, I didn't get offered a position.
7    Q.  All right. Have you applied anywhere
8  else since you left Zachry other than with the
9  school board and FedEx?
10   A.  I just applied for UPS, driving over the
11 road for UPS, but I had this deposition, so I
12 haven't taken -- she did call me back, but I told
13 her I couldn't take the job at this time.
14   Q.  Well, did UPS offer you a job?
15   A.  They called me for an interview. And I --
16 and instead of burning a bridge by going in there
17 and taking a job and then have to take off a week
18 later, I decided not to do that.
19   I told her I had some things -- that I wouldn't
20 be available at this time, but they did not offer me
21 the job. It was just called me in for an interview.
22   Q.  Okay. Are you going to call them back to
23 see --
24   A.  I'm going to call --
25   Q.  -- if you can schedule the interview?

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

---

Page 61

1   A.  Yes.  I'm trying to keep from driving over
2  the road, though.
3   Q.  Okay.  And is that what that position's
4  for?
5   A.  I'm sorry.
6   Q.  Is -- is the position at UPS for over the
7  road?
8   A.  Yes.
9   Q.  Okay.  So it's not necessarily a position
10  you want.
11   A.  No, I don't want drive over the road if --
12  unless I have to.
13   Q.  Have there been any other places that
14  you've applied since you left Zachry?
15   A.  Yes.
16   Q.  Where else?
17   A.  AMEC, A-M-E-C.  They're a construction
18  company like Zachry, but they're just starting up.
19  They're not ready.  And I'm hoping any time
20  they're going to call me.  I believe they will.
21   Q.  All right.
22   A.  I've applied for Kinder Morris -- Morgan,
23  Kinder Mor -- Morgan is the name of the company.
24  They are a -- specialize in gas -- natural gas, kind
25  of like --

---

Page 62

1   Q.  Where are -- where are they located?
2   A.  Bedford, Kentucky, Trimble County.
3   Q.  Okay.  Have you had an interview with
4  them?
5   A.  Not yet.  Not yet; no.
6   Q.  Are there any other applications that
7  you've made?
8   A.  I'm sorry.
9   Q.  Are there any other applications that
10  you've made?
11   A.  Yes.  Yes.
12   Q.  Where else?
13   A.  I just applied for Kinder Morgan.  I
14  applied for -- oh, I'm trying to think.  So many, I
15  can't remember.  FedEx, UPS.
16   THE REPORTER:  I'm sorry.
17   THE WITNESS:  I applied for FedEx, and
18  I applied for UPS.
19   A.  I can't recall right now.  I have applied
20  for work, you know.  I try to daily.
21  BY MR. JOHNSON:
22   Q.  Okay.  What -- what have you done for
23  income since you left Zachry?
24   A.  Living off my savings.
25   Q.  Okay.  You don't have any -- any active

---

Page 63

1  income coming in.
2   A.  No.  No, sir.
3   Q.  All right.  Have you -- have you ever filed
4  any disability claims at all, whether it be with a
5  private company or with Social Security?
6   A.  Not yet.
7   Q.  Okay.  "Not yet" means -- it sounds like
8  you may be considering that.  Is that something
9  that you've considered?
10   A.  Yes, it was something I could consider,
11  but I -- I'd rather work.
12   Q.  Have you been terminated from any
13  position other than with D.J. Incorporated and Gulf
14  Coast?
15   A.  No, sir.
16   Q.  What -- I meant to ask you this.  Are --
17  what are some of your hobbies?  What do you do in
18  your spare time?
19   A.  I like to run.  I exercise.  That's about
20  all I do, and -- and I enjoy my grandkids and my
21  son --
22   Q.  Okay.
23   A.  -- and my daughters.
24   Q.  And when you say "exercise," tell me
25  what you mean by that.

---

Page 64

1   A.  I work out.  I run.  I -- I lift weights, you
2  know, light.
3   Q.  And where do --
4   A.  I bike ride.
5   Q.  Okay.
6   A.  I walk the bridge.
7   Q.  Do you belong to any gym?
8   A.  I -- yeah.
9   Q.  What -- what gym do you belong to?
10   A.  We have our own gyms, you know.  We
11  have a gym set up at my friend's.  We had -- we
12  wrestle.  We box.  We lift weights.  We do
13  everything just to stay active.
14   This is what I do.  I'm a sports fanatic.  I
15  watch football.
16   Q.  Okay.  And when you say you -- you
17  wrestle, tell me what you mean by that.
18   A.  We just MMA, you know.  I'm 48 years
19  old, and I'm -- I'm still a kid at heart.  And -- and
20  we like to work out, and -- and that's when we do.
21   We practice grappling, but I have shoulder
22  tear.  I can't -- I can't get hurt, you know.
23   Q.  And how long have you done the -- the
24  wrestling?
25   A.  Oh, I've done that all since high school,

---

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 65

1  you know.
2  **Q.  Okay.  Okay.  And then how about the**
3  **boxing?**
4  A.  I've done boxing since 11 years old.
5  **Q.  Okay.  And do you currently box?**
6  A.  I'm sorry.
7  **Q.  Do you currently box?**
8  A.  No.  We -- we work out, but I don't get hit
9  upside the head no more, you know.  I don't get
10  hit, so. . .
11  **Q.  But do you get in and spar?**
12  A.  Yeah, light -- light.
13  **Q.  Okay.**
14  A.  Hit the bag.
15  **Q.  All right.  And same with wrestling, do**
16  **you do light wrestling?**
17  A.  Yeah, light.  I mean, you know, we do
18  jujitsu, you know, practice things.  And I haven't
19  been doing it lately --
20  **Q.  Okay.**
21  A.  -- but that's -- that's something I -- you
22  know, I enjoy to do.
23  **Q.  And are -- and are those things that**
24  **you've done throughout the course of your life?**
25  A.  No, because it's not something that we

Page 66

1  know.  You know, it's -- it's how to move, MMA,
2  and stuff like that.  It's just something, you know,
3  I'm. . .
4  **Q.  But you mentioned you've done boxing**
5  **since 11.**
6  A.  Yeah, off and on.
7  **Q.  Okay.  What about the -- what about the**
8  **wrestling-type stuff?  Is that something you've**
9  **done the past ten years?**
10  A.  Yeah.
11  **Q.  Okay.**
12  A.  I have friends that fight MMA, you know,
13  and we work out --
14  **Q.  Okay.**
15  A.  -- you know.
16  **Q.  So where -- where do you go to -- to box**
17  **and to wrestle?**
18  A.  At my friend's.
19  **Q.  And what's -- what's his name?**
20  A.  Scott Keller.
21  **Q.  Okay.  Is this at his house, or does he**
22  **have a gym?**
23  A.  It's at his house.
24  **Q.  Okay.  And at your places of work, would**
25  **you talk about boxing or wrestling?**

Page 67

1  A.  Yeah, because my friends had fights and,
2  you know, I would bring a -- a poster or something,
3  you know, and hang it up at work.
4  **Q.  Uh-huh.  Did you do that at Zachry?**
5  A.  Yes.
6  **Q.  Did you do it at Gulf Coast?**
7  A.  Yes.  Lear.
8  **Q.  And Lear, as well.**
9  A.  [nods head]
10  **Q.  Okay.  You have to answer "yes" for me.**
11  Did you do it --
12  A.  Yes.
13  **Q.  -- at Lear, as well?**
14  A.  Yes.
15  **Q.  Okay.  And so would people there know**
16  **you were into boxing or wrestling?**
17  A.  I guess they did, you know.
18  **Q.  Okay.**
19  A.  Some did.
20  **Q.  Okay.**
21      MR. JOHNSON:  All right.  We've been
22  going for over an hour plus.  Let's take a short
23  break, if you don't mind?
24      THE WITNESS:  Yeah, I'd like to myself.
25      MR. JOHNSON:  Yeah.  Absolutely.

Page 68

1  [WHEREUPON, a brief recess is taken.]
2  BY MR. JOHNSON:
3  **Q.  All right.  Do you recall who you**
4  **interviewed with at Gulf Coast?**
5  A.  Yes, Steve Parks; Richard Waters; and
6  Theresa was a secretary, but I don't recall her last
7  name.  But I had an initial interview with a man at
8  the same place, but I don't recall his name.  I'm
9  sorry.
10  **Q.  Okay.  And -- and did you have an**
11  **understanding of what Gulf Coast was?**
12  A.  Not really.
13  **Q.  All right.  Did you find out what they**
14  **were?**
15  A.  As I worked.
16  **Q.  Okay.  What was your understanding**
17  **before you began working there as to what Gulf**
18  **Coast was and what they did?**
19  A.  My understanding was I was going to work
20  at Fort Knox doing carpentry and stuff.
21  **Q.  All right.  Where did you first learn of**
22  **Gulf Coast?**
23  A.  Ebony Williams, vocational rehabilitation.
24  **Q.  And what did she tell you about Gulf**
25  **Coast?**

Deposition of Chris Steven Slaughter                                          Date: 10/29/2014

Page 69

1   A.  I went to see Ebony that day, and I told
2   her, I guess, I was going to go to school.  At my
3   age, I'm 48 years old, I'm trying to look for a good
4   job.  I just lost a good job after 20 years and 7
5   months due to a plant closure that I thought I'd
6   retire from.
7      So I was trying to look for a decent job.  At
8   that time, I told Ebony, I said, "I guess I'm going
9   to go to school."  And Ebony said, "Wait.  I'm
10  going to call."  And -- and I really didn't -- like I'd
11  be in the office.
12     And she come [sic] back and said, "Can you
13  do this type of work?"  And I said, "Yes, I've done
14  windows and doors and that, you know, on the side
15  of my house."
16     And that's when she called me one day and
17  set the interview up to talk to this guy at the
18  Holiday Inn in -- off 313 out towards E-town and
19  Radcliff.  And I had the initial interview.
20     Didn't -- wasn't familiar.  It was something
21  about a contract and the government.  And they
22  moved it -- they kept moving it back, but I never
23  went into detail.  I was too busy looking for work,
24  just. . .
25     Q.  All right.  Do you recall any information

Page 70

1   that you were given during the interview process?
2      A.  No.  You know, it was kind of like you just
3   went in there and they want to hire people, you
4   know.  And there was a lot of people there getting
5   hired, hired, you know, and interviewed.
6      Q.  Was it like a job fair?
7      A.  It wasn't a job fair.  I -- you know, I
8   really don't know what it was.  I just showed up
9   and seen it, you know.  I just know that I had a
10  certain time that I interviewed.
11     Q.  All right.  How many interviews did you
12  have?
13     A.  Two.
14     Q.  Okay.  And what position were you
15  applying for?
16     A.  General maintenance worker.
17     Q.  And is that the position that you were
18  hired for?
19     A.  Yes.
20     Q.  Okay.  And do you recall when you were
21  hired?
22     A.  11/1/11.
23     Q.  And who was your supervisor --
24     A.  I had --
25     Q.  -- at the time you started?

Page 71

1   A.  At the time I started was Mike Clemons.
2   What's the foreman's name?  They terminated him.
3   He was -- he was the foreman.  Mike is the lead
4   man.  And Zed -- Bill Zednick is the lead man.
5   They're like supervisors.  They call them lead man.
6      Q.  And --
7      A.  But there was a guy named -- and he is
8   the foreman.  He is the supervisor.  And he was
9   terminated, and his name was -- I can't recall his
10  name.
11     Q.  What was he terminated for?
12     A.  Looking up pornography or something on
13  the Internet.
14     Q.  Okay.
15     A.  This is what I was told.  I'm not for sure.
16     Q.  Okay.  Was -- was this gentleman that
17  was terminated, was he your direct supervisor?
18     A.  Yes.
19     Q.  Okay.  Where did -- tell me where Mike
20  Clemons and Bill Zednick fell in line then.
21     A.  They're lead men, and you have a
22  foreman who is the boss.  They are workers that
23  are kind of -- they leads, you know.  They kind of
24  lead.  They're supposed to show you what to do
25  and kind of lead the way.

Page 72

1      Q.  All right.
2      A.  They're called lead men.
3      Q.  Okay.  Was -- was the gentleman that was
4   terminated, would he have been above Mike and
5   Bill?
6      A.  Yes.
7      Q.  Okay.
8      A.  His -- and -- and it -- I know it'll come
9   back to me.
10     Q.  That's okay.
11     A.  I'm just trying to --
12     Q.  So if -- if -- if somebody said, "Hey" --
13     A.  Willis.  His name was Willis.
14     Q.  Okay.  That's his first name or last name.
15     A.  First name, Willis.
16     Q.  Okay.  If somebody said, "Chris, who's
17  your boss," who would you have said when you
18  started?
19     A.  I'd have said Willis.
20     Q.  Okay.  Now, I know that not everybody
21  that works there is a Gulf Coast employee.  Were
22  you aware of that, as well?
23     A.  Correct.
24     Q.  Okay.  Who else did people work for?
25     A.  Ginn Group.

Court Reporting Services, Inc.            Page: 18            Case No.: 3:14-CV-00281-CRS

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 73

1    Q.  G-i-n-n.
2    A.  They were Ginn Group; yeah.
3    Q.  Okay.  So was -- was Mike Clemons a
4  Ginn employee?
5    A.  Yes, sir.
6    Q.  And Bill Zednick.
7    A.  Yes, Ginn.
8    Q.  And -- and this Willis.
9    A.  Willis, yes, Ginn Group.
10   Q.  All right.  So your direct supervisor was
11  not a Gulf Coast employee.  It was a Ginn
12  employee.
13   A.  Exactly.  We had no supervisors --
14   Q.  Okay.
15   A.  -- from Gulf Coast.
16   Q.  What department did you start out in?
17   A.  Structures.
18   Q.  Tell me what that means.
19   A.  That's where you work on buildings:
20  Windows, doors, roofs, ceilings, anything to do
21  with a structure.
22   Q.  And would you be all throughout the base
23  doing that?
24   A.  Yes.
25   Q.  You weren't limited to one specific

Page 74

1  building, I take it.
2    A.  No, just what needed to be repaired.
3    Q.  Okay.  Did you work in -- in a crew or did
4  you work by --
5    A.  Sometimes.
6    Q.  -- did you work by yourself?
7    A.  Sometimes.  Both.
8    Q.  Okay.  Did it just depend on what you
9  were doing that day?
10   A.  Yes, and how many people were needed.
11   Q.  Okay.  Who -- who would tell you, "Okay.
12  Chris, here's what we're going to do today"?
13   A.  Mikey Williams and Zed -- Bill Zednick.
14   Q.  Okay.  So you said Mike Williams.  Mike
15  Clemons?
16   A.  Oh, Mike Clemons.  Right.
17   Q.  Okay.
18   A.  I'm sorry.
19   Q.  All right.  So you'd report to work on a
20  Monday, and either Mike or Bill would say, "Chris,
21  here's we need you to do today."
22   A.  Yes.  You had -- the -- the Ginn Group
23  people had boxes and -- let me explain this real
24  fast.  I was hired as a new -- they called me a
25  pioneer.  It was a new thing, people with

Page 75

1  disabilities working with them.
2    So really I had a partner that I worked with
3  from the Ginn Group.
4    Q.  Did or did not.
5    A.  No, sir.
6    Q.  You -- you did or did not have a --
7    A.  I did.
8    Q.  Okay.  Who was that partner?
9    A.  I've had different ones.
10   Q.  Okay.  All right.  So you said you were a
11  pioneer.  What do you mean by that?
12   A.  That's what they told me I was is -- Gulf
13  Coast.  I was a -- it was a new -- a new
14  government program to get people with disabilities
15  working.
16   Q.  Oh, so you -- you think -- or it was your
17  impression that -- that you were -- that this was a
18  new thing for Gulf Coast to hire people with
19  disabilities.
20   A.  No.
21   Q.  Okay.  I guess I don't understand why --
22  why is -- you thought it was a pioneer -- why
23  somebody said you were a pioneer.
24   A.  That's what Gulf Coast said I was, and
25  that this was a new thing that we were working --

Page 76

1  people with disabilities working.
2    Q.  Okay.
3    A.  It's really a complicated thing.
4    Q.  Okay.  What's your understanding of it?
5    A.  It's just a messed-up situation.
6    Q.  Okay.  What do you mean by that?
7    A.  It just wasn't planned out.  It wasn't
8  thought out.  And they threw us in a situation that
9  wasn't evaluated.
10   And they put me in a situation -- eventually,
11  the people that were training me, we were going to
12  take the jobs.  And I didn't know that until I
13  started working there.
14   And it just -- really, with my hearing
15  impairment, I just had a lot of difficulties, a lot of
16  problems.
17   Q.  Okay.  So you said the people that were
18  training you, you were going to be taking their job.
19   A.  Exactly.
20   Q.  Okay.  Who -- whose job were you going
21  to be taking?
22   A.  A Ginn Group.
23   Q.  Okay.  And was that in the structures
24  department?
25   A.  Yes.

Court Reporting Services, Inc.            Page: 19            Case No.: 3:14-CV-00281-CRS

Deposition of Chris Steven Slaughter                                         Date: 10/29/2014

Page 77

1   Q.   Okay.  So did the Ginn Group people
2   know this?
3   A.   Yes.
4   Q.   And do you think that that caused some
5   tension between the Gulf Coast people and the
6   Ginn folks?
7   A.   Absolutely.  Absolutely.
8   Q.   Okay.  Did that ever happen prior to you
9   leaving that you took a Ginn Group employee
10  position?
11  A.   Exactly.  It -- yes.
12  Q.   That did happen.
13  A.   Yes.
14  Q.   Okay.  Whose po -- whose position did
15  you take --
16  A.   I'm not sure.
17  Q.   -- at the -- at the Ginn Group?
18  A.   They were -- they were laid off,
19  terminated.
20  Q.   Okay.
21  A.   Yeah.
22  Q.   Who -- who was laid off at the Ginn Group
23  so you could take their job?
24  A.   I couldn't tell you.  An employee.
25  Q.   Where -- where did you get the

Page 78

1   information that Ginn Group employees were laid
2   off and you took their position?
3   A.   When I took the job.
4   Q.   Okay.  When you originally took the job in
5   November.
6   A.   Yes.
7   Q.   All right.
8   A.   Didn't know until the day I started, maybe
9   a couple days after when I got to working with
10  them.
11  Q.   All right.  When you started with Gulf
12  Coast, did you go through some orientation?
13  A.   Yes, I did.
14  Q.   Tell me how long that orientation lasted.
15  A.   I believe it was a day, day and a half.
16  Q.   And where did you do that orientation?
17  A.   At Fort Knox --
18  Q.   Okay.
19  A.   -- at 1730 Richardson Hall.
20  Q.   And who did the orientation?
21  A.   Different people.
22  Q.   Were you provided various documents at
23  that orientation?
24  A.   Yes, I was.
25  Q.   What do you recall being provided?

Page 79

1   A.   Handbooks, government rules, EEOC,
2   safety, attendance.
3   Q.   Do you -- I'm sorry.  Go ahead.
4   A.   Federal -- fed -- some federal rules, I
5   guess, safety rules and. . .
6   Q.   Okay.  Do you -- do you still have those
7   documents?
8   A.   No.
9   Q.   What happened to them?
10  A.   I had my handbooks and all those things
11  in my -- in my locker.  Now, I might have some
12  papers, you know, up in -- that I usually would put
13  up in a closet, but I haven't looked.
14  Q.   Okay.
15  A.   So I don't know what I also have.  I know
16  my handbook and all that was in my locker.
17  Q.   And -- and did you retrieve those
18  items from your locker?
19  A.   No, no.  As a matter of fact, I didn't even
20  get my personal items from them.
21  Q.   Okay.  And you're talking about a -- a
22  locker at work.
23  A.   Yes.
24  Q.   Okay.  Let me ask you, Mr. Slaughter --
25       MR. JOHNSON:  And, Rose Mary, I'll

Page 80

1   mark these as we go along --
2        THE REPORTER:  Okay.
3        MR. JOHNSON:  -- if that's okay with
4   you?
5        THE REPORTER:  That's fine.
6        MR. JOHNSON:  It makes it easier on
7   you.
8        THE REPORTER:  Thank you.
9        MR. JOHNSON:  All right.
10  [WHEREUPON, document referred to is marked
11  Exhibit 1 for identification.]
12  BY MR. JOHNSON:
13  Q.   What I'll give to you and your counsel --
14  A.   Uh-huh.
15  Q.   -- is -- what I've marked as Exhibit 1 is a
16  Code of Conduct Training document.  It's dated
17  November 1, 2011.  Is that your significance on
18  that document?
19  A.   Yes, it is.
20  Q.   And did you receive, read, and
21  understand the code of conduct document as
22  indicated on the form that you signed?
23  A.   Yes, I did.
24  Q.   All right.  What was your understanding --
25  or what is your understanding as to the code of

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 81

1  conduct that was expected of you at Gulf Coast?
2    A.  Basic rules, and it's always been a part
3  of my work, always part of all my work at different
4  places.
5    Q.  What -- tell -- that -- that's pretty
6  general.  Tell me what you mean by that.
7    A.  Right.  It's just basic rules that you go
8  by.
9    Q.  Okay.  And -- and when you say "basic
10  rules," tell me what you mean.
11    A.  You know, showing up for work,
12  attendance; proper attire, proper clothes;
13  dressing, being subordinate, not missing work.
14    Q.  Would it be -- would it also include
15  treating others with respect?
16    A.  With what?
17    Q.  With respect.
18    A.  Yeah.
19    Q.  Okay.  Not using profane language.
20    A.  Right, profane language.
21    Q.  All right.  Not threatening any
22  individuals.
23    A.  Right.
24    Q.  Okay.  And -- and, Mr. Slaughter, would
25  you understand that making a threat of violence or

Page 82

1  a statement of intimidation toward a coworker
2  could jeopardize your job?
3    A.  Yes, I did.
4    Q.  Okay.  And did you agree to by -- abide
5  by the code of conduct?
6    A.  Yes.
7    Q.  All right.  I'll show you what I'll mark as
8  Exhibit 2.  That document is entitled Creating
9  Respect in the Workplace.
10  [WHEREUPON, document referred to is marked
11  Exhibit 2 for identification.]
12  BY MR. JOHNSON:
13    Q.  And did you sign that document on
14  November 1, 2011?
15    A.  Yes, I did.
16    Q.  And that document in -- indi -- indicates
17  that you received nonharassment training and
18  written materials on preventing and reporting
19  harassment, including sexual harassment in the
20  workplace.
21    A.  Yes, I did.
22    Q.  All right.  And did you agree to abide by
23  the training you received?
24    A.  Yes, I did.
25    Q.  Which would include preventing and

Page 83

1  reporting harassment in the workplace.
2    A.  Yes.
3    Q.  Okay.
4  [WHEREUPON, document referred to is marked
5  Exhibit 3 for identification.]
6  BY MR. JOHNSON:
7    Q.  I'll show you what I've marked as
8  Exhibit 3.
9    A.  Okay.
10    Q.  And is that a document that's entitled
11  Employee Handbook Acknowledgment --
12    A.  Okay.
13    Q.  -- at the top?
14    A.  Okay.  Right.
15    Q.  All right.  So Exhibit 3 is Employee
16  Handbook Acknowledgment.
17    A.  Yes.
18    Q.  And did you ack -- acknowledge by your
19  signature of November 1, 2011 that you received
20  that handbook?
21    A.  Yes.
22    Q.  And that you acknowledged that you
23  would comply with the provisions of that handbook.
24    A.  Yes, sir.
25    Q.  And do you have any recollection of

Page 84

1  asking any questions of anyone at Gulf Coast
2  regarding any provision in that handbook?
3    A.  Yes, I have.
4    Q.  Okay.  Who did you ask questions about
5  regarding that?
6    A.  Bill van Cleave.
7    Q.  Okay.  And what sections of the handbook
8  did you ask Mr. van Cleave about?
9    A.  I couldn't tell you the sections, you know.
10  I don't know the sections.
11    Q.  Okay.  I know that you had some
12  conversations with Mr. van Cleave about some
13  issues at work, but did any of your conversations
14  with Mr. van Cleave pertain specifically to the
15  handbook?
16    A.  No, sir.
17    Q.  Okay.  All right.
18    A.  I can't be for sure, because I didn't --
19  when I asked questions, I didn't go back and see
20  what section it was in --
21    Q.  And -- and --
22    A.  -- and bring it -- A section 13 said -- I
23  didn't.
24    Q.  And -- and -- and that's the nature of my
25  question right now.  We'll get into some of the

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 85

1  conversations that you had with him.
2      A.  Okay.
3      Q.  But my question right now specifically
4  regarding the handbook and Exhibit 3 is:  Did you
5  have any specific discussions about the handbook
6  with anybody at Gulf Coast?
7      A.  No.
8      Q.  Okay.
9      A.  No.  I just want to make sure I understand
10  you right.  You mean did I ever take a handbook to
11  someone and ask them about certain rules?  Is that
12  what you're asking me?
13     Q.  Yes, sir.
14     A.  No.
15     Q.  Okay.
16  [WHEREUPON, document referred to is marked
17  Exhibit 4 for identification.]
18  BY MR. JOHNSON:
19     Q.  And, then, Mr. Slaughter, I -- I've marked
20  as Exhibit 4 a document entitled Workplace
21  Etiquette Training.  Is that your signature on that
22  document?
23     A.  Yes, it is.
24     Q.  And did you acknowledge receiving
25  training and written materials on proper workplace

Page 86

1  behaviors and etiquette?
2      A.  Yes, sir.
3      Q.  And do you know what that training
4  entailed?
5      A.  What?  Say that again.
6      Q.  Yeah.  What -- what did that training
7  include?
8      A.  Training include -- the workplace
9  training, it's just how you go about treating people
10  with respect.  And it basically was about people
11  with disabilities and -- and how to treat them,
12  and -- and just some normal -- you know, how to
13  talk to people, so forth.
14     Q.  Based on the entire time you were at Gulf
15  Coast, in your mind, was there ever a time in
16  which you did not abide by any of these trainings
17  that you received or rules that were provided to
18  you?
19     A.  No.
20     Q.  Okay.  You always complied with them.
21     A.  I always complied with the rules.
22     Q.  Okay.  Even the use of profane language.
23     A.  I don't use no profane language.
24     Q.  Never did.
25     A.  I -- now, I did -- I didn't say never did.  I

Page 87

1  mean, you know, we're out working at a place.  I
2  mean, we didn't cuss each other, but as far as --
3  no, I -- I'm not somebody that just cusses up and
4  down.  I'm not, but I can't say I wouldn't have said
5  "hell" or -- or something.  I -- I'm not for sure.  I
6  can't recall.
7      Q.  All right.  In my mind, there may be a
8  difference between using a cuss word and cussing
9  at somebody.
10     A.  Right.
11     Q.  Okay.
12     A.  Exactly.
13     Q.  You understand the distinction between
14  the two.
15     A.  I understand; yes, sir.
16     Q.  All right.  Did you ever cuss anybody?
17     A.  No.
18     Q.  Okay.  What was your rate of pay when
19  you started with Gulf Coast?
20     A.  17.33 an hour.
21     Q.  And did that rate of pay stay the same the
22  entire time that you were there?
23     A.  Yes, you're supposed to receive
24  Davis-Bacon pay for certain work.
25     Q.  Okay.  What does that mean?

Page 88

1      A.  There was skill pay.
2      Q.  Okay.  So did -- did -- did your hourly
3  rate depend upon the type of job you were
4  performing?
5      A.  Yeah, the work you were performing.
6      Q.  Okay.  Would sometimes it'd be less
7  than 17.33 an hour?
8      A.  No, it -- that was your base rate.  And
9  if you were painting or something, you'd get
10  Davis-Bacon pay sometimes.
11     Q.  Would that increase the rate of pay then?
12     A.  Yes.  Yes.
13     Q.  All right.  And -- and did you know that
14  going into your position?
15     A.  No.
16     Q.  Okay.  When did you become aware of
17  that?
18     A.  Maybe few days, a week.
19     Q.  Into the job.
20     A.  Right.  Right.
21     Q.  All right.  All right.  Was there ever a
22  time when you earned less than 17.33 an hour at
23  Gulf Coast?
24     A.  No, I don't believe.
25     Q.  Okay.  And was that -- was 17.33 the rate

Deposition of Chris Steven Slaughter                                          Date: 10/29/2014

**Page 89**

1  of pay that you were quoted at the time you were
2  hired?
3     A.  Right.
4     Q.  Okay.
5     A.  That was the government-set pay for a
6  general maintenance worker.
7     Q.  Okay.  All right.  How long did you stay in
8  the structures department?
9     A.  I stayed in structures for seven months --
10    Q.  Okay.
11    A.  -- from -- from November 11th until the
12  first of May -- from November the 1st, I mean.
13  Yeah.
14    Q.  Through the first of --
15    A.  November 1st, 2011 --
16    Q.  Okay.
17    A.  -- to May the 1st -- the first of May.  I'm
18  not specific on what exact date.
19    Q.  I gotcha.  Why -- why were you
20  transferred at that -- I guess, first off, where were
21  you transferred to?
22    A.  I was transferred to roads and grounds.
23    Q.  Okay.  And did you stay in roads and
24  grounds from May until your last day?
25    A.  Until my termination; yes.

**Page 90**

1     Q.  All right.  Tell us why you were
2  transferred from structures to roads and grounds.
3     A.  I couldn't tell you.  I believe -- I believe
4  they was trying to terminate me.
5     Q.  Okay.  If they were trying to terminate
6  you, why wouldn't they go ahead and terminate you
7  in May?
8     A.  I do not know.
9     Q.  What makes you think they were trying to
10  terminate you?
11    A.  I complained.  I filed a complaint with the
12  EOC about that time.
13    Q.  Okay.  Did you file your complaint with
14  the EEOC prior to being transferred?
15    A.  About the same time.  I'd say prior.
16    Q.  Okay.  So you think due to the fact that
17  you filed the EEOC complaint, they transferred you
18  from structures to roads and grounds.
19    A.  Yes.
20    Q.  Okay.  Is there any other reason why
21  you'd think of -- I'm sorry, the -- let me start over.
22    Is there any other reason why you can think of
23  that you were transferred from structures to roads
24  and grounds?
25    A.  Everybody in roads and grounds pretty

**Page 91**

1  much had a CDL, from what I understood.  I didn't
2  have a CDL.  I couldn't -- I -- I asked for them not
3  to transfer me, because I -- my experience was in
4  structures.
5     Q.  Did you have any issues at all while
6  working in structures?
7     A.  Yes.
8     Q.  Okay.  What were the issues?
9     A.  Just the way they would scream and
10  holler and raise their voice at me.  I had
11  complaints that I wouldn't receive Davis-Bacon pay
12  while other people would.  If they were taking
13  smoke breaks, and I didn't smoke, I wasn't
14  supposed to take a break.
15    Q.  Okay.  Who -- who would scream and
16  holler at you?
17    A.  Different, just -- just. . .
18    Q.  Okay.  Give me names.
19    A.  Mike Clemons, Elmer Wilson, Zach Dixon,
20  pretty much -- Steve Parks.  Let me think.  You
21  know, it's -- it's something -- if you don't hear, it's
22  a normal -- "Hey," you know.  Just people raise
23  they voice.  You know, if they're not -- if they're
24  not educated.
25    Q.  All right.  Were they screaming and

**Page 92**

1  hollering at you in a mean way or in a way in which
2  they were trying to communicate with you because
3  you have a hearing impairment?
4     A.  After I complained that I didn't like to be
5  screamed at or yelled at, that I was sensitive to
6  being hearing impaired, it got to be -- it -- it got
7  worse.  And I could say it got to be funny, a joke,
8  you know.
9     Q.  And who did you complain to?
10    A.  I complained to the individuals that
11  would -- you know, I would just -- I would just
12  explain, you know -- you know, "I'm hearing
13  impaired."  Just like I explained to you when I
14  came in here about how -- you know. . .
15    That's -- after several times, I finally went to
16  Bill.  And that's when I said he told you -- it's --
17  he told me I'm a pioneer.  It's a work-in-progress.
18    Q.  Were there any other hearing-impaired
19  individuals there?
20    A.  No, not that I know for sure.  Maybe they
21  didn't know.
22    Q.  How many times did you complain to Bill
23  about this?
24    A.  Numerous.  I -- I know I talked to Bill
25  seven, eight times, approximate.  Numerous times.

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 93

1    Q.  Okay.  And -- and let me be specific:
2    How many times did you talk to Bill about people
3    screaming and hollering at you in the structures
4    department?
5    A.  Probably five, six times.
6    Q.  Okay.  Can you give me the dates that
7    occurred?
8    A.  I can't recall, you know, exactly; within
9    that time frame at the time I started until the time
10   I was terminated.
11   Q.  And what would Bill tell you?
12   A.  Just what I told you.  He'd say, "It's a
13   work-in-progress.  We're -- we're pioneers, you
14   know.  Other people had these different
15   disabilities, and that it's -- it's, you know, a
16   work-in-progress that, you know, they're working
17   through it."  These people, you know, I have to
18   bear with them, you know.
19   Q.  Did Bill ever indicate that he would talk
20   to these people?
21   A.  Yes.
22   Q.  Okay.  And did he do that?
23   A.  I guess he did.
24   Q.  Okay.
25   A.  We had a meeting ourself, you know,

Page 94

1    with -- with those people.
2    Q.  Okay.
3    A.  Me, him, and them.
4    Q.  All right.  You mentioned that you had
5    about five or six meetings with Bill.  Were there
6    any people in those five to six meetings?
7    A.  Yes.  Yes, there was.  The secretary
8    would be in there.  I had a -- an interview with
9    Gary Nichols -- with -- with Gary Nichols and them.
10   Q.  Who's Gary Nichols?
11   A.  He was the safety coordinator for Ginn
12   Group.  I had -- he would basically have a meeting
13   with me and then maybe have a meeting with
14   them --
15   Q.  Okay.
16   A.  -- but --
17   Q.  And my -- my --
18   A.  -- eventually after a few times, we finally
19   had a big meeting --
20   Q.  Okay.
21   A.  -- together.
22   Q.  All right.  Prior to this big meeting
23   together, did you meet with Bill and any -- anyone
24   else?
25   A.  Yeah, Gary Nichols.

Page 95

1    Q.  Okay.  Was Gary Nichols in on the
2    meeting with you and Bill?
3    A.  Yeah, one time --
4    Q.  Okay.
5    A.  -- that we had.
6    Q.  Why was -- why was he on the meeting?
7    A.  Because he was the safety.  And one
8    time, Mike Clemons, we were working in his office,
9    and he asked me to step out because somebody
10   came -- we were fixing the ceiling -- drop ceiling.
11   And he told me to step out.
12   And Mike Clemons had came up.  He's the lead
13   man, now, and -- and got on me about being out of
14   the -- the office, being down there talking to Bill,
15   which he told me to take a break.
16   So he came in there to tell him, "Yeah, I told
17   Chris to step out of the office."
18   Q.  Okay.  All right.  So that sounds like it
19   was an isolated incident with Mr. Nichols.  I mean,
20   that didn't --
21   A.  Yeah.  Yeah, with Mr. Nichols, yeah --
22   Q.  Okay.
23   A.  -- that day.
24   Q.  That doesn't sound like that had anything
25   to do with your hearing impairment.

Page 96

1    A.  Yeah.  Well, just how he talks to you, you
2    know.
3    Q.  Okay.
4    A.  Yeah.
5    Q.  All right.  Who was all in this big
6    meeting?
7    A.  The big meeting?  It was Mike Johnson,
8    Mikey Clemons, Steve Parks, Hamlet Braxton, I
9    believe Gary Nichols was in that one, Bill -- Bill
10   van Cleave, and myself, and maybe Bill Zednick
11   might have been in there.
12   Q.  Bill Zednick.
13   A.  Yeah.
14   Q.  Okay.
15   A.  Zed -- Zednick.  I'm not sure how you
16   spell. . .
17   Q.  All right.  And what brought about this big
18   meeting?
19   A.  It -- it started that morning with Mikey
20   Clemons.  The day before, Mike Johnson told me
21   that, "Me and you are going to have a meeting in
22   the morning about all of this," just how things have
23   been going, the way they talk to me, the way they
24   raise their voice at me, the way my pay -- some
25   people getting paid Davis-Bacon pay by doing the

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 97

1  same work I did but I didn't get the pay.
2    Just the issues Mike told me before I left that
3  day. I had come back off the job. You have to go
4  in and sign out, and then you go for home. So
5  wherever you're working on the base, before you
6  go home you go back to the shop.
7    Mike come up to me at the end of the day and
8  said, "I want to speak with you tomorrow when you
9  come in," you know, because the day was over.
10   That morning I was waiting in his office where
11 their desks is, too, the lead men's desks. And he
12 said, "What are you doing?" And I said, "I'm
13 waiting to speak to Mike Johnson." And he took
14 Willis's spot. He is the foreman.
15   And he said, "We ain't got time for all this.
16 You need to get on back to work." And I said, "I
17 have a meeting with Mike."
18   "Well, come on. Let's go now."
19   So we went down and -- I followed him. And
20 we walked in to Steve Parks, who is a Ginn Group
21 project manager. And Mike Clemons is a Ginn
22 Group employee, but my lead man. Said he
23 couldn't have me standing out in the hall, walk --
24 wandering the halls. He couldn't have me
25 wandering the halls.

Page 98

1    And at that time, I asked to speak with Bill,
2  because they're Ginn Group employees that I work
3  for that supervise me. And at that time we had a
4  big meeting. It had been going on for a while.
5    Q.  Okay.
6    A.  And that's why we had the meeting.
7    Q.  All right. And -- and you mentioned that,
8  you know, some of these people had -- I guess,
9  would scream and holler at you, raise their voice.
10 Were any of these people Gulf Coast employees or
11 were they all Ginn Group?
12   A.  You know, I have to -- it would be some
13 of both. It would be --
14   Q.  Okay.
15   A.  -- some of both sometimes, but, you
16 know, most of the time they don't understand. You
17 know, just you're working, and I'd just say, "Man,
18 I -- you know, just -- you know, I don't hear well."
19 I usually present that to people when I meet
20 them. "I'm going to tell you. I'm hearing
21 impaired. I'm" -- you know, just like me and you
22 did. That's -- that's usually my normal how I, you
23 know, talk to some people.
24   Q.  Okay. But my -- my question was: Were
25 any of these individuals Gulf Coast employees?

Page 99

1    A.  Not -- not in structures, not in
2  structures --
3    Q.  Okay.
4    A.  -- you know.
5    Q.  All right.
6    A.  I only had one incident ever with a Gulf
7  Coast employee.
8    Q.  Okay. All right. And so all -- all these
9  structured folks and all the ones that you listed for
10 me were Ginn Group employees.
11   A.  Most of them, yes.
12   Q.  Okay.
13   A.  If you read them back to me, I --
14   Q.  Yeah. Mike Johnson --
15   A.  Yes.
16   Q.  -- Ginn Group.
17   A.  Yes.
18   Q.  Mike Clemons --
19   A.  Yes.
20   Q.  -- Ginn Group.
21   A.  Yes.
22   Q.  Steve Parks, Ginn Group.
23   A.  Yes.
24   Q.  Braxton --
25   A.  Yes --

Page 100

1    Q.  -- Ginn Group.
2    A.  -- Hamlet Braxton, yes.
3    Q.  Ginn Grou -- he was Ginn Group.
4    A.  Yes. Yes.
5    Q.  And Nichols.
6    A.  He's Ginn Group.
7    Q.  Ginn Group. Bill Zednick --
8    A.  Yes.
9    Q.  -- Ginn Group.
10   A.  Ginn Group.
11   Q.  And then you've got Bill -- Bill van Cleave
12 I think is Gulf Coast.
13   A.  No, he is HR for Gulf Coast.
14   Q.  For Gulf Coast. And did Bill --
15   A.  But Bill didn't yell at me or raise his
16 voice.
17   Q.  -- did Bill always treat you with respect?
18   A.  Yes, he did.
19   Q.  All right.
20   A.  A good man.
21   Q.  Okay. Okay. Tell me, then, what took
22 place at this big meeting.
23   A.  What went on in the meeting?
24   Q.  Yes, sir.
25   A.  Just about how my hearing impairment,

Deposition of Chris Steven Slaughter

Date: 10/29/2014

Page 101

1  and -- and them -- them being biased about paying
2  the people for the Davis-Bacon, and not spreading
3  the work around, but most of my problem was due
4  to my hearing.
5    And after I complained, it got to be just a lot
6  of games, you know.  And -- and like I said,
7  working in the museum one day, they stopped to
8  smoke.  And I took a little break with them.
9    And Mikey Clemons comes in and says, "What
10 are you doing?  You ain't smoking.  You get back
11 to work."  I said, "I don't get a break?"
12 "Well, you ain't smoking."  And it just kind of
13 snowballed.
14   Q.  Who would determine whether you got the
15 Davis-Bacon pay?
16   A.  Your supervisor: Mike Clemons, Bill
17 Zednick, Mike Johnson, Willis.
18   Q.  Okay.  All right.  So what was the
19 conclusion following that meeting?
20   A.  Say it again, please.
21   Q.  What was the conclusion or the plan
22 following that meeting?
23   A.  He asked me -- Mr. Parks told me -- I told
24 him some of the problems, we went over, due to my
25 hearing impairment.  And he said, "Don't tell me

Page 102

1  about hearing impairment.  I've played golf with a
2  man for 20 years.  I know all about hearing
3  impairment.  If you think somebody's picking on
4  you, you come to me."
5    And that's exactly what we did that morning.
6  We went to him, you know.
7    Q.  Okay.  And then what happened?
8    A.  Nothing happened.  In about a month --
9  I'm -- I'm not specific on dates.  I didn't know that
10 something -- that I -- really, you know, at that
11 time.  Like I said, they told me I was a pioneer.
12 We're working through this.  So I was hoping
13 things would get better, but they got worse.
14   Q.  Following this big meeting it got worse.
15   A.  Right.  Right, just -- it was just a mess
16 from the get-go.
17   Q.  Okay.  Was there only one big meeting
18 with all of you-all folks --
19   A.  Right.
20   Q.  -- there?
21   A.  Right.
22   Q.  So following this big meeting, it -- it's
23 your memory that you continued to work in the
24 structures department for about a month.
25   A.  I'm not -- I'm not specific, you know,

Page 103

1  being a -- approximately.  They moved me after
2  that meeting, but I don't remember exactly.
3    Q.  Did they move you immediately?
4    A.  I can't -- it -- it was a few days, I believe
5  it was.
6    Q.  Okay.
7    A.  Against my wishes.
8    Q.  Why was it against your wishes?
9    A.  I didn't want to move --
10   Q.  Why is that?
11   A.  -- because I didn't know roads and
12 grounds.  I didn't have a CDL, and I didn't think
13 that was secure.  I thought, you know, there's
14 room for a problem.
15   The people weren't educated working with
16 someone with a hearing disability.  And if I was a
17 pioneer like they said, I was trying to work through
18 it with them.
19   Q.  Okay.  Did they ask whether you want to
20 be moved?
21   A.  No --
22   Q.  Okay.
23   A.  -- but I told them I didn't want to be
24 moved.
25   Q.  Did they ask whether you had a -- kind of

Page 104

1  a personality conflict with Mr. Clemons?
2    A.  They said they thought it was.
3    Q.  Okay.  Did you agree or disagree with
4  that?
5    A.  I don't think he liked me.
6    Q.  Okay.  All right.  Did you like him or
7  dislike him?
8    A.  I try to like everybody.
9    Q.  Well -- and there's some people that you
10 get along with and some people you don't; right?
11   A.  It got to be biased where, you know, I --
12 I -- I didn't -- I can't say I disliked him as a
13 person, but he wasn't fair.
14   Q.  Okay.
15   A.  And he wasn't prepared to work with
16 someone with a hearing disability.
17   Q.  How often did you have to work with him
18 directly?
19   A.  Every day, daily.
20   Q.  Okay.  So then you were -- let me ask you
21 this: Was there any other incidences or
22 complaints that you had while you worked in the
23 structures department that we haven't talked
24 about?
25   A.  I went and complained to Niche, Todd

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

### Page 105

1 Bennett. He's on site. Niche is over the whole --
2 it is a very complicated situation.
3   Ginn Group had the contract for general
4 maintenance. I'm not even familiar -- like I said, I
5 did not even know this until I went in there. Niche
6 took over; kept the Ginn Group.
7   Eventually they're going to bring people in
8 with disabilities. 75%, I was told, were going to
9 have a disability. So they were eventually going
10 to bring people with disabilities in to weed out the
11 Ginn Group employees.
12   Eventually three out of four would have a
13 disability, is what it was explained to me after.
14   Q. Okay. By whom? Who explained that to
15 you?
16   A. Todd Bennett had.
17   Q. Okay. And he's with Niche.
18   A. Yes. And Jean Robinson, attorney for
19 Niche, that he sent to speak with me after I went
20 to him.
21   Q. When did you speak with Mr. Bennett?
22   A. Mr. Bennett? I think I have the date at
23 home. And then about a week later, I'm not
24 specific on the date right now, Mr. Bennett sent a
25 Niche attorney from Washington, D.C., Ms. Jean

### Page 106

1 Robinson, to speak with me -- and she had a
2 person with her. I don't recall his name -- about
3 the issues that I was having to deal with.
4   Q. Were you still in structures at that time?
5   A. Yes.
6   Q. Okay. All right. And you have the date
7 at home --
8   A. I believe I do.
9   Q. -- that you met with Mr. Bennett.
10   A. I believe I do.
11   Q. All right.
12   A. But I did speak with Mr. --
13   Q. Would you provide that to your attorney
14 for me?
15   A. I will try.
16   Q. Okay.
17   A. I'm not for sure.
18   Q. What would you have it written on?
19   A. A piece of paper.
20   Q. Okay. What else is on that paper?
21   A. Different things. You know, different. . .
22   Q. Different things about what?
23   A. Just different issues that I dealt with, you
24 know, when I thought it needed to be wrote down --
25   Q. Okay. So --

### Page 107

1   A. -- after awhile, you know.
2   Q. -- so do -- do you have notes, then, that
3 you've made about issues that you encountered at --
4   A. I have some notes.
5   Q. Okay.
6   A. Yes.
7   Q. All right. How many different pages of
8 notes do you have?
9   A. A few. I can't be specific.
10   Q. All right. And you have those at home.
11   A. Yes.
12   Q. All right. Can you get those to your
13 attorney, as well, please; okay?
14   A. Huh?
15   Q. If you could give those to your attorney,
16 as well, please? And I'll request --
17   A. Yeah.
18   Q. -- a copy of those.
19   And did you make those notes as these events
20 were occurring?
21   A. Yeah, like when I got home that day; and
22 then eventually I would keep in my car, and maybe
23 on lunch -- and like I said, just -- I was told this
24 was a work in progress. I was a pioneer.
25   Q. Okay. How did you know to go to Mr.

### Page 108

1 Bennett?
2   A. I know he was over -- he -- over the
3 contract. I -- I -- nothing was getting done. They
4 weren't listening. So I went -- I used my chain of
5 command.
6   Q. Okay. And is that something that you'd
7 learned to do, was to use your chain of command?
8   A. Of course. Of course.
9   Q. Okay. Where did you learn that?
10   A. Lear Corporation.
11   Q. Okay. Tell me about your meeting with
12 Mr. Bennett.
13   A. We went over it, and he listened to me,
14 and he made notes, and he tried to address it.
15 And --
16   Q. In what way?
17   A. -- he sent an attorney for Niche, Ms. Jean
18 Robinson, to speak with me maybe a week or two
19 later. They looked me up and called me to his
20 office, and I had a meeting with her and another
21 attorney. I'm not sure of his name.
22   Q. Okay. And what -- well, let me ask this:
23 Did anything else take place in your meeting with
24 Mr. Bennett?
25   A. I told him about the -- the bias, the --

Court Reporting Services, Inc.          Page: 27          Case No.: 3:14-CV-00281-CRS

Deposition of Chris Steven Slaughter                                      Date: 10/29/2014

Page 109

1  the -- the Davis-Bacon pay, how they was talking
2  to me; how we had to watch a video about how to
3  treat people with disabilities, how -- how to treat
4  somebody with a hearing impairment.
5    I told him, "I bet they were unprepared."
6  Nobody had the training to work with people with
7  disabilities. They just threw us to the -- just threw
8  us in.
9    Q.  And what did he have to say?
10   A.  He made notes, and I'm sure he got with
11 Bill and the rest of them. I -- I'm not for sure what
12 was done. I know he sent an attorney from
13 Washington, D.C. to speak with me.
14   Q.  Did -- did this attorney come specifically
15 to meet with you?
16   A.  Yes.
17   Q.  Okay. Tell me what took place during
18 that meeting.
19   A.  We went over the issues --
20   Q.  Same issues.
21   A.  -- and she made notes. Same issues --
22   Q.  Okay.
23   A.  -- same issues I just told you about,
24 about people making different rates of pay for
25 doing the same work; for being classified different.

Page 110

1  You know, people getting carpentry pay and
2  plumber's pay for doing what I did --
3    Q.  And what --
4    A.  -- about people getting Davis-Bacon pay
5  for doing the same work that I did.
6    I told her about how people were screaming
7  and -- and -- and talking down and -- and about
8  them not being trained, and the issues I faced
9  every day, you know.
10   Q.  And -- and did she explain to you the rate
11 of pay issue?
12   A.  She listened, and I guess she advised
13 him of certain things. I'm -- I'm not for sure.
14   Q.  Okay.
15   A.  I know --
16   Q.  My -- my -- my question at this point is
17 what she explained to you. Did she explain
18 anything to you about the rate of pay?
19   A.  She explained nothing. She listened.
20   Q.  All right. So she didn't tell you anything
21 during this meeting.
22   A.  No.
23   Q.  All right. She sat there and listened to
24 your complaints; said "Okay. Thank you," and --
25   A.  Right.

Page 111

1    Q.  -- that's it.
2    A.  Right. Made notes, wanted to know the
3  names of who were the ones that were un --
4  classified different.
5    Q.  Okay. Did you ever meet with her again?
6    A.  I believe I did meet with her again.
7    Q.  Okay. What happened in this follow-up
8  meeting?
9    A.  You know, I can't be sure that I -- I know
10 I spoke with her on the phone, but I can't be for
11 sure, you know. I -- I think it was just some things
12 that -- that it was going to get better, and -- and I
13 think they listened to me.
14   And -- and -- and I do believe maybe the -- it
15 got the ball rolling, and maybe it's gotten better
16 since I left. I don't remember.
17   Q.  Did you ever speak with Mr. Bennett
18 again?
19   A.  I spoke with Mr. Bennett a few different
20 times.
21   Q.  Tell me about those other conversations.
22   A.  Same kind of thing, just how things are
23 going. And -- and he said -- same thing, you
24 know, "It's something new." And he -- it's -- he
25 has an open-door policy, and that we could come

Page 112

1  to him any time -- that I could come to him at any
2  time.
3    He said -- I told him -- he said, "Ginn Group
4  don't run this place. Gulf Coast don't run this
5  place. I run this place. Niche runs this place."
6  And it wasn't well, liked, to -- taken well that I
7  went to Mr. Bennett when I needed to.
8    Q.  Okay. By -- by whom?
9    A.  By Ginn Group.
10   Q.  Okay. Did anybody at Gulf Coast have an
11 issue that you went to Mr. Bennett?
12   A.  Yes, I guess Bill didn't like it. Nobody
13 likes somebody going over their head, do they?
14   Q.  Okay. Okay. Have we, then, covered all
15 the issues or concerns that you had while you were
16 in the structures department?
17   A.  You know, I got to where I kind of was
18 reserved. I didn't speak to people unless I had to,
19 you know.
20   I'm an outgoing -- I'm usually a pretty friendly
21 person, you know, but I -- I did start to see --
22 and -- and I had 20 years and 7 months in with
23 Lear, and they knew I was hearing impaired, and
24 they treated me very well.
25   And here I'm going to a place that they're

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 113

1 hiring people with disabilities to treat me worse,
2 you know. And it was just a nightmare from the
3 get-go for me. And -- and -- and --
4 **Q. And my -- my --**
5 A. -- it's -- it's really a sad situation.
6 **Q. Okay. My question is: Were there any**
7 **other specific concerns that you haven't already**
8 **told me about while you were working in**
9 **structures? I don't --**
10 A. Yeah, then it --
11 **Q. -- I don't -- I don't want to -- I don't want**
12 **to rehash all that you told me again, but is there**
13 **anything new, is what I'm asking?**
14 A. Okay. Same thing. It went on and on.
15 **Q. Okay. That's all I need to know.**
16 **All right. So then you went to roads and**
17 **grounds; correct?**
18 A. Yeah, I was moved against my wishes. I
19 asked him. He said, "I don't care. Mr. Parks said
20 you're going in there." I said, "I don't want to go
21 in there," and he said, "but you're going."
22 **Q. And -- and Mr. Parks, again, is a Ginn**
23 **Group --**
24 A. Yeah, Ginn Group project manager.
25 **Q. Okay. Who was your supervisor for roads**

Page 114

1 and grounds?
2 A. Same people, Mike Johnson. And I say
3 "Mike Johnson." He's the foreman. He's literally
4 the boss, but they have a couple of peoples like
5 the best of the workers that are elite, but they're
6 still general maintenance workers.
7 **Q. Okay. Who -- who did you report to on a**
8 **daily basis when you were at roads and grounds?**
9 A. Mike Clemons.
10 THE REPORTER: I'm sorry.
11 THE WITNESS: Mike Clemons.
12 THE REPORTER: Thank you.
13 BY MR. JOHNSON:
14 **Q. I thought you were moved from**
15 **structures --**
16 A. Oh, the roads and grounds.
17 **Q. Yes, sir.**
18 A. Dennis. I was moved -- I'm sorry -- from
19 roads to ground --
20 **Q. Yeah.**
21 A. -- was Dennis -- and I don't remember
22 Dennis's last name, but he and there -- there was
23 a guy called "Hippie." He was over -- he's the
24 foreman, and then you just had Dennis, but Hippie
25 was the foreman, but I don't know his name

Page 115

1 exactly. That's what they called him.
2 **Q. Okay. So when you came in on an**
3 **everyday basis at roads and grounds, you'd report**
4 **to Dennis.**
5 A. Yes.
6 **Q. Okay. And he'd tell you what you needed**
7 **to do that day.**
8 A. Right, right. He would give me a work
9 order or a work crew I was working with, where to
10 go.
11 **Q. Was the set up the same? Some days you**
12 **would work with yourself and some days you'd work**
13 **with a crew at roads and grounds, or were you**
14 **always with a crew?**
15 A. They put me on a cemetery crew when I
16 first started in roads and grounds cutting -- taking
17 care of old cemeteries, weed-eating, mowing
18 grass.
19 **Q. Who was on -- else is on that crew?**
20 A. Different people.
21 **Q. Okay. How long were you on that crew?**
22 A. Until Memorial Day, from the first of May
23 to Memorial Day weekend.
24 **Q. And while on roads and grounds, was your**
25 **rate of pay the same as it was at structures?**

Page 116

1 A. Yes.
2 **Q. Okay. So that -- that didn't change.**
3 A. It didn't change; no.
4 **Q. Still worked the same shift.**
5 A. Yes.
6 **Q. Still same number of hours.**
7 A. Yes.
8 **Q. Okay. Did you have any issues while**
9 **working on the cemetery crew?**
10 A. I couldn't use a lot of my hearing aids,
11 you know. I couldn't wear my hearing aids, and it
12 was loud, you know, weed-eating, mowing grass.
13 You know, there's snakes that are back in the
14 thing, yeah, snakes and -- and different. I mean,
15 you might be in weeds and brush that high, you
16 know.
17 **Q. Okay. What --**
18 A. But I didn't dislike it.
19 **Q. Okay. Didn't have any complaints with**
20 **any individuals.**
21 A. No, not nobody.
22 **Q. Okay.**
23 A. I wasn't happy that I moved --
24 **Q. No, I understand.**
25 A. -- but I. . .

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 117

1   Q.   But -- but you didn't have any complaints
2   regarding any --
3   A.   No, sir.
4   Q.   -- the way anybody treated you on the
5   cemetery crew.
6   A.   No, sir.
7   Q.   What crew did you go to next?
8   A.   Just different crews. We might be
9   painting lines. We might be patching holes with
10  asphalt, fixing the roads. Might be cutting a tree
11  down, just different things. You'd rotate around.
12  Q.   Okay. And -- and your supervisor was
13  always Dennis.
14  A.   Yes. Now, Dennis would send you out,
15  and you would be with some other workers. And
16  somebody usually would just take charge --
17  Q.   Sure.
18  A.   -- who's been there a while.
19  Q.   Okay. Somebody would become the lead
20  of that crew on that day.
21  A.   Kind of, but, you know, they weren't, like,
22  appointed --
23  Q.   Sure.
24  A.   -- but it's just somebody may have had
25  more experience, you know.

Page 118

1   Q.   Okay. Fair enough. And would Dennis be
2   the one that would assign the crews?
3   A.   Yes, yes.
4   Q.   How many people worked in roads and
5   grounds when you were there?
6   A.   I can't tell you. Maybe 20 or so.
7   Q.   Okay. All right. And so would -- would
8   you work with all the other 19 people at some
9   point?
10  A.   Yeah, certain times. Some people were
11  operators. They will operate heavy equipment,
12  and -- it's just whatever you really need. I was
13  kind of, like, the low, low -- you know.
14  Q.   You were the new man --
15  A.   A new man on the --
16  Q.   -- in the -- in the crew; right?
17  A.   -- crew, so I was just basically a helper
18  or whatever.
19  Q.   How about -- did you know Gary
20  Matthews?
21  A.   Who?
22  Q.   Gary Matthews.
23  A.   Gary Matthews. Not right off --
24  Q.   Do you know who that is?
25  A.   Sounds familiar.

Page 119

1   Q.   Okay.
2   A.   Gary Matthews; no.
3   Q.   All right.
4   A.   That name sounds familiar to me, but I
5   couldn't pinpoint "yes" or "no," but. . .
6   Q.   Okay. Obviously, there was an incident
7   that occurred on July 2nd.
8   A.   Yes.
9   Q.   Okay. Were there any incidences or
10  issues that occurred prior to that date?
11  A.   No, sir.
12  Q.   Okay.
13  A.   I might -- matter of fact, against my
14  wishes, I liked the job. I ended liking roads and
15  grounds --
16  Q.   Okay.
17  A.   -- and they treated me pretty well.
18  Q.   And I -- I -- it sounds like you hadn't
19  gone to Bill about any issue since you'd been
20  transferred to roads and grounds.
21  A.   I can't be for sure. You know, I'd check
22  in with Bill; okay? It got to be, "How are things
23  going," and, you know, "Stop by on your lunch," or
24  he may have some paper or -- but I would check in
25  with Bill. I respect Bill.

Page 120

1   Q.   All right. But, I mean, as -- as you sit
2   here today, did you have any complaints that you
3   went to Bill with once you transferred to roads and
4   grounds?
5   A.   Maybe some Davis-Bacon pay, and -- and
6   I -- I did go to him, I believe, once about them
7   not -- people putting Davis-Bacon pay down when
8   they didn't do the Davis-Bacon work. I -- I believe
9   we got on an asphalt roller to flatten asphalt, you
10  know, and they told me to get on there so I could
11  get paid for an hour at $30-some an hour. And I
12  didn't do it.
13  Q.   Okay.
14  A.   But I didn't -- I just -- I would let him
15  know problems that were going on.
16  Q.   All right. Well, I mean, were there any
17  problems with the way anybody was treating you on
18  roads and grounds?
19  A.   No.
20  Q.   All right. Now, on -- on July 2nd, that day
21  you were working with whom?
22  A.   I was working with James Herr [phonetic],
23  Ginn Group. I was working with James Rogers,
24  Ginn Group. And I was working with a Gulf Coast
25  employee, Jeremy Lowe.

Page 121

1  Q.  Had you worked with Mr. Herr before --
2  A.  I believe I had.
3  Q.  July --
4  A.  Yes, I have.
5  Q.  -- before July 2?
6  A.  Yes, I have.
7  Q.  Do you know on how many different
8  occasions?
9  A.  A few.
10  Q.  Okay.  Less than five.
11  A.  Huh?
12  Q.  Less than five.
13  A.  Probably.
14  Q.  All right.
15  A.  Pro -- maybe that.
16  Q.  All right.
17  A.  I can't be specific.
18  Q.  Did you know Mr. Rogers before this day?
19  A.  Yes, I'd worked with Mr. Rogers before.
20  Q.  Okay.  How many times would you
21  estimate --
22  A.  Probably about --
23  Q.  -- you had worked with him?
24  A.  -- the same.  I --
25  Q.  Five or --

Page 122

1  A.  -- it's something that I really -- you know,
2  I worked with them enough.
3  Q.  Five or less.
4  A.  I can't tell you specifically, but a few
5  times.
6  Q.  All right.  And then how about Mr. Lowe?
7  A.  Same.
8  Q.  All right.  Now, were they a part of a
9  regular crew together, or were they like you, as
10  well?
11  A.  We all rotated different crews.
12  Q.  Okay.  And was -- so was it the four of
13  you on the crew that day?
14  A.  Three -- three of us -- three -- James --
15  yeah, four of us counting myself.
16  Q.  All right.  You made four.
17  A.  Yeah.  Yeah.
18  Q.  All right.  Okay.  Tell me what you-all
19  were doing that day.
20  A.  We were doing asphalt.  We were
21  patching holes.
22  Q.  Is this something you had done before?
23  A.  Yeah, a few times.  It's the only time I,
24  you know, would get -- it was a Davis-Bacon thing.
25  It was something that paid more money, so it was

Page 123

1  always good to do asphalt.
2  Q.  Okay.  How many times would you
3  estimate you had done asphalt before?
4  A.  Maybe three, three or four, maybe five.
5  Q.  Okay.  And tell me what that would
6  physically require of you.
7  A.  You would just -- sometimes you would
8  have to go get the asphalt while the other crew
9  waited, which you'd have to go off base, down 313
10  to an asphalt place.  You'd wait in line if people
11  were there.  You get the asphalt and come back.
12  And you take the asphalt off the truck, and
13  you pack it down in the hole.  And you have a little
14  roller, a little roller, you know how you roll, a
15  street roller.
16  Q.  Uh-huh.
17  A.  And you'd just roll it.
18  Q.  Okay.
19  A.  And you'd go up and down, whatever
20  they'd tell you to go on the worksheet --
21  Q.  Okay.
22  A.  -- and patch holes.
23  Q.  All right.  Is the roller something that
24  somebody drives?
25  A.  That somebody's what?

Page 124

1  Q.  Drives, or is it something that you -- is it
2  a -- is it a piece of equipment that you have to
3  drive?
4  A.  The roller?
5  Q.  Yes.
6  A.  Yeah, you had to drive.
7  Q.  Okay.  Is that something you had done
8  before?
9  A.  No, I didn't.
10  Q.  Okay.  And then you also had the truck
11  with the asphalt in it.
12  A.  And what now?
13  Q.  You also had the truck with the asphalt in
14  it --
15  A.  Right.
16  Q.  -- as well.
17  A.  Right.
18  Q.  All right.  So is that the two pieces of
19  equipment that you had?
20  A.  Right, plus shovels --
21  Q.  All right.
22  A.  -- and spreaders.
23  Q.  And -- and had you driven the truck with
24  the asphalt before?
25  A.  Yes, I have.

Deposition of Chris Steven Slaughter                                     Date: 10/29/2014

Page 125

1  Q.  All right.  And so tell me what happened
2  on that particular day?
3  A.  It was a hot -- it was a hot day, and it --
4  it was -- we had about three days of over 100
5  degrees.  We're doing hot asphalt.
6  It was towards the end of the day.  We were
7  about done.  And at that time, you moved your
8  trying [phonetic] the truck up to where the holes
9  are, you know.  You'd go and move the truck up.
10  The truck was up -- the bed was up a little bit.
11  So, of course, you moved the truck up, because I
12  don't know how to use the roller.  I'm the new guy.
13  So I kind of just did mop up, you know, a helper.
14  So we moved the truck up a little bit.  I get in
15  the truck to move it up little bit.
16  Q.  Who asked you to move it up?
17  A.  Dans -- Herr, some -- I can't be specific
18  who asked, you know.  I just -- I -- I knew it
19  needed to be moved up anyway, you know.  We're
20  part of the crew.  I think James Herr told me to
21  move the truck up a little bit.
22  When I got in the truck, Jeremy's screaming,
23  and I -- I didn't understand what he -- you know, I
24  couldn't -- I -- I just heard him screaming.  So I
25  moved the truck up and stopped and got out.

Page 126

1  And I told Jeremy, I said, "What did you
2  want?"  He said, "I was telling you to watch the
3  bed."  I said, "Man," I said, "I heard" -- I said, "I
4  know what I was doing."  I said, "Man, don't
5  scream at me like that."  I said, "I'm not" -- and --
6  and in a normal toned voice, "I'm not deaf and
7  dumb, man.  You don't have to scream at me.  I
8  know what I'm doing."
9  "I'm not screaming at you.  You" -- and at that
10  time, I told Jeremy these exact words.  "You've got
11  a disability.  I have a disability.  I accommodate
12  yours.  You accommodate mine."
13  He kept on arguing about it and arguing about
14  it.  Finally, he wasn't listening to me.  I couldn't
15  get my point across to him.  I said, "I'm not
16  arguing with you at work."  I said, "I'm done
17  arguing with you at work."
18  He kept on.  I said, "Jeremy, I'm not arguing
19  with you at work."  I said, "If you want to talk
20  about it after work, I'll stop at Dodge's and we get
21  something to eat on the way home."  He shut up.  I
22  shut up.  We went about our work and moved on.
23  Q.  Is that it?
24  A.  That was it.  That was the whole thing.
25  Q.  Okay.  Was there any further discussion

Page 127

1  after you-all left the work site about this incident?
2  A.  A little while later, right before we left, I
3  told him, I said, "I apologize that you don't
4  understand my hearing impairment," I said, "but I
5  don't like people screaming at me and -- and --
6  and talking down to me.  I've had". . .
7  He's on the phone calling somebody.  I don't
8  know who, but I just apologized to him.  I said he
9  didn't understand how I felt about people raising
10  their voice at me.
11  Q.  Well, was he trying to raise his voice to
12  get your attention?
13  A.  I guess so, you know, in hindsight or
14  something, you know.
15  Q.  Okay.  I mean, what -- what was he trying
16  to get your attention about?
17  A.  You know, he -- they tried to say that
18  there was a -- Jeremy said that I was going to
19  dump the asphalt, but that wasn't the case, that
20  wasn't the case.
21  Q.  Well, was the bed of the truck --
22  A.  Yeah, it was -- it was up a little bit, you
23  know --
24  Q.  Okay.  What -- what --
25  A.  -- so you can get it.

Page 128

1  Q.  Okay.  Was the -- I -- I've got to ask the
2  question, and then you answer.  Was the bed of
3  the truck tilted in a position where asphalt could
4  fall out of it?
5  A.  Not fall out of it.  The bed was already --
6  already raised.  The asphalt's not falling out of it,
7  but I -- you know, I moved the truck up a little bit,
8  you know --
9  Q.  Okay.
10  A.  -- like they told me to.
11  Q.  Okay.  Could that present a safety
12  concern of moving the truck with the bed elevated?
13  A.  Well, I can't say it did --
14  Q.  Could it?
15  A.  -- but it could have.
16  Q.  Okay.  What -- what could happen?
17  A.  Oh, the asphalt could just slide, the -- a
18  little bit that was left could slide out.
19  Q.  How -- how much of the asphalt was
20  there?
21  A.  It wasn't very much, maybe 1/4 of the --
22  of the bed.  It holds like a ton, two tons.
23  Q.  Yeah.  How many --
24  A.  Maybe a pile like so.
25  Q.  Okay.  How much of the -- I'm sorry.  How

Court Reporting Services, Inc.              Page: 32              Case No.: 3:14-CV-00281-CRS

Page 129

1  much asphalt would the bed hold?
2    A.  I think two tons --
3    Q.  Okay.
4    A.  -- but it's a -- just a regular,
5  normal-sized Ford pickup truck, but I think it's like
6  three -- a one-ton truck.
7    Q.  Okay.  All right.  So the bed would hold
8  two tons, and about how much was le -- did you-all
9  get a full -- full -- load that day?
10   A.  No, we were at the end of the day.
11   Q.  No, at the start of the day.
12   A.  Yes, start it was a full load ; yes.
13   Q.  All right.  And so about how much was
14  left at the time --
15   A.  I'd say --
16   Q.  -- at the time --
17   A.  -- about 1/4 --
18   Q.  -- this incident happened?
19   A.  -- about 1/4.
20   Q.  Okay.  And how far did you move the
21  truck?
22   A.  Just maybe five feet.
23   Q.  Did you have your hearing aids in at the
24  time?
25   A.  I'm sorry.

Page 130

1    Q.  Did you have the hear -- your hearing
2  aids in at the time --
3    A.  No.
4    Q.  -- of the incident?
5    A.  No, I did not.
6    Q.  Okay.  Did you have --
7    A.  It was hot and sweaty.
8    Q.  Okay.  Did you have them in at all that
9  day?
10   A.  Yes, I had them in my pocket.
11   Q.  Did you have them in at all that day?
12   A.  Did I what?
13   Q.  Did you wear your hearing aids at all that
14  day?
15   A.  Yes.
16   Q.  Okay.  When did you take them out?
17   A.  Once I got hot and sweaty, and they got
18  wet.
19   Q.  Okay.  How long had you had them out
20  prior to the incident?
21   A.  Maybe an hour or two.
22   Q.  Had you been told previously that you
23  needed to keep your hearing aids in?
24   A.  Yeah, I mean -- I mean, nobody told me I
25  had to keep my hearing aids in.  I was just --

Page 131

1  you've got to understand.  I'm working in
2  100-and-some degree hot, sweaty heat, and they
3  get wet.  They're -- they're very delicate
4  instruments.
5    See, people -- people don't know.  They're not
6  knowledgeable about what you. . .
7    Q.  But had anybody at Gulf Coast or Ginn or
8  Niche told you that you needed to keep your
9  hearing aids in while you were working?
10   A.  Said that would help me, but I could not
11  wear sweaty hearing [phonetic] -- sometimes you
12  have to wear earplugs.
13   Q.  Okay.
14   A.  So you can't always wear your hearing
15  aids.
16   Q.  Okay.  Who had told you that you needed
17  to keep your hearing aids in?
18   A.  Oh, Bill just told me, you know, that
19  when -- when I can wear them at that time.  And
20  that -- that was all part of the thing, you know.  No
21  one --
22   Q.  Okay.
23   A.  I have to explain.  When you ask me a
24  question like that, I have to explain to you,
25  because you're not knowledge -- apparently not

Page 132

1  knowledgeable about a hearing -- what -- what
2  hearing aids are.
3    You can't have sweat in 103.  The heat can
4  damage the hearing aids.  And I have a paper I
5  gave them, that I gave Gulf Coast, about the
6  issues that I deal with.
7    You can't wear them in the rain.  You can't
8  wear them with sweat all in them.  They squeal.
9  They don't work.
10   Q.  Okay.
11   A.  And that's what I'm trying to tell them
12  then.  It was. . .
13   Q.  When -- when did Bill tell you that you
14  needed to keep them in --
15   A.  I --
16   Q.  -- if you could?
17   A.  He just it would help certain times.  You
18  know, make sure I have them in, and I might not
19  have -- people might -- I might not have enough
20  trouble with them screaming at me and that.
21   Q.  Were the windows rolled up on the truck
22  at the time?
23   A.  Yeah, they said it was.  I -- I can't recall.
24   Q.  Okay.  Was the radio on?
25   A.  They -- it's been awhile.  I don't know.

Deposition of Chris Steven Slaughter                                      Date: 10/29/2014

Page 133

1  Maybe it was.
2  **Q.  "Yes," "no," what --**
3  A.  They said it was.
4  **Q.  Okay.**
5  A.  I don't recall.
6  **Q.  Okay.  So your answer is "I don't know."**
7  A.  I don't know.
8  **Q.  All right.  And was the air up on full that**
9  **day in the truck at the time?**
10  A.  I don't know.  It's not something -- I got
11  in it and I'm -- it was just for a minute.
12  **Q.  Was anyone else trying to get your**
13  **attention other than Jeremy?**
14  A.  I don't know.  I don't know, you know,
15  just. . .
16  **Q.  And was -- was anyone making any kind**
17  **of signs, you know, waving their hands trying to**
18  **get your attention?**
19  A.  I jumped in this truck and moved it five
20  feet.  I -- I knew where I was moving it already,
21  you know.  It was -- it -- it was something -- it
22  wasn't -- it was get in and move the truck five
23  feet.
24  **Q.  I understand, but was anybody trying to**
25  **get your attention?**

Page 134

1  A.  Not that I recall.
2  **Q.  Okay.  And so when you got out of the**
3  **truck, what -- what was -- who said what first?**
4  A.  I told Jeremy, I said, "Hey, man, what are
5  you screaming for?"
6  "I'm trying to get your attention so you don't
7  drop that asphalt."  I said, "Man, you didn't have
8  to scream at me.  I wasn't dumping that asphalt."
9  **Q.  Okay.  And then what was said?**
10  A.  That's when I told him that I wasn't deaf
11  and dumb, and I'd appreciate -- I said -- I've done
12  told them, "Quit screaming and raising your voice
13  to me."  I said, "I'm not deaf and dumb."  I said, "I
14  accommodate your hearing -- I mean, your
15  disability.  You accommodate mine."
16  **Q.  At any time did you tell Jeremy to "shut**
17  **his f'ing mouth"?**
18  A.  No.  No, I did not.
19  **Q.  Did Jeremy cuss you at all that day?**
20  A.  I'm not -- I don't recall.
21  **Q.  Did you cuss Jeremy at all?**
22  A.  Not that I recall.  No, it -- it was just. . .
23  **Q.  So is it possible that you did?**
24  A.  I might have.  I don't recall.  You know, I
25  was kind of -- I had been aggravated for a while,

Page 135

1  you know.  It had been -- it had been going on for
2  a long time, but I don't recall cussing anybody.
3  **Q.  Would you agree that your choice of**
4  **words probably could have been better that day?**
5  A.  I don't recall -- I don't recall what I said.
6  I remember telling him something about our
7  disability.  I accommodate his; you accommodate
8  mine.  I'm a grown man.  I'm not a kid.  Don't talk
9  to me like a kid.
10  **Q.  Would you agree that you could have**
11  **handled the situation better that day?**
12  A.  Maybe.
13  **Q.  Okay.  In what way could you have**
14  **handled it better?  If you had to go back and do it**
15  **over again, what would you have done differently?**
16  A.  I probably wouldn't have said nothing,
17  just -- like I said, this is just -- it kind of
18  snowballed; been going on for a while.  And
19  maybe -- maybe we had -- didn't understand, you
20  know.
21  At that time, I -- I don't know if I understood,
22  you know, really what's going on, you know, the
23  way he was screaming at me, you know.  And
24  maybe I didn't understand, you know, at the time.
25  **Q.  Okay.  And -- and you didn't understand**

Page 136

1  **what?**
2  A.  Why he was screaming.
3  **Q.  Okay.  And do you understand now that he**
4  **was screaming because of the bed --**
5  A.  Well, from what --
6  **Q.  -- of the truck was --**
7  A.  -- he said.
8  **Q.  -- elevated?**
9  A.  Yeah, from what he said.
10  **Q.  Okay.  Had you had any issues with**
11  **Jeremy prior to this day?**
12  A.  To Jeremy?
13  **Q.  Yes, sir.**
14  A.  No.  No, I had a good -- for the most part,
15  I enjoyed it.  I didn't want to go, but I ended up
16  liking it.  And I had no problems, and everything
17  was smooth up until that day.
18  **Q.  Had you had any issues with James Herr?**
19  A.  No.
20  **Q.  Or James Rogers.**
21  A.  No.
22  **Q.  And -- and you did make some reference**
23  **during your conversation with Jeremy about going**
24  **to Dodge's Chicken.**
25  A.  All -- all I said, I said, "I'm not arguing

Page 137

1   with you no more at work." I said, "If you want to
2   talk to -- about it after work, I'll stop at Dodge's
3   and get something to eat." My exact words.
4      Q.  What is your memory as to the tone of
5   voice that you used when you told him that?
6      A.  Calm, just like I told you.
7      Q.  Okay.  Was he in a -- a calm state when
8   you told him this, as well?
9      A.  He -- Jeremy supposedly had a disability,
10  too.  He was a Gulf Coast employee.  And from
11  what I know, it must have been combat stress,
12  from what I know.
13      THE REPORTER:  I'm sorry.  From what
14  you know --
15      THE WITNESS:  Combat stress syndrome.
16      THE REPORTER:  Thank you.
17      A.  And he was kind of a hostile person, too.
18  And, like I said, that was just -- it was hot that
19  day.  We're almost done.  I've had numerous
20  problems with my hearing or people talking to me.
21  And he's screaming at the top of his lungs.
22   And, you know, in hindsight, you know, after I
23  got out and after we went over it, you know, it --
24  it -- it's just a disagreement that we had.
25  BY MR. JOHNSON:

Page 138

1      Q.  Okay.  You mentioned that he was kind of
2   a hostile person, too.  Are -- are you a hostile
3   person?
4      A.  No.
5      Q.  Has anybody described you as that way
6   before?
7      A.  I mean, you know, if you -- if you do me
8   wrong, I'm going to stand up for myself, you know.
9   That's true.
10      Q.  Has -- has anybody said to you that they
11  think that you're hostile?
12      A.  No, they'll tell you that Chris -- Chris is a
13  good guy, but he's not going to let you push him
14  around.
15      Q.  Okay.  Do you know what Mr. Lowe's
16  disability was other than combat stress?
17      A.  I know he got hit by a roadside bomb.
18      Q.  Do you believe that anybody could
19  interpret your actions on July 2nd as being hostile?
20      A.  No, because that's not what I meant, but,
21  you know. . .
22      Q.  I know you didn't mean it, but did -- do
23  you think that somebody could view them as
24  hostile or intimidating?
25      A.  I -- I didn't give it a thought, you know.

Page 139

1   I --
2      Q.  As you --
3      A.  -- don't know.
4      Q.  As you sit here today --
5      A.  I do not know.
6      Q.  -- as you sit here today. . .
7      A.  I guess you can interpret things a
8   different way.  I don't know.  I don't know what he
9   thought.  I know what I said.
10      Q.  You know what you said, but you don't
11  know how Jeremy interpreted it.  Would that be
12  fair?
13      A.  No, I don't know how he interpreted it.
14      Q.  Did you go talk to Bill that day?
15      A.  No, it was at the end of the day.  I didn't
16  think no more of it.
17      Q.  Okay.
18      A.  It was not something -- it was at the end
19  of the day.
20      Q.  Did you talk to anybody else that day
21  about it?
22      A.  No.  I didn't feel they'd do anything about
23  it anyway.
24      Q.  You knew, obviously, at -- at this point
25  what -- the chain of command and the people that

Page 140

1   you needed to report things to; didn't you?
2      A.  Yeah.
3      Q.  Who did you next talk to about the
4   incident?
5      A.  I talked to Bill the next morning.
6      Q.  Okay.  Let me ask you this before we
7   move -- move to the next morning.  Is there
8   anything else that you recall happening that day
9   on July 2nd, the day of the incident, that we haven't
10  talked about?
11      A.  No, I just -- it -- it ended.  It was over,
12  you know.
13      Q.  Okay.
14      A.  He didn't understand how I felt, and we
15  weren't getting anywhere.
16      Q.  And were you all --
17      A.  And I wasn't going to argue in a heated
18  argument at work.
19      Q.  Were -- were you-all having a heated
20  argument?
21      A.  Not -- you know, he's trying to explain.
22  And I don't mean heated, but just trying to get
23  your point across.  And we weren't getting
24  anywhere.  And that's when I said he had disability
25  and I have one.  I'd accommodate his;

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

---

Page 141

1 accommodate mine.
2   And then I -- and then a little while later,
3 as -- as being the man that I am, I just said, "I'm
4 sorry you don't understand what I go through
5 because of my disability." So however he took it,
6 you know, if it's hard feelings or -- or whatever.
7   Q.  Okay. What would you say, that you-all
8 had an argument?
9   A.  A disagreement.
10   Q.  Okay. That's -- that's the word you'll use
11 is a "disagreement."
12   A.  [nods head]
13   Q.  I'm sorry. Did --
14      THE REPORTER: I put down that he
15 nodded.
16      MR. JOHNSON: Okay.
17   A.  Oh, I'm sorry.
18 BY MR. JOHNSON:
19   Q.  That's all right. Did --
20   A.  Yeah. I'm sorry. I said disagreement --
21   Q.  Okay.
22   A.  -- so --
23   Q.  All right. So that's the word -- that's the
24 word you'll use is "disagreement."
25   A.  Yeah.

Page 142

1   Q.  All right. Who did you next talk to, then,
2 about this disagreement?
3   A.  I talked to Bill.
4   Q.  All right. And how did that come to be?
5 Did Bill call you in?
6   A.  He just -- Bill -- I seen Bill in the
7 restroom the next morning, and I told Bill -- he
8 asked me how things were going and -- like we
9 always do. I said, "Well, everything's going good.
10 I like" -- I told him that I liked roads and grounds,
11 you know. I had checked in with him before, and
12 things are getting better. And, you know, it was --
13 at least, you know, I wasn't having the incidents I
14 was having.
15   And I told him that I had a -- a -- a
16 disagreement with Jeremy hollering at me, raising
17 his voice to me. And a little while later they
18 called me in to make a statement of what
19 happened. And I was told how to make my
20 statement.
21   Q.  Okay. Did were you called in to make the
22 statement before you talked to Bill or afterwards?
23   A.  After.
24   Q.  Okay. Did Bill know about the incident at
25 the time you talked to him?

Page 143

1   A.  I didn't know.
2   Q.  Okay. Who called you in to make the
3 statement after you talked to Bill?
4   A.  Gary Nichols.
5   Q.  And what did Mr. Nichols ask you to do?
6   A.  I was the last one called in to make a
7 statement. And Mr. Nichols told me to make my
8 statement specifically up to the point until I got
9 out of the truck. He said, "Just make your
10 statement until you exit the truck." So I didn't get
11 to explain in my statement the whole situation.
12   Q.  Okay. Did you ever make a statement
13 that explained the whole situation?
14   A.  I believe I did when they called me in to
15 terminate me.
16   Q.  All right. What -- do you recall what
17 statements you gave to Mr. Nichols?
18   A.  I had to make a writing -- a written
19 statement. I was called into the roads and
20 grounds foreman's office, that Gary Nichols and
21 Hamlet Braxton, the project manager's son, Ryan
22 Braxton, was his assistant. And they told me to
23 make my statement up to -- Gary told me to re --
24 make my statement up until the exit the truck.
25   Q.  Okay. And was it your understanding that

Page 144

1 statement was being taken for safety purposes?
2   A.  I do not know.
3   Q.  Okay. Okay. Did you understand that
4 there was a safety concern relative to that
5 incident?
6   A.  I guess, you know, there's safety incident
7 to any -- I mean, for anything, you know. You've
8 got a moving vehicle.
9   Q.  All right.
10   A.  You've got workers on the road.
11   Q.  So you made that statement for Mr.
12 Nichols -- or wrote that out for him.
13   A.  Yes.
14   Q.  Okay.
15   A.  I wrote it like he told me.
16   Q.  All right. Who else did you talk to that
17 day?
18   A.  Bra -- Braxton, Ryan Braxton was in there
19 with him.
20   Q.  Okay. Did you-all talk about the incident
21 or did they --
22   A.  No, just told --
23   Q.  -- just ask you --
24   A.  -- me to make my statement, and I was
25 the last one called in to make it.

---

**Page 145**

1  Q.  Okay.  And was what you wrote in the
2  statement true and accurate?
3  A.  Yes.
4  Q.  Okay.  And did you include in that
5  statement as much detail as you could recall about
6  what had happened prior to you exiting the truck?
7  A.  I can't remember -- it's been awhile.  It's
8  been a couple years -- exactly when I made --
9  exactly what's went on since then.
10  Q.  Okay.  But, I mean, at -- at the time, did
11  you try to include as much information as you
12  could --
13  A.  Yeah, up to when he said --
14  Q.  Yeah.
15  A.  -- to stop my statement.
16  Q.  Okay.  All right.  And then after you made
17  the -- the handwritten statement, who did you talk
18  to after that?
19  A.  At the time, I went back to work, and I
20  worked the rest of the day.  And I believe that was
21  early, like, 8:00 in the -- that morning.  I made a
22  statement; went out on a crew.
23  Q.  Okay.  Did you work with Jeremy that
24  day?
25  A.  No, they put that in a building that we

**Page 146**

1  stored.  Later that day, when we take our
2  equipment back to a building that's -- where we
3  was.  There's a building next door that they own,
4  James Herr, Jeremy Lowed, and James Rogers
5  was all sitting at a  table.  They didn't have work
6  that -- the rest of that day.  They just sit there.
7  Q.  Okay.
8  A.  So I don't know why.
9  Q.  Okay.  But did you talk to any of those
10  three that day?
11  A.  No.
12  Q.  Have you talked to any of those three
13  since the incident on July 2?
14  A.  No, I haven't seen them.
15  Q.  All right.  And you haven't talked to them.
16  A.  No.
17  Q.  Okay.  What happened later that day?
18  A.  I come back to work, and it was like a
19  normal day.  I filled out my work sheet for the day.
20  I went home.
21  It was my daughter's birthday, July 3rd.  I get
22  home.  I had a missed call about 7:00 that night.
23  My grandmother had called and said that somebody
24  from Gulf Coast was trying to get ahold of me.
25  At that time, I called Bill van Cleave at his

**Page 147**

1  house and said -- where he had called me from.
2  And he said, "Hey, we're suspending you with pay."
3  And I says, "Suspending me with pay?  At 7:00 at
4  night?"  I -- I didn't understand.
5  He said, "I don't really know."  He said, "I was
6  told to tell you you're suspended with pay, and I'll
7  get back with you and let you know."
8  Q.  Okay.  What happened after that?
9  A.  I was off work -- I think that was a
10  Tuesday.  I was off work until Mr. Allen Harbin
11  called me to come in to work -- or he called me the
12  next day, and we went over the incident, I believe
13  it was.
14  Q.  Okay.
15  A.  I don't know the exact date, but I --
16  Q.  Okay.
17  A.  -- did speak with Al -- Allen Harbin due to
18  the incident.  He called me at home.
19  Q.  All right.  So you talked to him about the
20  incident.  And then did he give you any decision as
21  to what your status was at that point, or did he
22  call you --
23  A.  Not at --
24  Q.  -- back later?
25  A.  -- that time; no.

**Page 148**

1  Q.  Okay.  Did somebody call you back at
2  another time?
3  A.  They called me and told me to come to
4  work on that Monday, the 9th.  "Could you come in
5  today?"  And I said, "Yes, sir."  Told me to be
6  there at 4:00, I believe it was.
7  Q.  Okay.  And who did you meet with at that
8  time?
9  A.  At that time, I came in.  I came into Bill's
10  office.  We sat down.  He called Allen Harbin on
11  the phone, on the speakerphone.  And he said,
12  "How are you doing?  Thanks for coming in,"
13  roundabout.  I couldn't be specific -- exact words.
14  He said, "We decided that we're going to
15  terminate you due to threats of violence."  He
16  said, "We're afraid that you're going to carry out
17  your threats."  He said he was afraid I was going
18  to carry out my threats.
19  And I told him at that time, "I never
20  threatened anyone.  I didn't threaten anyone."
21  And I said, you know. . .
22  And he said, "Well, we're terminating."  And
23  I -- I just said, "Oh, could" -- I said, "Am I going to
24  get my unemployment?"  And he said he didn't
25  know.

Deposition of Chris Steven Slaughter                                      Date: 10/29/2014

### Page 149

1  Q.  Okay.
2  A.  And I told Bill at that time that I was
3  okay.  And -- and I thanked him.  He'd been good
4  to me.  He tried to -- tried to make things better,
5  but he said that I was terminated due to threats of
6  violence.  He was afraid I was going to carry out
7  my threats.
8  Q.  That's what Mr. Harbison [sic] said.
9  A.  Yes, Mr. Allen Harbin.  I -- I suspect
10  that's who it was.  That's who he identified --
11  Q.  Okay.
12  A.  -- hisself as.  He was on speakerphone
13  from Pensacola, Florida.
14  Q.  Have you talked to anybody at Gulf Coast
15  since July 9th?
16  A.  I called the -- whatever the vice president
17  is afterwards, that I wanted to, you know -- I -- I
18  tried to explain how -- I tried to keep my job.  I
19  wanted my job.  It -- it was -- was getting better,
20  you know.
21  I liked my job.  I needed my job.  And I left a
22  message, but I don't think he ever called me back.
23  Q.  Do you remember who that was?
24  A.  Yeah, I would know it.  I could tell -- I
25  could find out who it was.  I know he was the vice

### Page 150

1  president.
2  I talked to Jean Robinson, the attorney for
3  Niche.
4  Q.  And what did she say?
5  A.  She agreed.  You know, she listened to
6  me, and -- and told me, you know, "File for
7  unemployment and". . .
8  Q.  Did she tell you anything else?
9  A.  She just said she would check, and --
10  and, like I said, they made these statements
11  against me, so, you know. . .
12  Q.  Did you ever speak to the vice president
13  of Gulf Coast, or was that just a voicemail?
14  A.  To Allen -- or to the guy, the vice
15  president?
16  Q.  Yes, sir.
17  A.  No, I never spoke with him.  I left a
18  message, but. . .
19  Q.  All right.  Did you ever speak to Mr.
20  Bennett again?
21  A.  No.
22  Q.  Did you ever --
23  A.  Oh, yes, I did speak with Mr. Bennett.
24  Yeah, I did speak to Mr. Bennett.  I don't recall
25  exactly when.

### Page 151

1  Q.  And what did he say?
2  A.  I don't know if it was before they
3  terminated me, or maybe it's after, you know.
4  Q.  Okay.
5  A.  So much -- a lot of times with my --
6  Q.  What do you remember him -- he -- what
7  do you remember Mr. Bennett saying to you?
8  A.  I'm sorry?
9  Q.  What do you remember Mr. Bennett saying
10  to you?
11  A.  He just listened to me, and, you know,
12  they -- I told him what happened asked, and --
13  and -- really, you know, he didn't say anything
14  other than, I guess, he was going to check into it.
15  I just told him I wanted my job and that -- you
16  know, that I didn't threaten anybody.  And it had --
17  I had complained many times, and it just was a
18  misunderstanding.
19  Q.  Uh-huh.  How -- how do you claim -- or
20  what did -- strike that.
21  What is your claim of discrimination with
22  respect to Gulf Coast?
23  A.  Not getting the Davis-Bacon pay.  I
24  applied for a plumbing job.  I wanted to get out
25  of -- get away from, you know, where I was in

### Page 152

1  structures and that.
2  And I asked them -- I had an interview with
3  Mr. Parks.  Mr. Bennett was in there.  They -- they
4  post a job that's up, and I wanted a plumbing job.
5  And I asked them -- I interviewed for it.
6  They said, "Would you be willing to go to
7  school?"  And I said, "I would."  And I said, "If I
8  got into schooling, could I -- you know, could I
9  move into plumbing or something?"  And they told
10  me they couldn't guarantee it at the time.
11  I didn't get the plumbing job that I interviewed
12  for.  I thought -- they gave it to another guy
13  younger than me, a Gulf Coast employee.
14  And I know many times that I didn't get the
15  Davis-Bacon pay, that we would hand our paper in,
16  that the guy I worked with got Davis-Bacon pay for
17  doing the same work as me.
18  Q.  Do you know why that was?
19  A.  I don't know why.  I said just
20  discrimination.
21  Q.  I mean, was that pay -- how many times
22  did that happen?
23  A.  Many times that you'd do something or he
24  wouldn't -- you know, they'd put me off.  On a
25  Saturday, we're painting.  It pays Davis-Bacon

Deposition of Chris Steven Slaughter                                          Date: 10/29/2014

Page 153

1  pay.  At that time they brought people from other
2  shops, but I wouldn't get to paint.  I'd have to do
3  something else.  I wouldn't get the Davis-Bacon.
4  I'd only get my regular pay.  Different incidents.
5     Q.  How many times?
6     A.  Three or four.
7     Q.  Okay.
8     A.  Plus the job that I applied for that I
9  offered to go to school.  I would have enrolled in
10  school.
11     Q.  All right.  So there were three or four
12  occasions in which you thought did you not get
13  Davis-Bacon pay because of --
14     A.  Yes.
15     Q.  -- some discrimination.
16     A.  Yeah.
17     Q.  And -- and was it the Ginn Group who
18  would determine whether you got Davis-Bacon pay
19  or not?
20     A.  Yes, sir.
21     Q.  All right.  What would have been the
22  differential in your rate of pay had you gotten
23  Davis-Bacon pay?
24     A.  If you're rolling with a roller, painting, I
25  think it paid 19.05.  If you painted with a brush,

Page 155

1     A.  I don't know.  He was in a different shop.
2     Q.  You don't know his name or her name.
3     A.  No.  No.  I know I offered to go to school,
4  and told them I would enroll.
5     Q.  Did that person have a disability?
6     A.  I believe so.
7     Q.  Okay.  Do you know --
8     A.  I'm not --
9     Q.  -- if that person already had a plumbing
10  license?
11     A.  No, he didn't.
12     Q.  Okay.  But, again, it was the Ginn Group
13  who determined who got that position.
14     A.  Yeah.
15     Q.  Okay.  Well, how -- I guess I'm a little
16  confused.  How -- how do you claim Gulf Coast
17  discriminated against you with respect to that
18  plumbing position when they didn't make that
19  determination?
20     A.  Well, the guy was a -- a tool room
21  attendant.  He didn't work out there doing different
22  forms of work, like I did myself.
23     And then I volunteered -- I -- I had done some
24  plumbing, you know.  And I offered to go to school.
25  And I didn't get the job.

Page 154

1  they're cutting in, I think you got 26.26, I believe
2  it was, an hour.
3     Q.  Okay.  So $7 or so an hour.
4     A.  I guess so, whatever it is.
5     Q.  Okay.  All right.  Now, you also made
6  mention that you applied for a position.
7     A.  Yes.
8     Q.  Okay.  Who determined whether you got
9  that position or not?
10     A.  Ginn Group, Steve Parks.
11     Q.  And that was a plumbing position.
12     A.  Yes.
13     Q.  When did you apply for that position?
14     A.  Within that time frame, four or five
15  months after I started.  I'm not for sure.  I did
16  interview.
17     Q.  And who did you interview with?
18     A.  Todd Bennett, Steve Parks, and a
19  plumbing supervisor.
20     Q.  Okay.
21     A.  And I don't know his name.
22     Q.  And -- and who was the individual that
23  got that position?
24     A.  A Gulf Coast employee.
25     Q.  Okay.

Page 156

1     Q.  I understand, but it -- it doesn't sound
2  like Gulf Coast had anything to -- to do with who
3  got that position; correct?
4     A.  I -- I don't know.  I -- I really don't know.
5     Q.  Okay.
6     A.  I don't know what goes on behind the
7  scenes.
8     Q.  All right.  But --
9     A.  I know that I wanted it, and they knew I
10  wanted it.
11     Q.  And it's your testimony that Steve Parks
12  determined who got that position.
13     A.  I believe so --
14     Q.  Okay.
15     A.  -- from what I know.
16     Q.  Okay.  What other ways, if any, do you
17  claim that Gulf Coast discriminated against you?
18     A.  Just on breaks and that, you know.  I
19  wasn't -- I didn't -- my rules weren't the same
20  rules.  There's double standards.
21     Q.  All right.  And you referenced earlier the
22  smoking.  If you didn't smoke, you didn't get to --
23     A.  Right.
24     Q.  -- take a break.
25     A.  Right.  You know, just --

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 157

1  Q.  All right.  Was there --
2  A.  -- just --
3  Q.  -- was there any --
4  A.  -- picking at me.
5  Q.  -- any other way?
6  A.  Maybe just not getting the Davis-Bacon,
7  you know, not getting to go on that crew as much.
8  I didn't get the same amount.  They always had a
9  lot more Davis-Bacon work than I got.
10  Q.  Okay.  All right.  You already told me
11  about that, so I don't want to replow the --
12  A.  I -- I --
13  Q.  -- same ground.
14  A.  No more that I can recall, you know, right
15  off.
16  Q.  All right.
17  A.  So. . .
18  Q.  So those -- not getting Davis-Bacon, the
19  plumbing position, and double standard on breaks
20  is the only ways that you claim Gulf Coast
21  discriminated against you.
22  A.  Well, did you see my EOC complaint?
23  Because I know I have some different issues on
24  there, but I --
25  Q.  Well --

Page 158

1  A.  -- can't recall at this time what-all they
2  were.
3  Q.  Okay.  Well, I'm -- I'm here to find out all
4  the other ways that you claim that you were
5  discriminated against.
6  A.  Okay.
7  Q.  Are -- are there any others?
8  A.  Not that I can recall.
9  Q.  Is it your claim that Gulf Coast
10  discriminated against you by terminating you?
11  A.  Yes.
12  Q.  Okay.  What's the basis of that?
13  A.  Just from my complaints and me going
14  over their head to Todd Bennett; them calling
15  Niche down.  And I filed an EOC complaint, which
16  they said I done something that I didn't do by
17  threats of violence.
18  Q.  All right.  Any other ways that you claim
19  that -- or that are the basis of your claim that you
20  believe Gulf Coast discriminated against you in the
21  termination?
22  A.  They -- they let people make statements
23  that didn't add up and didn't use them or -- you
24  know, they didn't look into it.  They didn't read the
25  statements and say, "Hey, wait a minute.  There's

Page 159

1  some diff -- some -- these ain't right.  They ain't
2  the same."
3  You know, they -- they didn't listen to me at
4  all.  They didn't even read the statements, as far
5  as I'm concerned.  There's no way you could read
6  those statements and terminate me, and not listen
7  and know something was wrong.  And, to me, that's
8  discrimination.
9  Q.  All right.  So it's -- it's your belief that
10  you were terminated by Gulf Coast because you
11  had made complaints on the job.
12  A.  Yes.
13  Q.  And because you went to Mr. Bennett.
14  A.  Yes, over their heads.
15  Q.  And -- and because you had filed an
16  EEOC complaint.
17  A.  Yes.
18  Q.  All right.
19  A.  And I had complained on -- on the
20  supervisors talking to me, to Bill.
21  Q.  All right.  That -- that -- that's what I
22  presumed you --
23  A.  Okay.
24  Q.  -- meant when you --
25  A.  Okay.

Page 160

1  Q.  -- based on your complaints.
2  A.  Well, I meant numerous complaints.
3  Q.  Right.  All right.  Did you file income tax
4  returns in 2009, 2010, and 2011?
5  A.  Yes, I file a tax return every year.
6  Q.  All right.  I've not been provided those.
7  If you can provide those to your counsel so that so
8  we can have copies of those, please?
9  A.  Say it again, now.
10  Q.  I have not yet been provided copies of
11  those.
12  A.  A copy of what years?
13  Q.  2009, 2010, and 2011.
14  A.  Okay.
15  Q.  So if you can get those to your counsel?
16  A.  Okay.  Okay.  Did you ask for those?
17  Q.  We had.  So if you can look into that and
18  get those for us?
19  A.  I thought I gave you what -- what I was
20  asked for.
21  Q.  Yeah, I've only been given 2012
22  and 2013.
23  A.  Okay.  Okay.
24  Q.  And then if you have W-2s on all those
25  years --

Court Reporting Services, Inc.                Page: 40                Case No.: 3:14-CV-00281-CRS

Page 161

1   A.   Okay.
2   Q.   -- in addition to 2012 and 2013, please
3   provide those, also.
4   A.   Okay.
5   Q.   You listed a number of individuals.  I
6   want to go over some of those --
7   A.   I left something out that I've recalled
8   since then, too.
9   Q.   Okay.  All right.  Well, we'll get in --
10   MR. BOYLAN:  Can we take a break
11   before you do that?
12   MR. JOHNSON:  Sure.  Yeah.
13   [WHEREUPON, a brief recess is taken.]
14   BY MR. JOHNSON:
15   Q.   All right.  Mr. Slaughter, you've identified
16   some individuals that may have knowledge
17   regarding some of the facts of this case, and --
18   A.   Yes.  Yes.
19   Q.   -- and I just want to go over that list.  A
20   lot of them we've already talked about, so I'm not
21   going to repeat some names that -- that we've
22   already discussed.  All right.  There was a Richard
23   Waters.
24   A.   Richard Waters.
25   Q.   Who is he?

Page 162

1   A.   Richard Waters was a project manager at
2   the Ginn Group when they had the contract for
3   themself, you know, for just them.  Then Niche
4   took over, and he goes to Niche and works for
5   Niche.
6   After the complaints and all these things has
7   started going on -- and I'm hired in [phonetic] and
8   I'm -- I'm not familiar with the operation or how
9   they do things.  After I had complained -- and I
10   complained to Mr. Parks.  That was his son-in-law.
11   I mean, Richard Waters is Steve Parks son-in-law.
12   He moved to Gulf Coast, and he was the project
13   manager of Gulf Coast.  He became Bill van
14   Cleave's supervisor.
15   Q.   Okay.  What does Mr. Waters know about
16   these facts?
17   A.   He's the one that filled the papers out
18   that I was term -- you know, that -- that they was
19   terminating me due to this threats of violence.  He
20   didn't -- knows that I had complained, you know.
21   Q.   Did he know that you had complained?
22   A.   Yes.
23   Q.   How -- how did he know --
24   A.   I had complained on him.
25   Q.   How did you know that?

Page 163

1   A.   How did I know that?
2   Q.   Yeah.  How did you know that Mr. Waters
3   was aware you had complaint of the way you had
4   been treated?
5   A.   Because I've tried to speak to Mr. Waters
6   and his son -- or his father-in-law.  I had went to
7   them.  I tried to speak with Mr. Waters.  I've asked
8   for Mr. Waters.
9   Q.   Okay.  Did you ever speak with him
10   directly?
11   A.   Never got -- never got to.
12   Q.   So are -- are you aware as to what
13   knowledge he has?
14   A.   Yeah, he's the one that terminated me.
15   He's the one that sent word to terminate me.
16   Q.   Okay.
17   A.   He's the one that filled out the papers
18   that says threats of violence and that.
19   Q.   Okay.  So you -- you have some paper
20   with his signature on it.
21   A.   Yes.
22   Q.   Okay.
23   A.   Yeah, signed terminated due to threats of
24   violence, Richard Waters.
25   Q.   Okay.  Then you have Mark Heck,

Page 164

1   H-e-c-k.  Who is he?
2   A.   Mark Heck's a worked, a Ginn Group
3   worker.
4   Q.   All right.  What does he know?
5   THE REPORTER:  I'm sorry.  He's a what?
6   MR. JOHNSON:  Ginn --
7   THE WITNESS:  A Ginn Group --
8   THE REPORTER:  Thank you.
9   THE WITNESS:  G-i-n-n Group, Ginn
10   Group.
11   BY MR. JOHNSON:
12   Q.   What does he know?
13   A.   He's -- just situations I had to go
14   through, and -- and right off the bat, me and him
15   worked together.  He didn't know, and he screamed
16   at me one day, "Hey," and -- and was talking to me
17   loud, hostile.  And I just explained to him, I said,
18   "Man, I'm sorry.  I don't always hear you.  I'm
19   hearing impaired."
20   And -- he told Todd Bennett that, you
21   know, "Chris explained.  I didn't know he was
22   hearing impaired.  I don't know what" -- they don't
23   tell people what their disabilities are.  They didn't
24   go over what people was going to -- what their
25   disabilities were.  They didn't tell these people

Deposition of Chris Steven Slaughter                                      Date: 10/29/2014

Page 165

1  they we're working with.
2    And after that, you know, he knew, you know,
3  some of the problems I was dealing with, but he's
4  somebody that I educated about what I go through.
5  And -- and he -- he was great ever since then, but
6  we did have an incident about my hearing.
7    Q.  Okay.  And once he became
8  knowledgeable, did you have any more incidences
9  with Mr. Heck?
10   A.  No.
11   Q.  Is he somebody that you keep in touch
12  with?
13   A.  Yeah.
14   Q.  Are you-all friends?
15   A.  Yeah, we're friends.
16   Q.  When's the last time you've seen him or
17  talked to him?
18   A.  He works at Zachry now, but I worked
19  with -- his girlfriend worked there with me before,
20  but, you know, he works and, I mean, we -- you
21  know.  I mean, yeah, we're friends.  I'm friends
22  with a lot of them.
23   Q.  Okay.  When did he leave Ginn Group?
24   A.  He left Ginn Group -- I'm -- I m not fam --
25  I'm not sure.

Page 166

1    Q.  And do you know why he left Ginn Group?
2    A.  No.
3    Q.  Is he still at Zachry?
4    A.  Yes, recently at Zachry.  He hasn't been
5  there long.
6    Q.  Then I have a Dave -- is it Anderson --
7    A.  Dave Anderson.
8    Q.  -- at the Ginn Group.  What does he
9  know?
10   A.  Well, he knows -- he was in there when
11  they told me why -- Mikey Clemons asked me why I
12  couldn't hear.
13   Q.  Okay.
14   A.  He was sitting in the break room.  See,
15  sometimes I might -- hearing aids don't mean you
16  always hear everything people say.  They only help
17  you hear.
18   We'd have a meeting, and I'm sitting over here
19  in this big room.  And people are talking, and --
20  and he's -- we have a safety meeting every
21  Thursday.
22   Well, he said something about the paint.  And
23  it was a safety issue that I thought it was
24  important enough to make sure I heard him
25  correctly.

Page 167

1    After the meeting, I walked up to Mikey
2  Clemons, and I said, "Mike, you know, I don't hear
3  well.  Make sure I hear what you said."  And I --
4  "Why can't you hear?"  And Dave Anderson
5  happened to be sitting there --
6    Q.  Okay.
7    A.  -- on that -- on that -- on hat incident.
8    Q.  Okay.  Does -- according to your
9  knowledge, does Mr. Anderson know anything else?
10   A.  Yeah, he knows that we were taking their
11  jobs, but from what I understand now, he moved.
12  He had a disability, and he moved to Gulf Coast
13  and works --
14   Q.  Okay.
15   A.  -- for them now.
16   Q.  All right.  Then Ronnie, it's i-e, Ammons,
17  A-m-m-o-n-s --
18   A.  Right.
19   Q.  -- what does he know?
20   A.  He knows the same things, the problems
21  that I've had, you know, working in that shop,
22  and -- and -- and not being able to hear, and them
23  not being prepared for working with people with a
24  hearing impairment.
25   Q.  Okay.  And was Mr. Ammons a Ginn Group

Page 168

1  employee?
2    A.  Mr. Ammons is a Ginn Group; yes.
3    Q.  All right.  Then Jeff Boone, B-o-o-n-e.
4    A.  Yes.
5    Q.  What does he know?
6    A.  He is a Gulf Coast with a disability, and
7  he knows that, you know, they put us in a situation
8  that they weren't trained to work with people with
9  disabilities, you know.  Weren't ready to work with
10  my disability, but. . .
11   Q.  Do you know how long Gulf Coast had
12  been working under that system at Fort Knox?
13   A.  I -- I did not know.  I knew nothing about
14  Gulf Coast whatsoever until the day I worked in
15  there.
16   Q.  Okay.  Then David Bowling, B-o-w-l-i-n-g.
17   A.  David Bowling, Ginn Group employee, I --
18  just someone I worked with, you know, that -- that
19  knows that -- he was scared he was going to lose
20  his job any time.  They all were scared that they
21  were going to be the next ones to go, which they
22  told them they were going to go.  Eventually they
23  were going to go.
24   Q.  Jordan Kay, K-a-y.
25   A.  Yes.

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

**Page 169**

1  Q.  What does --
2  A.  Gulf --
3  Q.  -- Jordan know?
4  A.  Gulf Coast employee.  Same thing, come
5  in with us.
6  Q.  Does he know -- what does he know
7  about -- about you and your claim?
8  A.  Just -- me and him just -- just -- my
9  hearing problems that he didn't know.  You know,
10 would tell me something and get aggravated
11 because I don't hear.  You know, might ask twice
12 or grab the wrong thing.
13 Q.  And then a Glenn Terry.
14 A.  Glenn Terry.
15 Q.  Yes.
16 A.  He is a Ginn Group employee, and I
17 worked with him, you know, just knowing that I
18 have trouble communicating with people.
19 Q.  And then Zach Dixon.
20 A.  Zach Dixon, Ginn Group employee.
21 Q.  What does he know?
22 A.  He's -- made a false statement against
23 me.
24 Q.  Okay.  In what way?
25 A.  Said that I told him to meet me at

**Page 170**

1  Dodge's at -- around some date, that the incident
2  didn't take place.  Said I gave him the finger at a
3  stop sign while I was on the side of the road.
4  Q.  Did -- did any of that take place?
5  A.  No, sir.
6  Q.  Did you ever have any incident with Mr. --
7  Mr. Dixon?
8  A.  No.
9  Q.  None at all.
10 A.  No, not until -- I mean, I did once, you
11 know.  Statements were made.  I mean, you know,
12 he's another one that -- that we're taking their
13 work, you know.  They -- that we weren't well liked.
14 I wasn't well liked at all.
15 Q.  Why is that?
16 A.  I couldn't hear.
17 Q.  Okay.  Was there a time in which Mr.
18 Dixon told you not to -- not to touch him?
19 A.  No.  No.
20 Q.  Not to put your arm around him, not to
21 poke him, nothing like that.
22 A.  Me and Zach were friends I thought, I
23 mean, you know, where we were compatible.  I
24 mean, he was good friends with -- with Steve Parks
25 and those.  He's -- he -- he --

**Page 171**

1  Q.  Okay.  But you --
2  A.  I -- I don't understand.  I don't know.  I
3  can only tell you no.
4  Q.  But you never had any issue with Mr.
5  Dixon at all.
6  A.  Never issues.  No issues with Zach.
7  Q.  Did he ever have an issue with you?
8  A.  Not that I know of.
9  Q.  Okay.  Who is Don Woods?
10 A.  Don Woods is a friend that I worked with
11 at Lear for 20-some years.
12 Q.  Okay.  And what's he know about all of
13 this?
14 A.  He -- he made -- when -- at Lear, he
15 always took care of me and my hearing and -- and
16 watched out for me.  And we usually worked
17 together.
18 He knows I had an impairment.  He -- he
19 knows what I went through, and he always -- you
20 know, he's my friend, someone I talk to.  One of
21 my best friends.
22 Q.  Were there any complaints made about
23 you while you worked at Gulf Coast?
24 A.  Not that I know of, not -- nothing that was
25 brought to my attention other than this with Jeremy

**Page 172**

1  Lowe.
2  Q.  Did you ever any -- ever have any
3  discussions with Bill van Cleave about things that
4  you needed to do differently?
5  A.  He told me to have patience and
6  tolerance, but that -- you know, just like we would
7  talk.  It's not something, you know, was written or
8  write up or something, you know.  We would just
9  talk about it.
10 And he's the one that always stressed that I'm
11 a pioneer.  He said we're the first ten people
12 they've ever hired.  It's a work in progress.  That's
13 what I was told.
14 You know, "We're working through it, and, you
15 know, I think we're going to have a good thing one
16 day."
17 Q.  And to your knowledge, were there any
18 disciplinary actions or corrective actions taken
19 against you during your employment at Gulf Coast?
20 A.  No.
21 Q.  Okay.
22 A.  Never.
23 Q.  Do you know the amount of damages that
24 you're claiming in this action?
25 A.  It's a fair -- it's fair to me.

Deposition of Chris Steven Slaughter                                      Date: 10/29/2014

Page 173

1   Q.  Okay.  And is there a certain amount that
2  you are claiming?
3   A.  I'm sorry?
4   Q.  Is there a certain amount of damages that
5  you are claiming?
6   A.  Yeah.
7   Q.  And what is that amount?
8   A.  500,000, and around my lost wages, I
9  believe it's around $6,000.
10   Q.  And what is the $500,000 for?
11   A.  Pain and suffering, and they ruined my
12  credit.  They have me behind on child support.
13  They embarrassed me.  They made false
14  statements against me.
15   They repossessed my car; got behind on rent;
16  gad to borrow money.  They give me a poor
17  reference, and never listened to my complaints.  It
18  should have never got to this point.
19   Q.  What was the difference in what your
20  take-home pay was versus what you were drawing
21  on unemployment?
22   A.  I couldn't tell you.  You'd have to figure
23  it up yourself, you know.
24   Q.  Okay.  Prior to being terminated from
25  Gulf Coast, had you been behind on your child

Page 174

1  support payments?
2   A.  No.
3   Q.  You were even --
4   A.  Even.
5   Q.  -- and making timely payments.
6   A.  Even.  As a matter fact, I'm -- I'm even
7  now and I haven't been working.
8   Q.  All right.  When was your car
9  repossessed?
10   A.  My car was repossessed in the fall
11  of 2012.
12   Q.  How much did you owe on it at the time it
13  was repo --
14   A.  It was a brand-new car.  I bought it in
15  2012, March/February 2012.
16   Q.  Where did you buy it from?
17   A.  I'm sorry?
18   Q.  I'm sorry.  Where did you by it from?
19   A.  Oxmoor Ford, 2012 Focus.
20   Q.  And when -- do you remember what month
21  it was repossessed?
22   A.  Not exactly.  I can't remember, so. . .
23   Q.  How far were you behind on the
24  payments?
25   A.  Three months behind.

Page 175

1   Q.  Three months behind.
2   A.  Yes.  I had perfect credit, too.
3  [WHEREUPON, off-the-record remarks are
4  made.]
5  BY MR. JOHNSON:
6   Q.  All right.  So how is your credit ruined
7  now?
8   A.  Well, I've defaulted on the -- on the car.
9  I couldn't get a car loan.
10   Q.  Do you have a car now?
11   A.  Yeah.
12   Q.  And what kind of car?
13   A.  2002 Nissan Sentra.
14   Q.  And is it paid for?
15   A.  Yeah, but I have a Trailblazer, too.
16   Q.  Okay.
17   THE REPORTER:  I'm sorry.
18   THE WITNESS:  A trailblazer.
19   MR. JOHNSON:  Okay.
20   THE REPORTER:  Thank you.
21  BY MR. JOHNSON:
22   Q.  When did you get the Nissan?
23   A.  About -- about last fall about this time, I
24  believe it was.
25   Q.  And did you pay cash for that?

Page 176

1   A.  Yes.
2   Q.  Okay.  And --
3   A.  With my tax return.
4   Q.  All right.  What's the year on the
5  Trailblazer?
6   A.  I've had it since '07 when I was married.
7  It's a gas hog.
8   Q.  Is it paid for?
9   A.  Yes.
10   Q.  Okay.  Is there any other basis for this
11  $500,000 that you're seeking?
12   A.  Did you read the statements they made
13  against me?  I'm sure you did, Mr. Johnson, and
14  that's pretty pathetic to make bogus statements up
15  that don't even match and terminate me when they
16  didn't listen to my complaints the many times I
17  went to them.
18   They fought my unemployment; said they was
19  terminating due -- because he was afraid I was
20  going to carry out my threats.  Sad, man.
21   Q.  Have you shown those statements to
22  anyone?
23   A.  Yes.
24   Q.  Who did you show them too?
25   A.  Jean Robinson.

Deposition of Chris Steven Slaughter                                                    Date: 10/29/2014

Page 177

1   Q.  Okay.
2   A.  Unemployment commission.
3   Q.  All right.  What did Ms. Robinson say?
4   A.  She told me to obtain an attorney.
5   Q.  Okay.  And did you show them to anyone
6   else other than her and the unemployment
7   commission?
8   A.  Yes.  Yes.
9   Q.  Who -- who else?
10  A.  The lady at the unemployment office.
11  Q.  Okay.  Anybody else?
12  A.  My attorney --
13  Q.  Okay.
14  A.  -- like I said, the lady at unemployment,
15  the unemployment commission, and that's about all
16  I recall -- my mother and my friends, Don Woods.
17  Q.  And do you have a Facebook account?
18  A.  Yes, sir.
19  Q.  How long have you had that?
20  A.  I've had it since '09.
21  Q.  And is it still active?
22  A.  I'm sorry?
23  Q.  Is it still active?
24  A.  Yes.  Yes.
25  Q.  Right.  Do you use it?

Page 178

1   A.  Yes.  Now more than I have since I
2   haven't been working.
3   Q.  Okay.  We've made a request for that, as
4   well, so we'll follow up.
5   A.  You -- you can have it now, if you want.
6   Q.  Okay.  All right.  We'll follow up with a
7   letter on that; okay?
8   A.  Okay.  I tried to do what you asked me to
9   do --
10  Q.  Uh-huh.
11  A.  -- but I can give you my password.
12  Q.  I don't want your password.
13  A.  It -- it don't matter to me.
14  Q.  I don't -- I don't want it at this time.
15  A.  Just saying.  Okay.
16  Q.  If -- if -- if the instructions we gave you
17  don't work, we'll figure something else out; okay?
18  A.  Okay.  Okay.  I -- I -- it's no big deal to
19  me.  If you I want my password, you can --
20  Q.  I --
21  A.  -- go through it.
22  Q.  -- I don't want it.  Thank you.
23  A.  I'm not a computer genius.  I'm not real
24  good at computers.
25  Q.  You're -- you're in good company then.

Page 179

1   A.  Okay.
2   Q.  Mr. Slaughter, have we covered the basis
3   for your claim today?
4   A.  Yes, I believe we did.
5   Q.  And have we covered the damages you're
6   seeking and the reason why you're seeking those
7   damages?
8   A.  Yes, sir.
9   Q.  All right.  Have I given you an opportunity
10  to explain the basis both for your claim and for
11  your damages?
12  A.  I've had a great work record, you know.  I
13  had just had 20 years and 7 months in.  They put
14  me in a situation that -- I thought I was just
15  applying for a job, and I was going to go in there
16  and be a normal employee and be able to work.
17  I did know that vocational rehabilitation
18  helped get me the job.  I -- I -- I know that my
19  hearing disability got me this job, but the people
20  and the situation they put me in with the Ginn
21  Group supervising me and us taking their jobs,
22  which they knew for sure we was, that I had no
23  knowledge of before I came in.
24  It should have never happened.  I was in a
25  hostile situation to begin with.  And you take my

Page 180

1   hearing impairment, and people that already don't
2   like me, it caused -- it caused me a lot of trouble
3   and a lot of pain.
4   And to ruin my great work record and say that
5   I threatened somebody at 40-some years old that I
6   didn't over a disagreement that men had at work,
7   and to make bogus statements and not even read
8   them to terminate me, and not listen to my
9   complaints that I went to them so numerous times,
10  and fought my disability -- I mean, my
11  unemployment.  I'm sorry.
12  And I got behind on my child support, and I
13  no -- and I don't have food.  And I have child
14  supporting a son and grandkids, and not be able to
15  do things, not be able to buy my son pizza, and
16  borrowing money off my mom.  It should never
17  have happened.
18  Q.  Okay.  Let me ask you about this last
19  document I'll attach as Exhibit 5.
20  [WHEREUPON, document referred to is marked
21  Exhibit 5 for identification.]
22  BY MR. JOHNSON:
23  Q.  Is that your handwriting?
24  A.  Yeah.
25  Q.  Do you know -- or can you tell me the

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

Page 181

1  circumstances as to how that particular note came
2  to be?
3     A.  Yes, sir.  That note, a person was having
4  trouble, and they had a disability.  And they
5  couldn't -- you know, some people can't talk.  And
6  with the situation that they put us in -- and I told
7  them if they had any problem, and if anybody
8  needed somebody to talk to. . .
9     Q.  Who was the person that you gave that
10  to?
11     A.  I don't know -- recall his name.  It was an
12  employee that had trouble with his disability.
13     Q.  Was it somebody that you worked with?
14     A.  No.  No.
15     Q.  How do you know that --
16     A.  Somebody in another department.
17     Q.  How did you know he was having trouble?
18     A.  Because he was outside one day on
19  lunch, and he said that -- you know, that -- I don't
20  even remember it.  So much has went on, so I can't
21  tell you specifically, but I gave him my number,
22  and I said if they needed someone to talk to. . .
23        MR. JOHNSON:  Mr. Slaughter, I believe
24  those are all the questions I have.  Thanks for
25  your time today.

Page 182

1        MR. BOYLAN:  I have no questions.
2  [WHEREUPON, the Deposition of Chris Steven
3  Slaughter concludes at 1:32 p.m.]
4   .
5   .
6   .
7   .
8   .
9   .
10   .
11   .
12   .
13   .
14   .
15   .
16   .
17   .
18   .
19   .
20   .
21   .
22   .
23   .
24   .
25   .

Page 183

1              C A P T I O N
2     The Deposition of Chris Steven
3  Slaughter, taken in the matter, on the date, and
4  at the time and place set out on the title page
5  hereof.
6     It was requested that the deposition be
7  taken by the reporter and that same be reduced to
8  typewritten form.
9     It was agreed by and between counsel
10  and the parties that the reading and signing of the
11  transcript of said deposition be, and the same is
12  hereby, waived.
13   .
14   .
15   .
16   .
17   .
18   .
19   .
20   .
21   .
22   .
23   .
24   .
25   .

Page 184

1        CERTIFICATE OF REPORTER
2  STATE OF KENTUCKY AT LARGE:
3     I, ROSE MARY KITHCART, RPR, Notary
4  Public for the State of Kentucky at Large, do
5  hereby certify that the foregoing was reported by
6  stenographic and mechanical means, which matter
7  was held on the date, and at the time and place
8  set out in the caption hereof and that the
9  foregoing constitutes a true and accurate
10  transcript of same.
11     I further certify that I am not related to any of
12  the parties, nor am I an employee of or related to
13  any of the attorneys representing the parties, and
14  I have no financial interest in the outcome of this
15  matter.
16     GIVEN under my hand and Notarial seal this
17  _____ day of _____, 2014.
18   .
19  My Commission Expires:        Notary Public
20   .
21  AUGUST 27, 2017
22   .
23  Notary ID: 494347
24   .
25   .

Court Reporting Services, Inc.            Page: 46            Case No.: 3:14-CV-00281-CRS

Deposition of Chris Steven Slaughter                                         Date: 10/29/2014

**WORD INDEX**

**< $ >**
$1  48:15
$100  33:11
$2  48:18
$200  33:15
$30-some  120:11
$4  39:11
$500,000  173:10
  176:11
$6,000  173:9
$6.65  40:14
$7  154:3

**< 0 >**
07  176:6
09  177:20

**< 1 >**
1  3:11  45:9  47:3
  70:22  80:11, 15, 17
  82:14  83:19
  128:21  129:17, 19
1:32  182:3
10  43:19  44:14
  45:11
10.80  55:1
10:00  1:24
100  125:4
100-and-some
  131:2
103  132:3
10812  8:5
11  26:4  45:9, 9, 11
  65:4  66:5  70:22,
22
11901  1:23  2:13
11th  89:11
12  9:9  46:21
  47:18, 19
13  47:3  84:22
13th  41:2
15  13:1
156  7:21

16  38:7  48:1, 2
16.10  48:4, 5
16.20  59:15
16th  43:20
17.33  87:20  88:7,
22, 25
1730  78:19
18.40  48:9
180  3:15
18th  59:18
19  118:8
19.05  153:25
19.81  44:9
1982  9:16
1983  38:23
1984  4:18  8:25
  21:2  28:12  38:24
1986  36:24
1988  10:12  39:21
  41:2
1990  42:7  43:6
1995  10:12
1996  12:10
1st  89:12, 15, 17

**< 2 >**
2  3:12  82:8, 11
  121:5  146:13
20  19:24  20:23
  37:23  43:17  48:12,
13, 14  69:4  102:2
  112:22  118:6
  179:13
2000  44:11
2002  25:20  175:13
2003  23:19
2004  25:20
2005  8:1
2008  12:10
2009  35:6  160:4,
13
2010  35:13  38:4
  43:20  160:4, 13
2011  22:18  23:2
  80:17  82:14  83:19
  89:15  160:4, 13

2012  9:6  46:20
  53:5  160:21  161:2
  174:11, 15, 15, 19
2013  160:22  161:2
2014  1:24  4:2
  47:14  184:17
2017  184:21
20-some  171:11
21  48:15, 16, 17
23  47:25  48:18, 19
233  7:9
253  13:17
26  11:7
26.26  154:1
27  184:21
28  47:3
29  4:2
29th  1:24
2nd  119:7  120:20
  138:19  140:9

**< 3 >**
3  3:13  7:9  8:19
  83:5, 8, 15  85:4
3:14-cv-0028-CRS
  1:9
313  69:18  123:9
31st  47:14
3rd  146:21

**< 4 >**
4  3:4, 14  85:17, 20
  128:21  129:17, 19
4:00  148:6
40047  7:10, 22
40202  2:7
40243  2:14
40-some  180:5
415  33:10
47-3  37:16, 18
48  64:18  69:3
494347  184:23

**< 5 >**
5  3:15  180:19, 21

500,000  173:8

**< 6 >**
6  47:18
6.65  40:14
630  33:14

**< 7 >**
7  37:23  43:17
  46:21  47:18  69:4
  112:22  179:13
7.50  42:11
7:00  146:22  147:3
75  105:8
7th  43:6

**< 8 >**
8  42:17, 18
8:00  145:21
80  3:11
800  33:13
807  2:6
82  3:12
83  3:13
830  33:12
84  29:23  39:19, 21
85  3:14
88  39:20  42:2

**< 9 >**
9  46:20, 21
9th  148:4  149:15

**< A >**
a.m  1:24
abide  82:4, 22
  86:16
ability  19:17  21:23
able  21:20  22:3, 9
  23:24  52:16
  167:22  179:16
  180:14, 15
above-styled  1:22
Absolutely  67:25
  77:7, 7
accent  52:3, 18

accident 28:8 29:23

accommodate 6:11 44:19 126:11, 12 134:14, 15 135:7, 7 140:25 141:1

accommodated 44:18

account 177:17

accurate 19:18 145:2 184:9

accurately 6:2

ack 83:18

acknowledge 83:18 85:24

acknowledged 83:22

Acknowledgment 83:11, 16

ACTION 1:9 172:24

actions 34:19 138:19 172:18, 18

active 62:25 64:13 177:21, 23

activities 9:23

acts 36:2

add 158:23

addition 161:2

additional 9:1

address 7:8, 11, 20 10:18 108:14

adequate 59:11

advised 110:12

afraid 148:16, 17 149:6 176:19

age 20:23 34:15 69:3

aggravated 134:25 169:10

ago 59:25

agree 82:4, 22 104:3 135:3, 10

agreed 150:5 183:9

ahead 48:23 79:3 90:6

ahold 146:24

aid 23:13

aids 21:12 22:23 23:1, 6, 9, 17, 17, 18 116:10, 11 129:23 130:2, 13, 23, 25 131:9, 15, 17 132:2, 4 166:15

ain't 97:15 101:10, 12 159:1, 1

air 133:8

Al 147:17

allege 36:2

Allen 14:18, 21, 22, 24 15:7 20:15 30:19 147:10, 17 148:10 149:9 150:14

allow 6:5

AMEC 61:17

A-M-E-C 61:17

American 52:8 56:23

Ammons 167:16, 25 168:2

A-m-m-o-n-s 167:17

amount 32:25 33:8 157:8 172:23 173:1, 4, 7

analyst 14:8

Anderson 30:19, 21 31:13 166:6, 7 167:4, 9

answer 5:23, 24 6:5, 6 18:11 67:10 128:2 133:6

answering 19:13

answers 5:20

Antonio 47:5

anybody 43:1 85:6 87:16 112:10 117:4 120:17 131:7 133:24 135:2 138:5, 10, 18

139:20 149:14 151:16 177:11 181:7

anyway 125:19 139:23

Apartment 7:9

apologize 127:3

apologized 127:8

apparently 131:25

appeals 32:23

Applebee's 11:14

applications 54:1, 5 56:19 57:5, 16 62:6, 9

applied 45:24 53:4, 6, 12, 16, 16, 17, 18 55:17 59:5 60:7, 10 61:14, 22 62:13, 14, 17, 18, 19 151:24 153:8 154:6

apply 53:21 154:13

applying 55:24 70:15 179:15

appointed 117:22

appreciate 134:11

Approximate 49:2 51:16 92:25

Approximately 8:9 10:10 28:10 35:5 38:21 45:10 103:1

approximates 49:1

a-r 27:2

area 8:7, 15

areas 50:16

argue 140:17

arguing 126:13, 13, 16, 17, 18 136:25

argument 140:18, 20 141:8

arguments 36:1, 5, 6

arm 170:20

arrested 36:24

asked 55:11 84:19 91:2 95:9 98:1

101:23 113:19 125:16, 18 142:8 151:12 152:2, 5 160:20 163:7 166:11 178:8

asking 84:1 85:12 113:13

asphalt 117:10 120:9, 9 122:20 123:1, 3, 8, 10, 11, 12 124:11, 13, 24 125:5 127:19 128:3, 17, 19 129:1 134:7, 8

asphalt's 128:6

assembly 43:23

assign 118:2

assigned 26:5

assist 30:23 46:10, 13

assistant 143:22

assume 34:12

attach 180:19

attend 8:20 9:14 13:2

attendance 79:2 81:12

attendant 155:21

attended 9:18

attention 127:12, 16 133:13, 18, 25 134:6 171:25

attire 81:12

attorney 27:22 28:1 105:18, 25 106:13 107:13, 15 108:17, 21 109:12, 14 150:2 177:4, 12

attorneys 184:13

audiologist 23:22, 23 25:5

August 59:18 184:21

auto 29:23 37:12 38:7, 10, 22, 23

39:1
**automatically** 34:2
**automobile** 28:8
**Automotive** 55:23
**Avada** 24:10 25:3
**Avado** 22:12, 12
**available** 60:20
**Avenue** 1:23 2:13
7:9
**aware** 30:1 58:14
72:22 88:16 163:3,
12
**awhile** 107:1
132:25 145:7

**< B >**
**back** 16:6 29:8
35:15, 16 43:24
46:16 56:22 57:10,
24 60:1, 3, 3, 12, 22
69:12, 22 72:9
84:19 97:3, 6, 16
99:13 101:10
116:13 123:11
135:14 145:19
146:2, 18 147:7, 24
148:1 149:22
**background** 5:6
**Backyard** 11:18
**bad** 23:19
**bag** 65:14
**Balance** 22:12
**Balfour** 17:11
**ball** 111:15
**Bardstown** 11:16
55:23
**bartender** 11:14
**base** 22:4 73:22
88:8 97:5 123:9
**Based** 86:14 160:1
**Basic** 81:2, 7, 9
**basically** 86:10
94:12 118:17
**basis** 114:8 115:3
158:12, 19 176:10

179:2, 10
**bat** 164:14
**Bazan** 50:4, 13, 22
**B-a-z-a-n** 50:8
**Beam** 45:24 56:7
**bear** 93:18
**Beatrice** 8:5
**bed** 125:10 126:3
127:21 128:2, 5, 12,
22 129:1, 7 136:4
**Bedford** 62:2
**Beeler** 13:9, 12, 16
**B-e-e-l-e-r** 13:13
**began** 68:17
**beginning** 1:24
**behalf** 4:3
**behaviors** 86:1
**belief** 159:9
**believe** 11:22 14:8
19:2, 19 20:24
25:20 28:10 40:14,
15 46:19 53:23
56:25 61:20 78:15
88:24 90:3, 3 96:9
103:4 106:8, 10
111:6, 14 120:6, 8
121:2 138:18
143:14 145:20
147:12 148:6
154:1 155:6
156:13 158:20
173:9 175:24
179:4 181:23
**belong** 37:8, 14
64:7, 9
**benefits** 31:25
49:3, 11 58:17
**Bennett** 105:1, 16,
21, 22, 24 106:9
108:1, 12, 24
111:17, 19 112:7,
11 150:20, 23, 24
151:7, 9 152:3
154:18 158:14
159:13 164:20

**best** 5:11 114:5
171:21
**bet** 109:5
**better** 23:3, 12
102:13 111:12, 15
135:4, 11, 14
142:12 149:4, 19
**beyond** 9:2
**bias** 108:25
**biased** 101:1
104:11
**big** 94:19, 22 96:5,
7, 17 98:4 100:22
102:14, 17, 22
166:19 178:18
**bike** 64:4
**Bill** 71:4, 20 72:5
73:6 74:13, 20
84:6 92:16, 22, 24
93:2, 11, 19 94:5,
23 95:2, 14 96:9, 9,
10, 12 98:1 100:7,
11, 11, 14, 15, 17
101:16 109:11
112:12 119:19, 22,
25, 25 120:3
131:18 132:13
139:14 140:5
142:3, 5, 6, 6, 7, 22,
24 143:3 146:25
149:2 159:20
162:13 172:3
**Bill's** 148:9
**bin** 27:10
**birth** 6:20 7:1, 5
20:14
**birthday** 146:21
**bit** 51:22, 24
125:10, 14, 15, 21
127:22 128:7, 18
**Blankenbaker**
11:19, 20, 22, 23
22:15
**Bluegrass** 53:14
**Board** 59:5 60:9
**Bobby** 52:8

**bogus** 176:14
180:7
**bomb** 138:17
**Boone** 168:3
**B-o-o-n-e** 168:3
**born** 10:21 12:14
20:13, 17
**borrow** 173:16
**borrowing** 180:16
**boss** 71:22 114:4
**boss,** 72:17
**bother** 34:2
**bottler** 56:9, 10
**bought** 174:14
**Bowling** 168:16, 17
**B-o-w-l-i-n-g** 168:16
**box** 64:12 65:5, 7
66:16
**boxes** 74:23
**boxing** 65:3, 4
66:4, 25 67:16
**BOYLAN** 2:4, 5
161:10 182:1
**Bra** 144:18
**Bracken** 11:19
**branch** 54:12
**Brandi** 12:4 36:8
**Brandi's** 36:9
**brand-new** 174:14
**brass** 41:10
**Braxton** 96:8
99:24 100:2
143:21, 22 144:18,
18
**Bre** 22:15
**break** 6:10 52:22
58:6 67:23 91:14
95:15 101:8, 11
156:24 161:10
166:14
**breaks** 91:13
156:18 157:19
**bridge** 60:16 64:6
**brief** 68:1 161:13
**bring** 67:2 84:22

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

105:7, 10
Brinley 1:23 2:13
brother 14:18 20:6
brothers 14:14
15:17 17:12
brought 19:25
96:17 153:1
171:25
Brown-Forman
45:24
brush 116:15
153:25
Bryant-Burnett
14:13
Building 14:2 74:1
145:25 146:2, 3
buildings 73:19
Bullitt 10:14 12:12
34:7
Burd 58:8
Burgers 11:18
burner 57:10
burning 60:16
bus 51:9, 11 59:19
business 40:5 47:6
busy 69:23
buy 174:16 180:15

< C >
C. 12:25
C.D 12:24
call 58:13 60:1, 3,
12, 22, 24 61:20
69:10 71:5 142:5
146:22 147:22
148:1
called 4:3 35:15
55:18 60:15, 21
69:16 72:2 74:24
108:19 114:23
115:1 142:18, 21
143:2, 6, 14, 19
144:25 146:23, 25
147:1, 11, 11, 18
148:3, 10 149:16,
22

calling 127:7
158:14
Calm 137:6, 7
Cammi 13:17
caption 184:8
car 4:18, 22 21:2
107:22 173:15
174:8, 10, 14 175:8,
9, 10, 12
care 113:19
115:17 171:15
Carissa 11:2, 4, 9,
17, 18
C-a-r-i-s-s-a 11:5
Carnell 16:16
C-a-r-n-e-l-l 16:17
carpentry 51:4, 21,
25 68:20 110:1
carry 148:16, 18
149:6 176:20
case 4:19 28:5, 13,
16, 22 29:23 56:21
57:4, 13 127:19, 20
161:17
cash 175:25
Cassie 11:2, 4, 9, 11
C-a-s-s-i-e 11:4
caused 21:1 77:4
180:2, 2
CDL 9:7, 12 59:19
91:1, 2 103:12
ceiling 95:10, 10
ceilings 73:20
cemeteries 115:17
cemetery 115:15
116:9 117:5
CENTER 1:11, 18
2:9 4:4
certain 5:19 6:1
70:10 85:11 87:24
110:13 118:10
132:17 173:1, 4
CERTIFICATE
184:1
certify 184:5, 11

chain 108:4, 7
139:25
Chamberlain 36:11
change 116:2, 3
changed 23:4
charge 30:24
117:16
charged 35:2, 18
charges 34:21
36:22
check 33:6, 9, 21
34:1 119:21, 24
150:9 151:14
checked 21:3
142:11
chest 27:12
Chicken 136:24
child 33:10, 18, 20,
23 34:5, 8, 12
173:12, 25 180:12,
13
children 10:21, 24
12:14 13:4 42:19
chip 41:10
choice 135:3
CHRIS 1:5, 21 2:3
4:1, 3 6:17 44:25
72:16 74:12, 20
95:17 138:12, 12
164:21 182:2
183:2
churches 37:9
circumstances
181:1
city 8:16
CIVIL 1:9
claim 5:7 26:24
27:4, 6, 20 29:5, 10,
13, 17, 20 30:4, 10,
15 151:19, 21
155:16 156:17
157:20 158:4, 9, 18,
19 169:7 179:3, 10
claiming 172:24
173:2, 5

claims 28:21
29:25 63:4
classified 109:25
111:4
Cleave 84:6, 8, 12,
14 96:10 100:11
146:25 172:3
Cleave's 162:14
cleft 20:13
Clemons 71:1, 20
73:3 74:15, 16
91:19 95:8, 12
96:8, 20 97:21
99:18 101:9, 16
104:1 114:9, 11
166:11 167:2
closet 79:13
closure 44:15 69:5
clothes 81:12
Club 16:25 17:1
clubs 37:8
COAST 1:12, 19
2:10 4:5, 10 30:4,
11 32:5, 19, 22
33:21 38:16, 17
45:5, 8, 9, 17, 20
46:2, 11, 16, 19
53:4 55:5, 5 57:17,
25 63:14 67:6
68:4, 11, 18, 22, 25
72:21 73:11, 15
75:13, 18, 24 77:5
78:12 81:1 84:1
85:6 86:15 87:19
88:23 98:10, 25
99:7 100:12, 13, 14
112:4, 10 120:24
131:7 132:5
137:10 146:24
149:14 150:13
151:22 152:13
154:24 155:16
156:2, 17 157:20
158:9, 20 159:10
162:12, 13 167:12
168:6, 11, 14 169:4

Deposition of Chris Steven Slaughter                                          Date: 10/29/2014

171:23  172:19
173:25
**Code**  80:16, 21, 25
82:5
**combat**  137:11, 15
138:16
**come**  33:23, 25
46:16  56:22  69:12
72:8  97:3, 7, 9, 18
102:4  109:14
111:25  112:1
123:11  142:4
146:18  147:11
148:3, 4  169:4
**comes**  57:23  101:9
**Coming**  33:17
63:1  148:12
**command**  108:5, 7
139:25
**commission**  177:2,
7, 15  184:19
**communicate**  92:2
**communicating**
169:18
**comp**  26:18  28:5
29:20
**company**  31:16
58:16  61:18, 23
63:5  178:25
**compatible**  170:23
**compensation**  27:3,
19  29:2, 5
**complain**  92:9, 22
**complained**  90:11
92:4, 10  101:5
104:25  151:17
159:19  162:9, 10,
20, 21, 24
**complaint**  19:8, 9
30:24  90:11, 13, 17
157:22  158:15
159:16  163:3
**complaints**  31:10,
22  36:23  91:11
104:22  110:24
116:19  117:1

120:2  158:13
159:11  160:1, 2
162:6  171:22
173:17  176:16
180:9
**complete**  6:4, 5
57:16
**complicated**  76:3
105:2
**complied**  86:20, 21
**comply**  83:23
**computer**  178:23
**computers**  178:24
**concern**  128:12
144:4
**concerned**  159:5
**concerns**  112:15
113:7
**concluded**  30:10
**concludes**  182:3
**conclusion**  101:19,
21
**concrete**  51:2, 2,
21, 23  52:6
**condition**  23:5
**Conduct**  80:16, 21
81:1  82:5
**conflict**  104:1
**confused**  155:16
**consider**  63:10
**considered**  63:9
**considering**  63:8
**constitutes**  184:9
**Construction**  47:7
61:17
**continued**  102:23
**contract**  69:21
105:3  108:3  162:2
**control**  23:24
43:25
**conversation**
136:23
**conversations**
31:13  84:12, 13
85:1  111:21

**Cooling**  14:13
**coordinator**  94:11
**copies**  54:4  160:8,
10
**copy**  107:18
160:12
**Corporation**  26:25
38:14  108:10
**Correct**  72:23
113:17  156:3
**corrective**  172:18
**correctly**  166:25
**counsel**  80:13
160:7, 15  183:9
**counselor**  46:9
**counties**  34:11
**counting**  122:15
**County**  10:14, 14,
15  12:13  28:14
34:7  35:4, 19, 20
36:20  37:2, 3  59:5
62:2
**couple**  34:25
45:25  78:9  114:4
145:8
**course**  65:24
108:8, 8  125:11
**COURT**  1:1  5:24
7:21  34:4
**covered**  112:14
179:2, 5
**coworker**  82:1
**CRAIG**  2:11  4:9
5:15
**Creating**  82:8
**credit**  173:12
175:2, 6
**Creek**  10:17  11:16
16:25  17:1, 3  47:9
**crew**  74:3  115:9,
13, 14, 15, 19, 21
116:9  117:5, 7, 20
118:16, 17  122:9,
13  123:8  125:20
145:22  157:7

**crews**  117:8  118:2
122:11
**criminal**  34:18
36:22
**CSX**  53:16
**cuff**  25:14, 25
27:14, 18  28:24
**current**  7:8
**currently**  25:6
58:23  65:5, 7
**cuss**  87:2, 8, 16
134:19, 21
**cusses**  87:3
**cussing**  87:8  135:2
**cutting**  115:16
117:10  154:1

< D >
**D.C**  105:25  109:13
**D.J**  38:12, 24
39:13  40:2, 20, 22,
24  41:14, 18  63:13
**daily**  53:19, 20
62:20  104:19
114:8
**damage**  41:1, 6
132:4
**damaged**  41:5, 7, 8,
11
**damages**  28:22
172:23  173:4
179:5, 7, 11
**Dans**  125:17
**date**  6:20  7:1, 4
89:18  105:22, 24
106:6  119:10
147:15  170:1
183:3  184:7
**dated**  80:16
**dates**  93:6  102:9
**daughters**  10:25
63:23
**daughter's**  146:21
**Dave**  42:15  166:6,
7  167:4
**David**  168:16, 17

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

**Davis-Bacon** 87:24
88:10 91:11 96:25
101:2, 15 109:1
110:4 120:5, 7, 8
122:24 151:23
152:15, 16, 25
153:3, 13, 18, 23
157:6, 9, 18
**day** 1:24 45:25
46:20 47:13, 14, 15,
21 59:8 69:1, 16
74:9 78:8, 15, 15
89:24 95:23 96:20
97:3, 7, 9 101:7
104:19 107:21
110:9 115:7, 22, 23
117:20 120:20
121:18 122:13, 19
125:2, 3, 6 129:9,
10, 11 130:9, 11, 14
133:9 134:19
135:4, 11 136:11,
17 137:19 139:14,
15, 19, 20 140:8, 9
144:17 145:20, 24
146:1, 6, 10, 17, 19,
19 147:12 164:16
168:14 172:16
181:18 184:17
**days** 42:18, 18, 20
47:18, 19 78:9
88:18 103:4
115:11, 12 125:4
**De** 43:20
**deaf** 126:6 134:10,
13
**deafness** 21:19
**deal** 106:3 132:6
178:18
**dealing** 165:3
**dealt** 106:23
**Debbie** 15:21
**Debra** 15:21, 24
16:1, 8
**Debra's** 15:22

**December** 38:4
43:19, 20 44:14
**decent** 69:7
**decided** 60:18
148:14
**decision** 147:20
**defaulted** 175:8
**defects** 20:14
**DEFENDANT** 1:14,
17 2:9 4:4
**degree** 24:18
131:2
**degrees** 125:5
**delicate** 131:3
**delivered** 39:2
**Dell** 40:9
**Dennis** 114:18, 21,
24 115:4 117:13,
14 118:1
**Dennis's** 114:22
**dentist's** 22:1
**Department** 13:24
53:19 54:11 55:14
73:16 76:24 89:8
93:4 102:24
104:23 112:16
181:16
**depend** 74:8 88:3
**depends** 22:4
**Deponent's** 6:25
**DEPOSITION** 1:17,
21 4:1, 12, 13, 16
18:9 28:3 60:11
182:2 183:2, 6, 11
**depositions** 5:1
**described** 24:22
31:14 138:5
**desks** 97:11, 11
**detail** 69:23 145:5
**determination**
155:19
**determine** 101:14
153:18
**determined** 27:14
154:8 155:13

156:12
**devices** 21:21, 24
**diff** 159:1
**difference** 87:8
173:19
**different** 23:12
32:2 34:11, 24
50:16 75:9 78:21
81:3 91:17 93:14
106:21, 21, 22, 23
107:7 109:24, 25
111:4, 19 115:20
116:14 117:8, 11
121:7 122:11
139:8 153:4 155:1,
21 157:23
**differential** 153:22
**differently** 135:15
172:4
**difficulties** 76:15
**direct** 71:17 73:10
**directions** 44:24
**directly** 104:18
163:10
**disabilities** 20:10,
11 25:12 27:16
30:12 31:17 57:20
58:10 75:1, 14, 19
76:1 86:11 93:15
105:8, 10 109:3, 7
113:1 164:23, 25
168:9
**disability** 18:2
20:8 26:2 28:25
63:4 103:16
104:16 105:9, 13
126:11, 11 134:15
135:7 137:9
138:16 140:24
141:5 155:5
167:12 168:6, 10
179:19 180:10
181:4, 12
**disabled** 25:25
**disagree** 104:3

**disagreement**
137:24 141:9, 11,
20, 24 142:2, 16
180:6
**disciplinary** 172:18
**discriminated**
155:17 156:17
157:21 158:5, 10,
20
**discrimination**
151:21 152:20
153:15 159:8
**discussed** 161:22
**discussion** 126:25
**discussions** 85:5
172:3
**dislike** 104:7
116:18
**disliked** 104:12
**dismissed** 35:6, 10
**distilleries** 53:17
**distinction** 87:13
**DISTRICT** 1:1, 2
**diversion** 35:11
**DIVISION** 1:3
**divorce** 10:13
12:11, 12
**divorced** 7:22
10:1 15:9, 10
35:23
**Dixie** 14:23
**Dixon** 91:19
169:19, 20 170:7,
18 171:5
**doctor** 24:12 26:19
**doctor's** 21:25
**document** 80:10,
16, 18, 21 82:8, 10,
13, 16 83:4, 10
85:16, 20, 22
180:19, 20
**documents** 18:12
55:6 78:22 79:7
**Dodge's** 126:20
136:24 137:2
170:1

doing 51:1, 17
65:19 68:20 73:23
74:9 96:25 97:12
101:10 109:25
110:2, 5 122:19, 20
125:5 126:4, 8
148:12 152:17
155:21
domestic 35:22
Don 171:9, 10
177:16
door 146:3
doors 69:14 73:20
double 156:20
157:19
Downtown 14:3
Dr 26:7, 12, 18
draw 43:12 45:13
drawing 173:20
dre 10:18
dress 58:12
dressing 81:13
Drive 8:17 13:17
61:11 124:3, 6
driven 124:23
drives 123:24
124:1
driving 9:3, 5 35:2
59:2 60:10 61:1
drop 95:10 134:7
drove 51:9, 9
drunk 35:2
due 4:18 55:5
69:5 90:16 101:3,
24 147:17 148:15
149:5 162:19
163:23 176:19
duly 4:5
dumb 126:7
134:11, 13
dump 127:19
dumping 134:8
DVO 35:14, 18
36:15

< E >
earlier 156:21
early 145:21
earned 88:22
earplugs 131:12
easier 80:6
easy 6:8
eat 126:21 137:3
Ebony 46:8 58:2
68:23 69:1, 8, 9
educated 91:24
103:15 165:4
education 23:10
EEO 30:6, 10
EEOC 30:3, 7, 10,
11, 14, 18, 24 31:9,
21 79:1 90:14, 17
159:16
eight 8:11 92:25
Eighteen 47:12
either 74:20
Electric 45:23
elevated 128:12
136:8
elite 114:5
Elizabethtown
54:14
Elmer 91:19
email 55:8
embarrassed
173:13
employed 47:11
employee 72:21
73:4, 11, 12 77:9,
24 83:11, 15 97:22
99:7 120:25
137:10 152:13
154:24 168:1, 17
169:4, 16, 20
179:16 181:12
184:12
employees 57:15
78:1 98:2, 10, 25
99:10 105:11
employer 32:19

employment 38:5
46:14 59:22
172:19
encountered 107:3
ended 119:14
136:15 140:11
enjoy 63:20 65:22
enjoyed 136:15
enroll 155:4
enrolled 153:9
entailed 86:4
ENTERPRISES
1:12, 19 2:10 4:5
entire 7:16 86:14
87:22
entitled 82:8
83:10 85:20
EOC 90:12 157:22
158:15
equipment 51:5, 6,
8 52:1 118:11
124:2, 19 146:2
escrow 59:8
ESQUIRE 2:4, 11
estimate 121:21
123:3
Etiquette 85:21
86:1
E-town 69:18
evaluated 76:9
event 21:1
events 107:19
eventually 46:1
76:10 94:18 105:7,
9, 12 107:22
168:22
everybody 72:20
90:25 104:8
Everybody's 50:14
everyday 115:3
everything's 142:9
exact 89:18
126:10 137:3
147:15 148:13
exactly 48:25
73:13 76:19 77:11

87:12 93:8 102:5
103:2 115:1 145:8,
9 150:25 174:22
EXAMINATION 3:1,
4 4:7
examined 4:6
excuse 50:19
exercise 63:19
exercise, 63:24
EXHIBIT 3:11, 12,
13, 14, 15 80:11, 15
82:8, 11 83:5, 8, 15
85:4, 17, 20 180:19,
21
EXHIBITS 3:8
exit 143:10, 24
exiting 145:6
expected 81:1
experience 51:23
91:3 117:25
expire 38:3
Expires 184:19
explain 34:20
74:23 92:12
110:10, 17 131:23,
24 140:21 143:11
149:18 179:10
explained 92:13
105:13, 14 110:17,
19 143:13 164:17,
21
exwife 35:13

< F >
Facebook 177:17
faced 110:8
facility 24:9
fact 79:19 90:16
119:13 174:6
facts 161:17
162:16
fair 70:6, 7 104:13
118:1 139:12
172:25, 25
Fairdale 39:4 40:4

Deposition of Chris Steven Slaughter

Date: 10/29/2014

**fall** 128:4, 5
174:10 175:23
**falling** 128:6
**false** 169:22
173:13
**fam** 165:24
**familiar** 69:20
105:4 118:25
119:4 162:8
**family** 14:17 20:3
**fanatic** 64:14
**far** 49:24 87:2
129:20 159:4
174:23
**fast** 74:24
**father-in-law** 163:6
**February** 42:7
174:15
**fed** 79:4
**Federal** 14:2 79:4,
4
**FedEx** 59:24 60:9
62:15, 17
**feel** 139:22
**feelings** 141:6
**feet** 129:22 133:20,
23
**Fegenbush** 17:24
**fell** 71:20
**felony** 36:18
**felt** 127:9 140:14
**Fer** 10:7
**Fern** 10:17 11:16
17:1
**Ferree** 44:4, 6
**F-e-r-r-e-e** 44:6
**Ferry** 10:9, 11, 16,
19, 22
**fight** 66:12
**fights** 67:1
**figure** 18:24
173:22 178:17
**file** 27:3, 19 32:11,
18 56:19 90:13
150:6 160:3, 5

**filed** 4:11 10:13
12:11, 12 27:6
28:7, 13, 18, 21, 23,
24 29:4, 20, 22
30:3 31:9, 21, 24
32:5, 14, 22 34:19,
21 36:23 58:20
63:3 90:11, 17
158:15 159:15
**filed,** 34:20
**filled** 146:19
162:17 163:17
**finally** 92:15 94:18
126:14
**financial** 14:8
184:14
**find** 5:5 52:19
68:13 149:25
158:3
**finding** 46:11, 13
**fine** 37:5 80:5
**f'ing** 134:17
**finger** 170:2
**finished** 43:25
**finisher** 51:3
**fire** 41:3
**fired** 41:1, 22
**first** 4:5 9:11
10:5 23:18 25:20
35:7 42:1 68:21
72:14, 15 89:12, 14,
17, 20 115:16, 22
134:3 172:11
**five** 30:22 48:17
93:5 94:5, 6
121:10, 12, 25
122:3 123:4
129:22 133:19, 22
154:14
**fix** 29:7
**fixing** 95:10 117:10
**flatten** 120:9
**Florida** 16:2
149:13
**Focus** 174:19

**folks** 77:6 99:9
102:18
**follow** 178:4, 6
**followed** 97:19
**following** 101:19,
22 102:14, 22
**follows** 4:6
**follow-up** 111:7
**food** 180:13
**football** 64:15
**Ford** 32:7 45:23
129:5 174:19
**foregoing** 184:5, 9
**foreman** 71:3, 8, 22
97:14 114:3, 24, 25
**foreman's** 71:2
143:20
**form** 80:22 183:8
**forms** 155:22
**Fort** 53:17, 21
68:20 78:17
168:12
**forth** 86:13
**Fortune** 38:13
40:18, 21 41:15, 15,
24, 25 42:8, 16, 17
43:8
**Forty** 37:17
**fought** 176:18
180:10
**found** 30:7 52:21
58:3
**four** 7:12, 12
30:22 105:12
122:12, 15, 16
123:4 153:6, 11
154:14
**frame** 93:9 154:14
**Free** 44:5
**frequently** 25:9
**Friday** 41:1
**friend** 171:10, 20
**friendly** 112:20
**friends** 66:12 67:1
165:14, 15, 21, 21

170:22, 24 171:21
177:16
**friend's** 64:11
66:18
**fuel** 51:10
**full** 6:16 129:9, 9,
12 133:8
**full-time** 40:10, 11
42:12
**funny** 92:7
**further** 126:25
184:11

**< G >**
**gad** 173:16
**Gainesville** 16:2, 5
**game** 35:25
**games** 101:6
**garage** 54:12
**Gary** 94:9, 9, 10, 25
95:1 96:9 118:19,
22, 23 119:2 143:4,
20, 23
**gas** 61:24, 24
176:7
**Gault** 44:11
**General** 45:23
70:16 81:6 89:6
105:3 114:6
**genius** 178:23
**gentleman** 71:16
72:3
**get-go** 102:16
113:3
**getting** 70:4 96:25
108:3 110:1, 4
140:15, 23 142:12
149:19 151:23
157:6, 7, 18
**Ginn** 72:25 73:2, 4,
7, 9, 11 74:22 75:3
76:22 77:1, 6, 9, 17,
22 78:1 94:11
97:20, 21 98:2, 11
99:10, 16, 20, 22
100:1, 3, 6, 7, 9,

*10* 105:3, 6, 11
112:3, 9  113:22, 24
120:23, 24  131:7
153:17  154:10
155:12  162:2
164:2, 6, 7, 9
165:23, 24  166:1, 8
167:25  168:2, 17
169:16, 20  179:20
**G-i-n-n** 73:1  164:9
**girlfriend** 165:19
**give** 7:4  8:15
19:18  23:9  28:3
48:15  52:21  56:21
57:14  58:5  59:7
80:13  91:18  93:6
107:15  115:8
138:25  147:20
173:16  178:11
**given** 4:13, 15, 25
5:3  70:1  160:21
179:9  184:16
**gives** 57:6
**Gladstein** 26:7, 18
**Glenn** 169:13, 14
**go** 9:5, 20  22:10
38:18  46:7  48:23
66:16  69:2, 9
78:12  79:3  80:1
81:7  84:19  86:9
90:6  97:3, 4, 6, 6,
18  107:25  113:20
115:10  117:7
120:6  123:8, 9, 19,
20  125:9  135:14
136:15  139:14
141:4  152:6  153:9
155:3, 24  157:7
161:6, 19  164:13,
24  165:4  168:21,
22, 23  178:21
179:15
**goes** 156:6  162:4
**going** 5:11, 25
6:22  59:11  60:16,
22, 24  61:20  67:22

68:19  69:2, 8, 10
74:12  76:11, 18, 20
88:14  96:21, 23
98:4, 20  105:7, 8, 9
111:12, 23  112:13,
25  113:20, 21
120:15  127:18
135:1, 18, 22
136:23  138:8, 13
140:17  142:8, 9
148:14, 16, 17, 23
149:6  151:14
158:13  161:21
162:7  164:24
168:19, 21, 22, 23
172:15  176:20
179:15
**going,** 119:23
**golf** 102:1
**Good** 58:15, 16
69:3, 4  100:20
123:1  136:14
138:13  142:9
149:3  170:24
172:15  178:24, 25
**gotcha** 89:19
**gotten** 21:10
111:15  153:22
**government** 69:21
75:14  79:1
**government-set**
89:5
**grab** 169:12
**graduate** 8:22
**graduated** 9:17
39:6, 8
**grandfather** 20:6
**grandkids** 63:20
180:14
**grandmother**
146:23
**grappling** 64:21
**grass** 115:18
116:12
**great** 165:5

179:12  180:4
**Grou** 100:3
**ground** 114:19
157:13
**grounds** 89:22, 24
90:2, 18, 24, 25
103:12  113:17
114:1, 8, 16  115:3,
13, 16, 24  118:5
119:15, 20  120:4,
18  142:10  143:20
**group** 58:9  72:25
73:2, 9  74:22  75:3
76:22  77:1, 9, 17,
22  78:1  94:12
97:20, 22  98:2, 11
99:10, 16, 20, 22
100:1, 3, 6, 7, 9, 10
105:3, 6, 11  112:3,
9  113:23, 24
120:23, 24  153:17
154:10  155:12
162:2  164:2, 7, 9,
10  165:23, 24
166:1, 8  167:25
168:2, 17  169:16,
20  179:21
**groups** 37:9
**grown** 135:8
**guarantee** 152:10
**guess** 29:11  57:12
67:17  69:2, 8
75:21  79:5  89:20
93:23  98:8  110:12
112:12  127:13
139:7  144:6
151:14  154:4
155:15
**guilty** 35:17  36:14
37:4
**GULF** 1:12, 19
2:10  4:4, 10  30:4,
11  32:5, 19, 22
33:21  38:16, 17
45:5, 7, 9, 17, 20
46:2, 11, 16, 19

53:4  55:5, 5  57:17,
25  58:3  63:13
67:6  68:4, 11, 17,
22, 24  72:21  73:11,
15  75:12, 18, 24
77:5  78:11  81:1
84:1  85:6  86:14
87:19  88:23  98:10,
25  99:6  100:12, 13,
14  112:4, 10
120:24  131:7
132:5  137:10
146:24  149:14
150:13  151:22
152:13  154:24
155:16  156:2, 17
157:20  158:9, 20
159:10  162:12, 13
167:12  168:6, 11,
14  169:2, 4  171:23
172:19  173:25
**Gun** 16:25  17:1
**gung** 57:21
**guy** 40:24  69:17
71:7  114:23
125:12  138:13
150:14  152:12, 16
155:20
**gym** 64:7, 9, 11
66:22
**gyms** 64:10

**< H >**
**half** 39:18  78:15
**half-brothers** 17:13
**half-sister** 17:16
**half-sisters** 17:15
**Hall** 78:19  97:23
**halls** 97:24, 25
**Hamlet** 96:8  100:2
143:21
**hand** 152:15
184:16
**handbook** 79:16
83:11, 16, 20, 23

Deposition of Chris Steven Slaughter                    Date: 10/29/2014

84:2, 7, 15   85:4, 5,
10
**Handbooks**  79:1, 10
**handled**  135:11, 14
**handler**  42:9
**handling**  43:23, 24
  56:1
**hands**  133:17
**handwriting**  180:23
**handwritten**  145:17
**Hang**  38:25   67:3
**happen**  77:8, 12
  128:16   152:22
**happened**  79:9
  102:7, 8   111:7
  125:1   129:18
  142:19   145:6
  146:17   147:8
  151:12   167:5
  179:24   180:17
**happening**  140:8
**happy**  6:11   116:23
**harassment**  82:19,
  19   83:1
**Harbin**  147:10, 17
  148:10   149:9
**Harbison**  149:8
**hard**  141:6
**Harvey**  17:22
**hat**  167:7
**head**  5:10, 21   12:1
  21:3   50:23   65:9
  67:9   112:13
  141:12   158:14
**heads**  159:14
**health**  49:6
**hear**  5:14, 15, 23
  21:20, 23   22:3, 4, 9,
  19   23:12   24:10, 15
  25:1   52:16   91:21
  98:18   130:1
  164:18   166:12, 16,
  17   167:2, 3, 4, 22
  169:11   170:16

**heard**  44:23
  125:24   126:3
  166:24
**hearing**  5:9   9:21
  18:22   19:21, 23
  20:9, 16, 22   21:1, 3,
  5, 11, 12, 17, 19, 21
  22:10, 12, 23   23:1,
  5, 9, 17, 17, 18, 19
  24:13, 19, 23   25:12
  31:8   32:24   44:16,
  21   52:4, 11, 14, 16,
  18   56:25   58:14
  76:14   92:3, 6, 12
  95:25   98:20
  100:25   101:4, 25
  102:1, 2   103:16
  104:16   109:4
  112:23   116:10, 11
  127:4   129:23
  130:1, 13, 23, 25
  131:9, 11, 14, 17
  132:1, 2, 4   134:14
  137:20   164:19, 22
  165:6   166:15
  167:24   169:9
  171:15   179:19
  180:1
**hearing-impaired**
  92:18
**hears**  44:25
**heart**  64:19
**heat**  131:2   132:3
**heated**  140:17, 19,
  22
**Heating**  14:13
**heavy**  118:11
**Heck**  163:25   165:9
**H-e-c-k**  164:1
**Heck's**  164:2
**He'd**  93:12   115:6
  149:3
**held**  184:7
**hell**  87:5
**he'll**  58:13

**help**  27:22   52:19
  57:11, 20, 23   58:10,
  15   131:10   132:17
  166:16
**helped**  31:1   56:20
  57:17   179:18
**helper**  118:17
  125:13
**helping**  57:15
**helps**  23:11
**Hereditary**  20:1
**hereof**  183:5   184:8
**Herr**  120:22   121:1
  125:17, 20   136:18
  146:4
**Hey**  72:12   134:4
  147:2   158:25
**Hey,**  91:22   164:16
**high**  8:20, 21   9:2
  64:25   116:15
**high-frequency**
  21:18   24:23
**Highway**  55:14
**highways**  54:15, 15
**hindsight**  127:13
  137:22
**Hippie**  114:23, 24
**hire**  70:3   75:18
**hired**  30:11   31:16
  57:3   59:6   70:5, 5,
  18, 21   74:24   89:2
  162:7   172:12
**hiring**  113:1
**Hispanic**  52:6
**Hispanics**  52:2
**hisself**  149:12
**history**  38:6
**hit**  65:8, 10, 14
  138:17
**ho**  57:21
**hobbies**  63:17
**hog**  176:7
**hold**  16:3   129:1, 7
**Holdings**  38:19
  46:25   47:1   58:3

**holds**  128:22
**hole**  123:13
**holes**  117:9
  122:21   123:22
  125:8
**Holiday**  69:18
**holidays**  49:14
**holler**  91:10, 16
  98:9
**hollering**  92:1
  93:3   142:16
**home**  97:4, 6
  105:23   106:7
  107:10, 21   126:21
  146:20, 22   147:18
**hopefully**  59:4
**hoping**  61:19
  102:12
**hostile**  137:17
  138:2, 2, 11, 19, 24
  164:17   179:25
**hot**  125:3, 3, 5
  130:7, 17   131:2
  137:18
**hour**  39:12   42:11
  44:9   48:1, 2, 18
  55:2   67:22   87:20
  88:7, 22   120:11, 11
  130:21   154:2, 3
**hourly**  39:10, 10
  59:14   88:2
**hours**  47:18, 19, 20
  59:8   116:6
**house**  66:21, 23
  69:15   147:1
**Housing**  13:24
**HR**  100:13
**HUD**  14:7
**Huh**  107:14   121:11
**huh-uhs**  5:22
**hurt**  64:22
**husband's**  13:19
  17:8

**< I >**

**ID** 184:23
**ideals** 57:7
**identification** 80:11 82:11 83:5 85:17 180:21
**identified** 149:10 161:15
**i-e** 167:16
**immediately** 103:3
**impaired** 44:21 58:14 92:6, 13 98:21 112:23 164:19, 22
**impairment** 5:9 9:21 18:22 19:21, 22 20:3, 9, 16 21:12, 17 22:11 24:13 25:13 44:17 52:11, 14 57:1 76:15 92:3 95:25 100:25 101:25 102:1, 3 109:4 167:24 171:18 180:1
**impairment,** 127:4
**impairments** 25:12 27:16
**important** 166:24
**impression** 75:17
**in,** 97:9 148:12
**incidences** 104:21 119:9 165:8
**incident** 95:19 99:6 119:6 127:1 129:18 130:4, 20 140:4, 9 142:24 144:5, 6, 20 146:13 147:12, 18, 20 165:6 167:7 170:1, 6
**incidents** 142:13 153:4
**include** 81:14 82:25 86:7, 8 145:4, 11
**including** 82:19

**income** 62:23 63:1 160:3
**Incorporated** 38:12 39:14 40:3, 20, 22, 24 63:13
**increase** 48:3, 6 88:11
**INDEX** 3:1, 8
**indi** 82:16
**indicate** 93:19
**indicated** 5:8 80:22
**indicates** 82:16
**individual** 154:22
**individuals** 52:15 81:22 92:10, 19 98:25 116:20 161:5, 16
**industrial** 11:24 53:14
**information** 5:6 69:25 78:1 145:11
**initial** 68:7 69:19
**injection** 39:15, 25 41:11
**injured** 4:22
**injury** 21:4 27:9, 18 29:17
**Inn** 69:18
**inspector** 43:25
**instructions** 178:16
**instruments** 131:4
**insurance** 49:6, 12
**intending** 49:21
**inter** 19:5
**interest** 184:14
**Internet** 71:13
**interpret** 138:19 139:7
**interpreted** 139:11, 13
**interrogatories** 19:6
**interview** 54:9, 13, 17 57:23 58:10 59:24 60:15, 21, 25 62:3 68:7 69:17,

19 70:1 94:8 152:2 154:16, 17
**interviewed** 56:7, 24 68:4 70:5, 10 152:5, 11
**interviews** 54:7 55:20 56:6 57:19 58:11 70:11
**intimidating** 138:24
**intimidation** 82:1
**intoxication** 36:25
**Iroquois** 8:21 37:2
**irreparable** 25:16
**isolated** 95:19
**issue** 110:11 112:11 119:19 166:23 171:4, 7
**issues** 44:16 52:10, 13 84:13 91:5, 8 97:2 106:3, 23 107:3 109:19, 20, 21, 23 110:8 112:15 116:8 119:10 132:6 136:10, 18 157:23 171:6, 6
**it,** 5:16
**it'd** 33:25 88:6
**items** 79:18, 20
**it'll** 72:8

**< J >**
**James** 120:22, 23 122:14 125:20 136:18, 20 146:4, 4
**Jean** 105:18, 25 108:17 150:2 176:25
**Jeff** 168:3
**Jefferson** 10:14, 15 28:13 35:4, 20 36:20 37:2, 3 59:5
**jeopardize** 82:2
**Jeremy** 120:25 126:1, 10, 18 127:18 133:13

134:4, 16, 19, 21 136:11, 12, 23 137:9 139:11 142:16 145:23 146:4 171:25
**Jeremy's** 125:22
**Jim** 45:24 56:7
**job** 53:18 54:7, 20, 21 55:3, 7, 11, 15 56:2, 11 57:10 58:3 59:10 60:13, 14, 17, 21 69:4, 4, 7 70:6, 7 76:18, 20 77:23 78:3, 4 82:2 88:3, 19 97:3 119:14 149:18, 19, 21, 21 151:15, 24 152:4, 4, 11 153:8 155:25 159:11 168:20 179:15, 18, 19
**jobs** 53:17, 19, 21 56:15 57:8 76:12 167:11 179:21
**John** 7:21
**Johnson** 1:22 2:11, 12 3:4 4:8, 9 6:22 7:3 13:15 18:7 24:5 37:20 62:21 67:21, 25 68:2 79:25 80:3, 6, 9, 12 82:12 83:6 85:18 96:7, 20 97:13 99:14 101:17 114:2, 3, 13 137:25 141:16, 18 161:12, 14 164:6, 11 175:5, 19, 21 176:13 180:22 181:23
**joke** 92:7
**Jones** 59:10
**Jordan** 168:24 169:3
**jujitsu** 65:18

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

**July** 46:20  47:14
49:17  53:5  119:7
120:20  121:3, 5
138:19  140:9
146:13, 21  149:15
**jumped** 133:19
**June** 42:1, 2
**junior** 12:21

**< K >**
**Kay** 168:24
**K-a-y** 168:24
**keep** 35:24  54:4
57:4, 6  61:1
107:22  130:23, 25
131:8, 17  132:14
149:18  165:11
**Keller** 66:20
**KENTUCKY** 1:2, 23
2:7, 14  7:10  22:19
24:10, 16  25:1
27:7  62:2  184:2, 4
**kept** 69:22  105:6
126:13, 18
**kid** 64:19  135:8, 9
**kind** 23:14  41:10
51:6, 8  55:13  57:9,
9, 22, 22  61:24
70:2  71:23, 23, 25
101:12  103:25
111:22  112:17
117:21  118:13
125:13  133:16
134:25  135:17
137:17  138:1
175:12
**Kinder** 61:22, 23
62:13
**KITHCART** 184:3
**Kmart** 14:23
**knew** 44:21
112:23  125:18
133:20  139:24
156:9  165:2
168:13  179:22
**Knob** 16:25  17:2, 3

**know** 6:11  10:16,
17  11:24  13:5
15:12, 16  16:8
18:18, 19, 21, 21, 22
19:15  21:8, 10, 16,
18  22:1, 8  23:15,
16, 18  30:3, 12
31:15, 17  32:8
33:8  34:14  35:9
36:14  42:20  44:23
45:1, 5  48:24, 25
49:23  50:5, 7, 15
51:23  53:24  54:19
56:4, 13  57:7  58:1,
11  59:13  62:20
64:2, 10, 18, 22
65:1, 9, 17, 18, 22
66:1, 1, 2, 12, 15
67:2, 3, 15, 17
69:14  70:2, 4, 5, 7,
8, 9, 9  71:23  72:8,
20  76:12  77:2
78:8  79:12, 15, 15
81:11  84:9, 10, 11
86:3, 12  87:1
88:13  90:8  91:21,
22, 23  92:8, 11, 12,
12, 14, 20, 21, 24
93:8, 14, 15, 16, 17,
18, 25  96:2  97:9
98:8, 12, 16, 17, 18,
18, 21, 23  99:4
101:6  102:2, 6, 9,
10, 25  103:11, 13
104:11  105:5
106:21, 24  107:1,
25  108:2  109:12
110:1, 9, 15  111:2,
9, 9, 11, 24  112:17,
19, 21  113:2, 15
114:25  116:11, 12,
13, 16  117:21, 25
118:13, 19, 24
119:21, 23  120:10,
15  121:7, 18  122:1,
24  123:14  125:9,

12, 13, 18, 19, 23
126:4, 8  127:8, 13,
14, 17, 23  128:7, 8
131:5, 18, 20
132:18, 25  133:6, 7,
10, 14, 14, 14, 17, 21
134:24  135:1, 20,
21, 22, 22, 23, 24
137:11, 12, 14, 22,
22, 23  138:7, 8, 15,
17, 21, 22, 25  139:3,
5, 8, 8, 9, 10, 11, 13
140:12, 21  141:6
142:11, 12, 13, 24
143:1  144:2, 6, 7
146:8  147:5, 7, 15
148:21, 25  149:17,
20, 24, 25  150:5, 6,
11  151:2, 3, 11, 13,
16, 25  152:8, 14, 18,
19, 24  154:21
155:1, 2, 3, 7, 24
156:4, 4, 6, 9, 15, 18,
25  157:7, 14, 23
158:24  159:3, 7
162:3, 15, 18, 20, 21,
23, 25  163:1, 2
164:4, 12, 15, 21, 21,
22  165:2, 2, 20, 21
166:1, 9  167:2, 9,
19, 21  168:5, 7, 9,
11, 13, 18  169:3, 6,
6, 9, 9, 11, 17, 21
170:11, 11, 13, 23
171:2, 8, 12, 20, 24
172:6, 7, 8, 14, 15,
23  173:23  179:12,
17, 18  180:25
181:5, 11, 15, 17, 19
**knowing** 169:17
**knowledge** 15:15
31:4, 6  49:18
56:18  131:25
161:16  163:13
167:9  172:17
179:23

**knowledgeable**
131:6  132:1  165:8
**knows** 162:20
166:10  167:10, 20
168:7, 19  171:18,
19
**Knox** 53:17, 21
68:20  78:17
168:12

**< L >**
**lady** 58:1, 4
177:10, 14
**laid** 32:3  77:18, 22
78:1
**LAKEVIEW** 1:11,
18  2:9  4:4
**land** 46:2
**language** 81:19, 20
86:22, 23
**LARGE** 184:2, 4
**lasted** 78:14
**lately** 65:19
**LAW** 2:5
**lawsuit** 4:10  19:8
28:8
**lawsuits** 28:18
29:22
**lay** 32:10
**le** 129:8
**lead** 71:3, 4, 5, 21,
24, 25  72:2  95:12
97:11, 22  117:19
**leads** 57:14  71:23
**Lear** 26:25  27:1, 2
29:6  32:3, 6, 16, 19
33:25  38:13  43:4,
5, 10, 16, 17, 21
44:10, 13, 17  45:4,
11  67:7, 8, 13
108:10  112:23
171:11, 14
**L-e-a-r** 27:2, 2
**learn** 68:21  108:9
**learned** 108:7
**Lear's** 44:11

Deposition of Chris Steven Slaughter                                    Date: 10/29/2014

leave 40:20, 22
41:14 42:16 43:1
44:13 165:23
leaving 77:9
left 25:17 40:14
41:16 42:17, 23
44:2, 3, 8 45:4, 11
46:19 47:25 50:3,
4 51:18 53:4
59:23 60:8 61:14
62:23 97:2 111:16
127:1, 2 128:18
129:14 149:21
150:17 161:7
165:24 166:1
letter 178:7
level 21:17 27:12
Lewis 15:23
LG 47:10
license 155:10
life 65:24
lift 64:1, 12
light 64:2 65:12,
12, 16, 17
liked 104:5 112:6
119:14 142:10
149:21 170:13, 14
likes 112:13
liking 119:14
136:16
limit 19:17
limited 73:25
Linda 15:12, 14
line 71:20 123:10
lines 117:9
lips 5:12
list 53:3, 8, 11, 11
57:4, 6 161:19
listed 99:9 161:5
listen 159:3, 6
176:16 180:8
listened 108:13
110:12, 19, 23
111:13 150:5
151:11 173:17

listening 108:4
126:14
literally 114:3
little 20:7 23:10
51:22, 24 101:8
123:13, 14 125:10,
14, 15, 21 127:2, 22
128:7, 18 141:2
142:17 155:15
live 7:14, 19 8:2,
10, 13, 18 11:8
13:16, 17 14:21
15:24 16:1, 19
17:23
lived 7:11, 16, 21,
23, 25 8:4, 11, 14
16:6
lives 10:16, 17
11:9, 10 14:22
16:2, 20 17:24
living 8:4 13:6
14:24 16:9 62:24
load 129:9, 12
loan 175:9
located 13:25
22:20 39:3 40:3
44:10, 11 47:4
62:1
locations 46:14
locker 79:11, 16, 18,
22
Loeb 26:12, 13
long 7:11, 23 8:9,
18 16:5 19:21
22:16 25:8 37:21
39:16 40:17 41:23
43:15 47:11 48:2,
5, 10, 13, 16, 19
50:13 51:14 64:23
78:14 89:7 115:21
130:19 135:2
166:5 168:11
177:19
look 57:8, 21 69:3,
7 158:24 160:17

looked 18:14, 15,
17, 18, 20, 25 45:12,
17, 20 53:19 79:13
108:19
looking 57:15
58:23 59:1, 2
69:23 71:12
Lori 17:18, 23, 24,
25, 25 20:7, 8
L-o-r-i 17:19
Lori's 17:21
lose 21:5 168:19
losing 19:23 21:1
loss 21:19 24:19,
24
lost 69:4 173:8
lot 15:19 51:24
70:4 76:15, 15
101:5 116:10
151:5 157:9
161:20 165:22
180:2, 3
loud 23:16 116:12
164:17
loudly 5:12
Louis 50:4, 21
LOUISVILLE 1:3,
23 2:7, 14 14:5
low 118:13, 13
Lowe 120:25
122:6 172:1
Lowed 146:4
Lowe's 138:15
lunch 107:23
181:19
lunch, 119:23
lungs 137:21
Lynn 10:7, 8, 8, 9

< M >
machines 39:25
maiden 15:12
maintenance 70:16
89:6 105:4 114:6

making 81:25
109:24 133:16
174:5
Male 13:3
man 52:8 68:7
71:4, 4, 5 95:13
97:22 98:17
100:20 102:2
118:14, 15 126:4, 7
134:4, 7 135:8
141:3 164:18
176:20
Man, 126:3
manager 97:21
113:24 162:1, 13
manager's 143:21
March 174:15
Mark 40:9 80:1
82:7 163:25 164:2
marked 80:10, 15
82:10 83:4, 7
85:16, 19 180:20
Market 2:6
marriage 10:21
12:14
married 9:25 10:3,
11 12:7, 9 15:7
17:6 176:6
Mary 6:8, 23 13:9,
12 79:25 184:3
Masterson 10:20
match 176:15
material 42:9
43:23, 24 56:1
materials 82:18
85:25
matter 1:22 79:19
119:13 174:6
178:13 183:3
184:6, 15
Matthews 118:20,
22, 23 119:2
McQueen 42:15
mean 4:18 34:20
63:25 64:17 65:17
75:11 76:6 81:6,

10  85:10  87:1, 2,
25  89:12  92:1
95:19  116:14
120:1, 16  127:15
130:24, 24  134:14
138:7, 22  140:22
144:7  145:10
152:21  162:11
165:20, 21  166:15
170:10, 11, 23, 24
180:10
meaning  28:21
49:11
means  39:24  63:7
73:18  184:6
meant  63:16
138:20  159:24
160:2
mechanical  184:6
medications  19:16
meet  94:23  98:19
109:15  111:5, 6
148:7  169:25
meeting  93:25
94:12, 13, 19, 22
95:2, 6  96:6, 7, 18,
21  97:17  98:4, 6
100:22, 23  101:19,
22  102:14, 17, 22
103:2  108:11, 20,
23  109:18  110:21
111:8  166:18, 20
167:1
meetings  94:5, 6
member  37:21, 25
members  20:2
Memorial  115:22,
23
memory  102:23
137:4
men  71:21  72:2
180:6
men's  97:11
mention  154:6

mentioned  20:15
28:7  46:24  66:4
94:4  98:7  138:1
mess  102:15
message  149:22
150:18
messed-up  76:5
met  106:9
metal  41:10
MICHAEL  2:4
Michelle  10:7, 9
12:4
Mike  25:7  44:4, 5,
6  71:1, 3, 19  72:4
73:3  74:14, 14, 16,
20  91:19  95:8, 12
96:7, 20  97:2, 7, 13,
17, 21  99:14, 18
101:16, 17  114:2, 3,
9, 11  167:2
Mikey  74:13  96:8,
19  101:9  166:11
167:1
Mill  47:9
mind  67:23  86:15
87:7
mine  126:12
134:15  135:8
141:1
minus  33:10
minute  46:17
133:11  158:25
mis  12:9
misdemeanor
36:17, 19
missed  146:22
missing  81:13
misunderstanding
151:18
MMA  64:18  66:1,
12
mold  41:1, 5, 6, 7, 8,
12
molder  39:23
molding  39:15, 25

mom  13:21  20:18,
19  31:3, 9  180:16
mom's  13:8
Monday  74:20
148:4
money  55:13
122:25  173:16
180:16
month  7:13  41:25
51:3  102:8, 24
174:20
months  25:10
32:3  33:4  37:24
43:7, 18  45:11
47:12  48:7, 11, 14,
17, 20  51:4, 16
55:4  69:5  89:9
112:22  154:15
174:25  175:1
179:13
month's  33:3
mop  125:13
Mor  61:23
Morgan  61:22, 23
62:13
morning  42:18, 19
96:19, 22  97:10
102:5  140:5, 7
142:7  145:21
Morris  61:22
mother  11:9  13:7
20:6  31:2  177:16
mother's  13:9
Mount  7:9, 21, 24,
25  8:3, 4
mouth  134:17
move  51:20, 25
66:1  103:3, 9
125:9, 15, 16, 21
129:20  133:22
140:7, 7  152:9
moved  51:3, 5
52:7, 9  69:22
103:1, 20, 24
113:18  114:14, 18
116:23  125:7, 11,

14, 19, 25  126:22
128:7  133:19
162:12  167:11, 12
moving  8:2  69:22
128:12  133:20
144:8
mowing  115:17
116:12
Mullin  25:7
muscle  27:13
museum  101:7

< N >
name  4:9  6:16, 17
10:6, 19  12:19
13:8, 9, 11, 19
14:19  15:11, 13, 22
16:15  17:8, 21
36:9  50:5, 7  53:10,
12, 22  58:1  61:23
66:19  68:7, 8  71:2,
9, 10  72:13, 14, 14,
15  106:2  108:21
114:22, 25  119:4
154:21  155:2, 2
181:11
named  16:14
17:18  71:7
names  11:1  53:24
91:18  111:3
161:21
natural  61:24
nature  84:24
necessarily  61:9
need  6:10  74:21
97:16  113:15
118:12
needed  59:12  74:2,
10  106:24  112:7
115:6  125:19
130:23  131:8, 16
132:14  140:1
149:21  172:4
181:8, 22
nerve  21:19

Deposition of Chris Steven Slaughter

Date: 10/29/2014

**never** 9:17  21:3 35:14, 25  55:13 69:22  86:24, 25 148:19  150:17 163:11, 11  171:4, 6 172:22  173:17, 18 179:24  180:16
**new** 22:23  23:1, 5, 16  74:24, 25  75:13, 13, 18, 25  111:24 113:13  118:14, 15 125:12
**Niche** 104:25 105:1, 5, 17, 19, 25 108:17  112:5 131:8  150:3 158:15  162:3, 4, 5
**Nichols** 94:9, 9, 10, 25  95:1, 19, 21 96:9  100:5  143:4, 5, 7, 17, 20  144:12
**night** 42:17 146:22  147:4
**nightmare** 113:2
**nights** 42:22
**nine** 8:1
**nineteen-ninety** 4:17
**Nissan** 175:13, 22
**no,** 119:5  133:2
**nodded** 141:15
**nodding** 5:21
**nods** 5:10  12:1 50:23  67:9  141:12
**nonharassment** 82:17
**normal** 20:22 86:12  91:22  98:22 126:6  146:19 179:16
**normal-sized** 129:5
**Notarial** 184:16
**Notary** 184:3, 19, 23
**note** 181:1, 3

**notes** 107:2, 4, 8, 19  108:14  109:10, 21  111:2
**November** 39:7, 7 78:5  80:17  82:14 83:19  89:11, 12, 15
**number** 6:21  7:1, 5  116:6  161:5 181:21
**numerous** 20:14 43:22  44:3  50:12, 18  53:6, 19  92:24, 25  137:19  160:2 180:9

< O >
**obtain** 31:6  177:4
**Obviously** 119:6 139:24
**occasions** 10:2 30:20  32:2  34:24 121:8  153:12
**occur** 25:19, 22 27:9
**occurred** 93:7 119:7, 10
**occurring** 107:20
**October** 1:24  4:2 9:10
**offense** 35:7
**offer** 55:7, 15  56:2 60:14, 20
**offered** 54:21  55:3, 10  56:11, 15  60:5, 6  153:9  155:3, 24
**OFFICE** 2:5  14:1 22:1, 1, 17, 20 69:11  95:8, 14, 17 97:10  108:20 143:20  148:10 177:10
**offices** 22:13
**off-the-record** 18:5 24:3  175:3
**Oh** 15:2  19:2 30:22  44:3  62:14

64:25  74:16  75:16 114:16  128:17 131:18  141:17 148:23  150:23
**Okay** 5:5, 17  6:2, 13, 14, 24  7:19  8:6, 9, 20  9:11, 22  10:2, 24  11:1, 17, 21 12:2, 23  13:4, 8, 16, 19  15:2, 7, 11, 14, 20  16:4, 8, 11  17:3, 6, 12, 17  18:3, 8, 12, 15, 20, 24  19:4, 6, 7, 8, 16, 20  20:2, 8, 11, 15, 22  21:9, 20 22:6, 10, 16  23:1, 4, 9, 20  24:2, 12, 18, 21, 25  25:5, 8, 11, 15  26:3, 5, 11, 17, 21  27:6, 15, 25 28:3, 18  29:4, 9, 12, 15  30:6, 23  31:3, 9, 24  32:6, 10, 18, 21, 25  33:12, 15, 20, 23 34:10, 17, 18, 24 35:1, 3, 7, 9, 12 36:5, 9, 17, 20, 22 37:6, 11, 25  38:5, 7, 25  39:13, 22, 24 40:16  41:3  42:23 43:15  44:19  45:2, 10, 13, 16  46:1, 4, 10, 17, 18  48:5, 8, 13, 16, 21  49:6, 8, 10, 13, 16, 20, 24 50:2, 17  51:17, 20 52:10, 17, 23  53:3, 8  54:12, 16, 19, 23, 25  55:15, 19  56:6, 8, 18  57:12  58:23 60:1, 22  61:3, 9 62:3, 22, 25  63:7, 22  64:5, 16  65:2, 2, 5, 13, 20  66:7, 11, 14, 21, 24  67:10, 15, 18, 20  68:10, 16

70:14, 20  71:14, 16, 19  72:3, 7, 10, 14, 16, 20, 24  73:3, 14 74:3, 8, 11, 11, 14, 17  75:8, 10, 21 76:2, 4, 6, 17, 20, 23 77:1, 8, 14, 20  78:4, 18  79:6, 14, 17, 21, 24  80:2, 3  81:9, 19, 24  82:4  83:3, 9, 12, 14  84:4, 7, 11, 17 85:2, 8, 15  86:20, 22  87:11, 18, 25 88:2, 6, 16, 25  89:4, 7, 10, 16, 23  90:5, 13, 16, 20  91:8, 15, 18  93:1, 6, 22, 24 94:2, 15, 20  95:1, 4, 18, 22  96:3, 14 98:5, 14, 24  99:3, 8, 12  100:21, 21 101:18  102:7, 17 103:6, 19, 22  104:3, 6, 14, 20  105:14, 17 106:6, 16, 20, 25 107:5, 13, 25  108:6, 9, 11, 22  109:17, 22 110:14, 24  111:5, 7 112:8, 10, 14, 14 113:6, 14, 15, 25 114:7  115:2, 6, 21 116:2, 8, 17, 19, 22 117:12, 19  118:1, 7 119:1, 6, 9, 12, 16, 22  120:13  121:10, 20  122:12, 18 123:2, 5, 18, 21 124:7, 10  126:25 127:15, 24  128:1, 9, 11, 16, 25  129:3, 7, 20  130:6, 8, 16, 19 131:13, 16, 22 132:10, 24  133:4, 6 134:2, 9  135:13, 25 136:3, 10  137:7 138:1, 15  139:14,

Deposition of Chris Steven Slaughter                                      Date: 10/29/2014

*17* 140:6, *13* 141:7,
*10, 16, 21* 142:21,
*24* 143:2, *12, 25*
144:3, *3, 14, 20*
145:1, *4, 10, 16, 23*
146:7, *9, 17* 147:8,
*14, 16* 148:1, *7*
149:1, *3, 11* 151:4
153:7 154:3, *5, 8,*
*20, 25* 155:7, *12, 15*
156:5, *14, 16*
157:10 158:3, *6, 12*
159:23, *25* 160:14,
*16, 16, 23, 23* 161:1,
*4, 9* 162:15 163:9,
*12, 16, 19, 22, 25*
165:7, *23* 166:13
167:6, *8, 14, 25*
168:16 169:24
170:17 171:1, *9, 12*
172:21 173:1, *24*
175:16, *19* 176:2,
*10* 177:1, *5, 11, 13*
178:3, *6, 7, 8, 15, 17,*
*18, 18* 179:1
180:18
**old** 11:6 12:25
19:24 23:7 64:19
65:4 69:3 115:17
180:5
**oldest** 14:17
**once** 35:15 120:3,
*6* 130:17 165:7
170:10
**ones** 23:7 53:8, 11
75:9 99:9 111:3
168:21
**one-ton** 129:6
**open-door** 111:25
**operate** 118:11
**operation** 162:8
**operator** 51:5 52:1
**operators** 118:11
**opportunity** 179:9
**opposed** 57:15

**Options** 57:18
58:7, *8*
**order** 34:5 35:22
115:9
**organizations** 37:9
**orientation** 78:12,
*14, 16, 20, 23*
**originally** 8:6
*24:15* 35:21 78:4
**orthopedic** 26:8
**ourself** 93:25
**outcome** 184:14
**outgoing** 112:20
**outside** 181:18
**Overton** 52:8
**owe** 174:12
**Oxmoor** 174:19

**< P >**
**p.m** 182:3
**pack** 123:13
**PAGE** 3:3, *10*
183:4
**pages** 107:7
**paid** 27:24 33:22
37:5 40:21 41:15
49:14 96:25
120:11 122:25
153:25 175:14
176:8
**Pain** 173:11 180:3
**paint** 153:2 166:22
**painted** 153:25
**painting** 88:9
117:9 152:25
153:24
**palate** 20:13
**paper** 18:25
106:19, *20* 119:24
132:4 152:15
163:19
**papers** 19:1 58:5
79:12 162:17
163:17
**paperwork** 52:22
**parents** 13:6

**park** 11:25 37:2
53:14
**Parks** 68:5 91:20
96:8 97:20 99:22
101:23 113:19, *22*
152:3 154:10, *18*
156:11 162:10, *11*
170:24
**part** 81:2, *3* 122:8
125:20 131:20
136:14
**particular** 125:2
181:1
**parties** 183:10
184:12, *13*
**partner** 75:2, *8*
**Parts** 38:8, *10, 22,*
*23* 39:1, *2, 2* 40:1
41:9
**party** 4:19, *21*
**password** 178:11,
*12, 19*
**patch** 123:22
**patching** 117:9
122:21
**pathetic** 176:14
**patience** 172:5
**pay** 34:5, *8* 40:12
42:10 44:7 47:24,
*25* 48:2 54:24, *25*
55:12 59:9, *12, 14*
87:18, *21, 24* 88:1,
*10, 11* 89:1, *5*
91:11 96:24, *25*
97:1 101:15 109:1,
*24* 110:1, *2, 4, 11,*
*18* 115:25 120:5, *7*
147:2, *3, 6* 151:23
152:15, *16, 21*
153:1, *4, 13, 18, 22,*
*23* 172:20 175:25
**paying** 34:3 101:1
**payments** 33:20
174:1, *5, 24*
**pays** 152:25
**Pensacola** 149:13

**people** 30:12
31:16 44:23 52:18
57:2, *11, 19* 58:9
67:15 70:3, *4*
72:24 74:10, *23, 25*
75:14, *18* 76:1, *11,*
*17* 77:1, *5* 78:21
86:9, *10, 13* 91:12,
*22* 93:2, *14, 17, 20*
94:1, *6* 96:25 98:8,
*10, 19, 23* 101:2
103:15 104:9, *10*
105:7, *10* 109:3, *6,*
*24* 110:1, *4, 6*
112:18 113:1
114:2 115:20
118:4, *8, 10* 120:7
123:10 127:5, *9*
131:5, *5* 132:19
137:20 139:25
153:1 158:22
164:23, *24, 25*
166:16, *19* 167:23
168:8 169:18
172:11 179:19
180:1 181:5
**peoples** 114:4
**percentage** 26:2, *3,*
*5* 28:25
**perfect** 175:2
**performing** 88:4, *5*
**period** 10:10 12:7
38:22 45:14
**person** 104:13
106:2 112:21
137:17 138:2, *3*
155:5, *9* 181:3, *9*
**personal** 79:20
**personality** 104:1
**pertain** 84:14
**PH** 6:18
**phone** 111:10
127:7 148:11
**phonetic** 10:9
120:22 125:8
131:11 162:7

physical 35:14 36:1, 2
physically 13:25 47:8, 9 123:6
physician 25:24
PI 36:24
picked 27:10
picking 102:3 157:4
pickup 129:5
piece 106:19 124:2
pieces 124:18
pile 128:24
pinpoint 22:8 119:5
pins 41:11
pioneer 74:25 75:11, 22, 23 92:17 102:11 103:17 107:24 172:11
pioneers 93:13
pizza 180:15
place 53:13, 22 56:22 58:9, 16 68:8 87:1 100:22 108:23 109:17 112:4, 5, 5, 5, 25 123:10 170:2, 4 183:4 184:7
places 45:17, 19 57:14 61:13 66:24 81:4
PLAINTIFF 1:7 2:3
plan 101:21
planned 76:7
Plant 44:15 47:10 69:5
plastic 40:1
Plastics 38:13 40:18, 21 42:8
played 102:1
plead 37:3
pleaded 35:17
please 5:16 6:15 7:8 30:8 45:18 58:14 101:20

107:13, 16 160:8 161:2
pled 36:14
plenty 49:20, 22
PLLC 1:23 2:12
plowing 54:14
plumber's 110:2
plumbing 151:24 152:4, 9, 11 154:11, 19 155:9, 18, 24 157:19
plus 67:22 124:20 153:8
po 77:14
pocket 130:10
point 31:18 110:16 118:9 126:15 139:24 140:23 143:8 147:21 173:18
poke 170:21
policy 111:25
poor 173:16
pornography 71:12
position 42:23 43:21 46:11 49:17 52:20 55:24 56:8 60:5, 6 61:6, 9 63:13 70:14, 17 77:10, 14 78:2 88:14 128:3 154:6, 9, 11, 13, 23 155:13, 18 156:3, 12 157:19
positions 43:22 53:4
position's 61:3
possible 134:23
post 152:4
poster 67:2
practice 64:21 65:18
precipitating 20:25
prepare 18:8, 13
prepared 104:15

167:23
preparing 30:23
present 98:19 128:11
presented 5:7
president 149:16 150:1, 12, 15
presumed 159:22
pretty 81:5 90:25 91:20 112:20 119:17 176:14
preventing 82:18, 25
previously 130:22
prior 7:19 8:12 30:1 55:16 77:8 90:14, 15 94:22 119:10 130:20 136:11 145:6 173:24
private 63:5
Pro 121:15
probably 19:23 22:18 25:2 93:5 121:13, 22 135:4, 16
problem 101:3 103:14 181:7
problems 18:22 31:7, 14 76:16 101:24 120:15, 17 136:16 137:20 165:3 167:20 169:9
process 70:1
profane 81:19, 20 86:22, 23
program 23:14, 21, 22 75:14
programmed 23:21
progress 107:24 172:12
prohibiting 19:13
project 49:22, 23, 25 97:21 113:24 143:21 162:1, 12

proper 81:12, 12 85:25
prorate 28:25
provide 106:13 160:7 161:3
provided 78:22, 25 86:17 160:6, 10
provision 84:2
provisions 83:23
PRP 14:22
public 36:24 184:4, 19
pulled 27:12, 13
purpose 5:5
purposes 144:1
push 138:13
put 6:23 52:5 57:9 76:10 79:12 115:15 141:14 145:25 152:24 168:7 170:20 179:13, 20 181:6
putting 120:7

< Q >
quality 43:25
question 5:13 6:4, 6, 13 84:25 85:3 98:24 110:16 113:6 128:2 131:24
questions 18:11 19:13 84:1, 4, 19 181:24 182:1
quiet 21:25 22:6 23:16
quit 47:16 134:12
quoted 89:1

< R >
Radcliff 69:19
radio 132:24
rain 132:7
raise 48:7, 8, 15 91:10, 22 96:24

98:9  100:15
127:11
**raised**  128:6
**raising**  127:9
134:12  142:16
**ran**  39:25
**rate**  39:10  40:12
44:7  47:24, 25
54:25  55:12  59:14
87:18, 21  88:3, 8,
11, 25  110:10, 18
115:25  153:22
**rates**  109:24
**read**  80:20  99:13
158:24  159:4, 5
176:12  180:7
**reading**  183:10
**ready**  61:19  168:9
**real**  74:23  178:23
**really**  21:7  22:7
57:8, 21  68:12
69:10  70:8  75:2
76:3, 14  102:10
113:5  118:12
122:1  135:22
147:5  151:13
156:4
**reason**  90:20, 22
179:6
**recall**  5:4  30:2
31:12, 20  32:20, 25
37:7, 10  39:9
45:16, 19, 21  53:9,
11, 24  54:16  56:17
62:19  68:3, 6, 8
69:25  70:20  71:9
78:25  87:6  93:8
106:2  132:23
133:5  134:1, 20, 22,
24  135:2, 5, 5
140:8  143:16
145:5  150:24
157:14  158:1, 8
177:16  181:11
**recalled**  161:7

**receive**  32:13, 21
56:2, 25  80:20
87:23  91:11
**received**  19:3
22:23  33:1  48:3, 6
60:1, 3  82:17, 23
83:19  86:17
**receiving**  58:17
85:24
**receptionist**  22:2
**recess**  68:1  161:13
**recollection**  83:25
**record**  6:2, 23  7:2,
6  179:12  180:4
**reduced**  183:7
**reference**  57:7, 24
136:22  173:17
**referenced**  156:21
**referred**  24:15
57:18  58:2  80:10
82:10  83:4  85:16
180:20
**reflect**  55:7
**regarding**  30:10
84:2, 5  85:4  117:2
161:17
**Regina**  16:14, 19,
22  17:6
**Regina's**  16:15
**regular**  122:9
129:4  153:4
**rehab**  52:19  53:1
54:2  56:19
**rehabilitation**  9:20
22:24  46:3, 5
68:23  179:17
**rehash**  113:12
**related**  184:11, 12
**relative**  144:4
**remarks**  18:5  24:3
175:3
**remarried**  36:12
**remember**  30:17
62:15  103:2
111:16  114:21
135:6  145:7

149:23  151:6, 7, 9
174:20, 22  181:20
**rent**  173:15
**reopen**  29:12
**repaired**  74:2
**repairing**  54:15
**repeat**  5:16  161:21
**replow**  157:11
**repo**  174:13
**report**  50:19  74:19
114:7  115:3  140:1
**reported**  184:5
**reporter**  5:25
13:10, 14  37:17, 19
62:16  80:2, 5, 8
114:10, 12  137:13,
16  141:14  164:5, 8
175:17, 20  183:7
184:1
**reporting**  82:18
83:1
**repossessed**
173:15  174:9, 10,
21
**represent**  4:10
**representing**
184:13
**request**  6:12
107:16  178:3
**requested**  183:6
**require**  123:6
**required**  23:5
**reserved**  112:18
**resign**  47:17
**resigned**  42:22
47:16  49:16  59:13
**respect**  27:18
28:8  81:15, 17
82:9  86:10  100:17
119:25  151:22
155:17
**responsible**  40:25
41:2, 4
**rest**  109:11  145:20
146:6

**restroom**  142:7
**result**  25:25
**retire**  14:12  69:6
**retired**  14:11
**retrieve**  79:17
**return**  160:5  176:3
**returns**  160:4
**review**  18:12  19:10
**Richard**  68:5
161:22, 24  162:1,
11  163:24
**Richardson**  78:19
**ride**  64:4
**right**  4:19, 25  6:15
7:12, 23  8:17  9:14,
18, 25  10:5  11:19
12:1, 2, 19  14:14,
22  16:3, 11  17:25
19:10, 12, 20  20:25
21:4, 11, 16  23:24
25:17, 18, 22  26:8,
23  29:4, 14, 16, 17,
18, 19, 21, 24, 25
30:3  31:12, 19
34:4, 14, 16  35:12
37:8, 13  38:11, 15,
17, 21, 21  39:9, 19
40:2, 5, 7, 16, 22
41:12, 14, 17, 19, 21,
23  43:12  44:12, 13
45:4, 4  46:1, 16
49:2  50:24  54:4
55:18, 19  58:20
60:7  61:21  62:19
63:3  65:15  67:21
68:3, 13, 21  69:25
70:11  72:1  73:10
74:16, 19  75:10
78:7, 11  80:9, 24
81:7, 20, 21, 23
82:7, 22  83:14, 15
84:17, 25  85:3, 10
87:7, 10, 16  88:13,
20, 20, 21, 21  89:3,
7  90:1  91:25  94:4,
22  95:18  96:5, 17

98:7  99:5, 8
100:19  101:18
102:15, 15, 19, 21
104:6, 10  105:24
106:6, 11  107:7, 10,
12  110:20, 23, 25
111:2  113:16
115:8, 8  118:7, 16,
23  119:3  120:1, 16,
20  121:14, 16
122:6, 8, 16, 18
123:23  124:15, 17,
18, 20, 21  125:1
127:2  129:7, 13
133:8  141:19, 23
142:1, 4  143:16
144:9, 16  145:16
146:15  147:19
150:19  153:11, 21
154:5  156:8, 21, 23,
25  157:1, 10, 14, 16
158:18  159:1, 9, 18,
21  160:3, 3, 6
161:9, 15, 22  164:4,
14  167:16, 18
168:3  174:8  175:6
176:4  177:3, 25
178:6  179:9
Riverport  17:11
Road  11:16  27:14
28:2  44:12  51:13
59:3  60:11  61:2, 7,
11  144:10  170:3
roads  89:22, 23
90:2, 18, 23, 25
103:11  113:16, 25
114:8, 16, 19  115:3,
13, 16, 24  117:10
118:4  119:14, 20
120:3, 18  142:10
143:19
roadside  138:17
Robinson  105:18
106:1  108:18
150:2  176:25

177:3
rod  41:10
Rogers  120:23
121:18, 19  136:20
146:4
roll  123:14, 17
rolled  132:21
roller  120:9
123:14, 14, 15, 23
124:4  125:12
153:24
rolling  111:15
153:24
Ronnie  167:16
roofs  73:20
room  103:14
155:20  166:14, 19
Rose  6:8, 23  13:9,
12  79:25  184:3
rotate  117:11
rotated  122:11
rotator  25:14, 25
27:14, 18  28:24
roundabout  148:13
route  59:7
RPR  184:3
Rubbertown  57:2
ruin  180:4
ruined  173:11
175:6
rules  79:1, 4, 5
81:2, 7  85:11
86:17, 21  156:19,
20
rules,  81:10
Run  16:20  63:19
64:1  112:4, 4, 5
runs  58:8  112:5
Ryan  143:21
144:18

< S >
sad  113:5  176:20
safety  79:2, 5
94:11  95:7  128:11

144:1, 4, 6  166:20,
23
salary  39:10  40:12
San  47:5
sat  110:23  148:10
Saturday  152:25
savings  62:24
saying  151:7, 9
178:15
says  22:4  101:9
147:3  163:18
scared  168:19, 20
scenes  156:7
schedule  60:25
school  8:20, 21
9:2, 3, 4, 5, 19, 22
13:2  39:5  51:9, 10
59:5, 19  60:9
64:25  69:2, 9
152:7  153:9, 10
155:3, 24
schooling  9:1
152:8
Scott  66:20
scrap  27:11
scream  91:9, 15
98:9  126:5, 7
134:8
screamed  92:5
164:15
screaming  91:25
93:3  110:6  125:22,
24  126:9  127:5
132:20  134:5, 12
135:23  136:2, 4
137:21
seal  184:16
seasonal  32:6
seat  27:11
second  12:2, 4
38:25
secretary  68:6
94:7
section  84:20, 22
sections  84:7, 9, 10
secure  103:13

Security  6:20, 25
7:5  63:5
see  5:23  12:10
25:6, 8, 9  33:2
60:23  69:1  84:19
112:21  131:5
157:22  166:14
seeking  28:22
176:11  179:6, 6
seen  24:9, 12  70:9
142:6  146:14
165:16
selling  32:7
send  55:8  117:14
sensitive  92:5
sent  22:25  105:19,
24  108:17  109:12
163:15
Sentra  175:13
September  9:6, 9
set  64:11  69:17
115:11  183:4
184:8
setting  4:15  21:25
22:6  23:16, 16
settings  23:12
settled  28:16, 23
30:1
seven  33:2, 4
48:14  55:4  59:8
89:9  92:25
sexual  82:19
shaking  5:20
sheet  146:19
Shepherdsville
13:18  46:8
shift  40:25  116:4
shop  97:6  155:1
167:21
shops  153:2
short  67:22
shoulder  64:21
shovels  124:20
show  71:24  82:7
83:7  176:24  177:5

showed 70:8
showing 81:11
shown 176:21
shut 32:8 126:21, 22 134:16
siblings 18:3
sic 22:12 56:21, 22 69:12 149:8
side 21:4 25:17 69:14 170:3
sign 82:13 97:4 170:3
signature 83:19 85:21 163:20
significance 80:17
signing 183:10
signs 133:17
Simpsonville 11:10
sir 4:14, 24 5:2, 4, 18 6:3 7:15 8:23 9:8, 13 10:23 12:16 13:5 21:13 28:20 29:3 36:4 37:7 45:22 46:6 54:6 63:2, 15 73:5 75:5 83:24 84:16 85:13 86:2 87:15 100:24 114:17 117:3, 6 119:11 136:13 148:5 150:16 153:20 170:5 177:18 179:8 181:3
sister 15:21 20:7
sisters 14:15 15:18, 19 17:13
sit 120:1 139:4, 6 146:6
site 105:1 127:1
sitting 146:5 166:14, 18 167:5
situation 57:13 76:5, 8, 10 105:2 113:5 135:11

143:11, 13 168:7 179:14, 20, 25 181:6
situations 164:13
six 25:10 33:2, 4 93:5 94:5, 6
six-year 49:23
skill 88:1
SLAUGHTER 1:5, 21 2:3 4:1, 3, 9 6:17 7:4 14:19 79:24 81:24 85:19 161:15 179:2 181:23 182:3 183:3
slide 128:17, 18
slowly 5:11
smoke 91:13, 13 101:8 156:22
smoking 101:10, 12 156:22
smooth 136:17
snakes 116:13, 14
snowballed 101:13 135:18
Social 6:20, 25 7:5 63:5
soft 22:2 41:9
sold 39:2
somebody 50:20 55:8 72:12, 16 75:23 87:3, 9 95:9 109:4 112:13 117:16, 19, 24 123:24 127:7 138:23 146:23 148:1 165:4, 11 180:5 181:8, 13, 16
somebody's 102:3 123:25
son 7:18 12:18 34:9, 13 63:21 143:21 163:6 180:14, 15
son-in-law 162:10, 11

sorry 13:10 15:25 26:22 37:17 42:5 48:23 50:6 51:7 52:12 61:5 62:8, 16 65:6 68:9 74:18 79:3 90:21 114:10, 18 128:25 129:25 137:13 141:4, 13, 17, 20 151:8 164:5, 18 173:3 174:17, 18 175:17 177:22 180:11
sound 95:24 156:1
sounds 52:13 63:7 95:18 118:25 119:4, 18
south 8:8, 17
Southside 8:17
spar 65:11
spare 63:18
speak 5:11, 12 30:20 97:8, 13 98:1 105:19, 21 106:1, 12 108:18 109:13 111:17 112:18 147:17 150:12, 19, 23, 24 163:5, 7, 9
speakerphone 148:11 149:12
speaking 6:7
speaks 22:2
specialize 61:24
specific 16:7 21:7 25:21 48:24 73:25 85:5 89:18 93:1 102:9, 25 105:24 107:9 113:7 121:17 125:17 148:13
specifically 32:4 53:15 84:14 85:3 109:14 122:4 143:8 181:21
specifics 18:19

Spell 11:3 12:5 50:5, 7 96:16
spoke 30:17 111:10, 19 150:17
sports 64:14
spot 6:12 97:14
spreaders 124:22
spreading 101:2
squeal 132:8
stand 138:8
standard 157:19
standards 156:20
standing 97:23
Stanley 44:11
start 6:5, 6 21:1 41:24 45:7 73:16 90:21 112:21 129:11, 12
started 5:8 19:23 43:5, 22 45:9 48:1 51:2 55:18 59:18 70:25 71:1 72:18 76:13 78:8, 11 87:19 93:9 96:19 115:16 154:15 162:7
starting 61:18
state 6:15 46:4 53:18 54:10 55:15 56:16 137:7 184:2, 4
stated 7:1
statement 82:1 142:18, 20, 22 143:3, 7, 8, 10, 11, 12, 19, 23, 24 144:1, 11, 24 145:2, 5, 15, 17, 22 169:22
statements 143:17 150:10 158:22, 25 159:4, 6 170:11 173:14 176:12, 14, 21 180:7
STATES 1:1
Station 8:5, 7, 10

16:21  22:21  47:10
status  147:21
**Stay**  5:20  64:13
87:21  89:7, 23
**stayed**  55:14  89:9
**Steiger**  12:4, 5, 8, 9,
15
S-t-e-i-g-e-r  12:6
**stenographic**  184:6
**step**  95:9, 11, 17
**stepfather**  13:7
14:9
**stepsister**  16:14
**Steve**  68:5  91:20
96:8  97:20  99:22
154:10, 18  156:11
162:11  170:24
**Steven**  1:21  4:1, 3
6:17, 18  182:2
183:2
**stop**  5:14  119:23
126:20  137:2
145:15  170:3
**stopped**  101:7
125:25
**stopping**  6:12
**stored**  146:1
**Street**  2:6  123:15
**stress**  137:11, 15
138:16
**stressed**  172:10
**strike**  151:20
**strong**  23:7
**structure**  73:21
**structured**  99:9
**Structures**  73:17
76:23  89:8, 9  90:2,
18, 23  91:4, 6  93:3
99:1, 2  102:24
104:23  106:4
112:16  113:9
114:15  115:25
152:1
**stuck**  41:9
**stuff**  66:2, 8  68:20

**submit**  54:1  56:20
**submitted**  54:5
**subordinate**  81:13
**substantiate**  30:15
**suffer**  20:3
**suffering**  173:11
**suing**  18:19
**suit**  18:14  19:7
28:23  30:1
**suit,**  18:16
**summer**  59:9
**supervise**  98:3
**supervising**  179:21
**supervisor**  40:7
42:14  44:1  50:2, 9,
13, 14, 15  52:5
70:23  71:8, 17
73:10  101:16
113:25  117:12
154:19  162:14
**supervisors**  50:12,
18  71:5  73:13
159:20
**support**  33:11, 18,
20, 23  34:5, 8, 12
173:12  174:1
180:12
**supporting**  180:14
**supposed**  71:24
87:23  91:14
**supposedly**  137:9
**Sure**  30:9  44:22,
23, 24, 25  45:19
56:9  71:15  77:16
84:18  85:9  87:5
92:20  96:15
106:17  108:21
109:10, 11  110:13
111:9, 11  117:17,
23  119:21  132:18
154:15  161:12
165:25  166:24
167:3  176:13
179:22
**surgeon**  26:8

**surgeries**  29:8
**surgery**  26:15
**surroundings**  23:15
**survey**  53:13
**surveying**  53:13
**suspect**  149:9
**suspended**  147:6
**suspending**  147:2,
3
**sweat**  132:3, 8
**sweaty**  130:7, 17
131:2, 11
**sweeper**  51:13
**switch**  22:22
**sworn**  4:6
**syndrome**  137:15
**Synthetic**  56:24
**system**  168:12

**< T >**
**table**  146:5
**take**  4:12  6:10
30:13  35:21  41:10
58:11  59:8  60:13,
17  67:22  74:1
76:12  77:15, 23
85:10  91:14  95:15
108:23  117:16
123:12  130:16
146:1  156:24
161:10  170:2, 4
179:25
**take-home**  173:20
**taken**  1:21  33:16
34:13  60:12  68:1
112:6  144:1
161:13  172:18
183:3, 7
**talk**  38:5  66:25
69:17  86:13  93:2,
19  96:23  98:23
126:19  135:8
137:2  139:14, 20
140:3  142:1
144:16, 20  145:17
146:9  171:20

172:7, 9  181:5, 8,
22
**talked**  19:20  92:24
104:23  140:5, 10
142:3, 22, 25  143:3
146:12, 15  147:19
149:14  150:2
161:20  165:17
**talking**  52:25
79:21  95:14  109:1
110:7  127:6
137:20  159:20
164:16  166:19
**talks**  96:1
**tax**  52:22  58:6
160:3, 5  176:3
**tear**  25:14  26:1
64:22
**tell**  17:5  18:16
21:7, 11  23:9
31:11, 12, 19  32:4
35:1  38:25  39:24
44:25  53:6, 15
58:7, 13  63:24
64:17  68:24  71:19
73:18  74:11  77:24
78:14  81:5, 6, 10
84:9  90:1, 3  93:11
95:16  98:20
100:21  101:25
108:11  109:17
110:20  111:21
115:6  118:6  122:4,
18  123:5, 20  125:1
132:11, 13  134:16
138:12  147:6
149:24  150:8
164:23, 25  169:10
171:3  173:22
180:25  181:21
**telling**  126:2  135:6
**ten**  43:24  66:9
172:11
**tension**  77:5
**term**  162:18

**terminate** 90:*4, 5, 6, 10* 143:15 148:15 159:6 163:15 176:15 180:8
**terminated** 63:12 71:2, 9, 11, 17 72:4 77:19 93:10 149:5 151:3 159:10 163:14, 23 173:24
**terminating** 148:22 158:10 162:19 176:19
**termination** 89:25 158:21
**terrogatories** 19:5
**Terry** 169:*13, 14*
**testifies** 4:6
**testimony** 5:3 19:18 156:11
**t-e-v-e-n** 6:19
**Texas** 47:5
**text** 35:*14, 15, 16* 36:16
**texting** 35:17
**Thank** 7:8 13:14 37:19 80:8 110:24 114:12 137:16 164:8 175:20 178:22
**thanked** 149:3
**Thanks** 148:12 181:24
**themself** 162:3
**there,** 113:21
**Theresa** 68:6
**thing** 57:22 74:25 75:18, 25 76:3 111:22, 23 113:14 116:14 122:24 126:24 131:20 169:4, 12 172:15
**things** 60:19 65:18, 23 79:10 96:22 102:13 106:21, 22 110:13 111:11, 22 117:11

119:22 139:7
140:1 142:8, 12 149:4 162:6, 9 167:20 172:3 180:15
**think** 16:12 39:11 55:1 56:10 62:14 75:16 77:4 90:9, 16, 21, 22 91:20 100:12 102:3 103:12 104:5 105:22 111:11, 13 125:20 129:2, 5 138:11, 23 139:16 147:9 149:22 153:25 154:1 172:15
**third** 40:25
**this,** 96:22
**Thomas** 13:20 17:9, 10
**thought** 18:10 27:13 69:5 75:22 76:8 103:13 104:2 106:24 114:14 138:25 139:9 152:12 153:12 160:19 166:23 170:22 179:14
**threat** 81:25
**threaten** 148:20 151:16
**threatened** 148:20 180:5
**threatening** 81:21
**threats** 148:*15, 17, 18* 149:5, 7 158:17 162:19 163:18, 23 176:20
**three** 39:17, 18 42:18, 18 43:7 48:11, 20 50:1 51:15 59:6, 16, 21, 25 105:12 122:14, 14, 14 123:4, 4 125:4 129:6

146:10, 12 153:6, 11 174:25 175:1
**threw** 76:8 109:7, 7
**Thursday** 166:21
**tilted** 128:3
**time** 5:13 6:8, 10 7:16 9:11, 16 10:10 12:7 21:14 23:18, 19 25:20 26:24 31:15 32:4, 13 38:20, 22 39:5 40:17 41:23 43:13 44:1, 3, 7 45:14 49:8, 9 51:18 55:11 57:23 59:10 60:13, 20 61:19 63:18 69:8 70:10, 25 71:1 86:14, 15 87:22 88:22 89:1 90:12, 15 93:9, 9, 9 95:3, 8 97:15 98:1, 3, 16 102:11 106:4 112:1, 2 122:23 125:7 126:10 129:14, 16, 24 130:2 131:19 132:22 133:9 134:16 135:2, 21, 24 142:25 145:10, 19 146:25 147:25 148:2, 8, 9, 19 149:2 152:10 153:1 154:14 158:1 165:16 168:20 170:17 174:12 175:23 178:14 181:25 183:4 184:7
**timely** 174:5
**times** 92:15, 22, 25, 25 93:2, 5 94:18 111:20 118:10 121:20 122:5, 23 123:2 132:17 151:5, 17 152:14,

21, 23 153:5 176:16 180:9
**title** 183:4
**today** 4:12, 13 5:5 18:9, 13 19:14 74:12, 21 120:2 139:4, 6 148:5 179:3 181:25
**Todd** 104:25 105:16 154:18 158:14 164:20
**told** 21:18 24:18, 25 25:24 55:11 58:4 59:10 60:12, 19 69:1, 8 71:15 75:12 92:16, 17 93:12 95:11, 15, 16 96:20 97:2 101:23, 23 102:11 103:23 105:8 107:23 108:25 109:5, 23 110:6 112:3 113:8, 12 120:10 125:20 126:1, 10 127:3 128:10 130:22, 24 131:8, 16, 18 134:4, 10, 12 137:5, 6, 8 142:7, 10, 15, 19 143:7, 22, 23 144:15, 22 147:6 148:3, 5, 19 149:2 150:6 151:12, 15 152:9 155:4 157:10 164:20 166:11 168:22 169:25 170:18 172:5, 13 177:4 181:6
**tolerance** 172:6
**Tom** 26:13
**tomorrow** 97:8
**ton** 128:22
**tone** 137:4
**toned** 126:6
**tons** 128:22 129:2,

*8*
**tool** 155:20
**top** 83:13 137:21
**torn** 27:14
**touch** 165:11
170:18
**Tower** 55:23
**town** 8:15
**track** 27:11, 11
**Trailblazer** 175:15,
18 176:5
**train** 59:19
**trained** 110:8
168:8
**training** 40:24, 25
41:5 57:19 59:6,
17 76:11, 18 80:16
82:17, 23 85:21, 25
86:3, 6, 8, 9 109:6
**trainings** 86:16
**transcribe** 5:25
**transcript** 183:11
184:10
**transfer** 91:3
**transferred** 89:20,
21, 22 90:2, 14, 17,
23 119:20 120:3
**Transportation**
53:18 54:10
**treat** 86:11 100:17
109:3, 3 113:1
**treated** 45:3 52:24
112:24 117:4
119:17 163:4
**treating** 81:15
86:9 120:17
**tree** 117:10
**tried** 108:14
127:17 149:4, 4, 18,
18 163:5, 7 178:8
**Trimble** 62:2
**trouble** 52:4, 6
132:20 169:18
180:2 181:4, 12, 17
**truck** 9:3, 5 51:10,
10 123:12 124:10,

13, 23 125:8, 9, 10,
11, 14, 15, 21, 22, 25
127:21 128:3, 7, 12
129:5, 6, 21 132:21
133:9, 19, 22 134:3
136:6 143:9, 10, 24
145:6
**true** 138:9 145:2
184:9
**try** 46:13 57:11
62:20 104:8
106:15 145:11
**trying** 18:24 35:24
41:12 57:10, 21
61:1 62:14 69:3, 7
72:11 90:4, 5, 9
92:2 103:17 125:8
127:11, 15 132:11
133:12, 17, 24
134:6 140:21, 22
146:24
**Tuesday** 147:10
**turn** 24:1, 6 54:23
**turned** 54:21
**turning** 31:18
**Twice** 10:4 169:11
**Twin** 10:25
**twins** 34:8
**two** 6:13 26:16
29:8 33:7 34:11
42:1 47:21 48:7
51:4 70:13 87:14
108:18 124:18
128:22 129:2, 8
130:21
**type** 28:22 47:6
69:13 88:3
**typewritten** 183:8

< U >
**UAW** 37:22
**Uh-huh** 67:4 80:14
123:16 151:19
178:10
**uh-huhs** 5:21

**un** 111:3
**underground** 53:13
**understand** 5:14,
16 19:17 75:21
80:21 81:25 85:9
87:13, 15 98:16
116:24 125:23
127:4, 9 131:1
133:24 135:19, 24,
25 136:3 140:14
141:4 144:3 147:4
156:1 167:11
171:2
**understanding**
23:11 30:7, 9, 14
52:7, 14 68:11, 16,
19 76:4 80:24, 25
143:25
**understood** 91:1
135:21
**unemployed** 38:20
55:17
**unemployment**
31:25 32:11, 18, 21
33:5, 24 34:1, 13
43:12 45:13 58:17,
21 148:24 150:7
173:21 176:18
177:2, 6, 10, 14, 15
180:11
**Union** 37:12, 12
**UNITED** 1:1 37:12
**Unlimited** 57:18
58:7, 8
**unprepared** 109:5
**upholsterer** 14:25,
25
**upholstery** 15:1
**UPS** 60:10, 11, 14
61:6 62:15, 18
**upside** 65:9
**Urban** 13:24
**use** 86:22, 23
108:7 116:10
125:12 141:10, 24
158:23 177:25

**usually** 79:12
98:19, 22 112:20
117:16 171:16

< V >
**vacation** 49:8, 9
**Valley** 8:5, 6, 10
16:20 22:21 47:10
**van** 84:6, 8, 12, 14
96:10 100:11
146:25 162:13
172:3
**various** 78:22
**vehicle** 144:8
**vehicles** 32:8
**verbal** 5:20
**versus** 173:20
**vice** 149:16, 25
150:12, 14
**video** 109:2
**view** 138:23
**violating** 35:18
36:15
**violence** 35:22
81:25 148:15
149:6 158:17
162:19 163:18, 24
**Virgin** 38:7, 10, 22,
23 39:1
**vocational** 9:4, 19,
20, 23 22:24 46:3,
5 52:19, 25 54:2
56:19 68:23
179:17
**voice** 22:5 91:10,
23 96:24 98:9
100:16 126:6
127:10, 11 134:12
137:5 142:17
**voicemail** 150:13
**volume** 24:7
**voluntarily** 42:24
**volunteered** 155:23

< W >

Deposition of Chris Steven Slaughter

Date: 10/29/2014

W-2s 160:24
wages 173:8
Wait 69:9 123:10
158:25
waited 123:9
waiting 97:10, 13
waitress 16:10
waived 183:12
walk 64:6 97:23
walked 97:20
167:1
wandering 97:24,
25
want 6:1 61:10, 11
70:3 85:9 97:8
103:9, 19, 23
113:11, 11, 20
126:2, 19 136:15
137:1 157:11
161:6, 19 178:5, 12,
14, 19, 22
wanted 35:23
59:12 111:2
149:17, 19 151:15,
24 152:4 156:9, 10
wanting 9:24
Washington 7:10,
22, 24, 25 8:3, 4
105:25 109:13
watch 5:12 44:24
64:15 109:2 126:2
watched 42:19
171:16
water 51:10
Waters 68:5
161:23, 24 162:1,
11, 15 163:2, 5, 7, 8,
24
waving 133:17
Way 8:5 44:23
58:15 71:25 91:9
92:1, 1 96:23, 23,
24 108:16 117:4
120:17 126:21
135:13, 23 138:5

139:8 157:5 159:5
163:3 169:24
ways 156:16
157:20 158:4, 18
wear 21:12, 14
116:11 130:13
131:11, 12, 14, 19
132:7, 8
wearing 23:17
Weaver 16:20
weed 105:10
weed-eating
115:17 116:12
weeds 116:15
week 33:10 47:18,
19 60:17 88:18
105:23 108:18
weekend 7:18
115:23
weeks 32:3 33:7
42:1 47:22 59:6,
16, 21, 25
weights 64:1, 12
welding 9:4, 15, 23
Well 9:10 20:16,
20 30:6 41:9 45:3
46:14 49:4 52:24
60:14 67:8, 13
72:22 96:1 97:18
98:18 101:12
104:9 107:13, 16
108:22 112:6, 6, 24
119:17 120:16
122:10 124:16
127:11, 21 128:13
136:5 137:8 142:9
148:22 155:15, 20
157:22, 25 158:3
160:2 161:9
166:10, 22 167:3
170:13, 14 175:8
178:4
went 9:3 22:19
29:7 32:23 35:11,
16 38:12, 13, 13, 16,
19, 24 39:13 40:18

43:23, 23 44:22
45:5 46:8 48:15
57:25 59:7 69:1,
23 70:3 92:15
97:19 100:23
101:24 102:6
104:25 105:5, 19
108:4, 13 109:19
112:7, 11 113:14,
16 120:3 126:22
137:23 145:9, 19,
22 146:20 147:12
159:13 163:6
171:19 176:17
180:9 181:20
We're 4:12 74:12
87:1 93:13, 13
102:12 125:5, 19
137:19 147:2
148:14, 16, 22
152:25 165:1, 15,
21 170:12 172:11,
14, 15
West 2:6 7:9
WESTERN 1:2
wet 130:18 131:3
We've 67:21
161:20, 21 178:3
what-all 53:3 158:1
whatsoever 168:14
When's 165:16
Whonsetler 1:22
2:12
wife 12:3, 4 36:7
wife's 10:5 15:11
Williams 46:8, 10
57:13, 17 68:23
74:13, 14
willing 152:6
Willis 72:13, 13, 15,
19 73:8, 9 101:17
Willis's 97:14
Willy 58:8
Wilson 91:19
windows 69:14
73:20 132:21

wishes 103:7, 8
113:18 119:14
withdrawn 33:21
witness 4:20 6:24
13:12 37:18 62:17
67:24 114:11
137:15 164:7, 9
175:18
Wolverine 53:23, 23
Woods 171:9, 10
177:16
word 87:8 141:10,
23, 24 163:15
words 126:10
135:4 137:3
148:13
wore 23:17
work 11:11, 13
13:21, 23 14:10
15:2, 14 16:22
17:25 25:23 32:6
35:24 38:19, 22
39:16 40:10 42:12,
20 43:15 45:5, 12,
20 47:8 49:20, 22
50:24 53:20 55:5
57:8, 22, 25 58:24
62:20 63:11 64:1,
20 65:8 66:13, 24
67:3 68:19 69:13,
23 72:24 73:19
74:3, 4, 6, 19 79:22
81:3, 3, 11, 13
84:13 87:24 88:5
97:1, 16 98:2
101:3, 11 102:23
103:17 104:15, 17
107:24 109:6, 25
110:5 115:8, 9, 12,
12 118:8 120:8
126:16, 17, 19, 20,
22 127:1 132:9
137:1, 2 140:18
145:19, 23 146:5,
18, 19 147:9, 10, 11
148:4 152:17

Deposition of Chris Steven Slaughter                                                      Date: 10/29/2014

155:21, 22  157:9
168:8, 9  170:13
172:12  178:17
179:12, 16  180:4, 6
**worked**  38:7, 23, 24
39:6, 17  41:25
42:17, 20  43:17
46:24  47:9, 18
52:15  57:2  68:15
75:2  104:22  116:4
118:4  121:1, 19, 23
122:2  145:20
152:16  164:2, 15
165:18, 19  168:14,
18  169:17  171:10,
16, 23  181:13
**worker**  56:21  57:4,
14  70:16  89:6
164:3
**workers**  26:18
27:3, 19  28:5  29:1,
5, 20  37:12  71:22
114:5, 6  117:15
144:10
**working**  26:23
41:24  42:22  43:4,
5  44:17  47:2
49:18  50:15  53:24
55:10, 16  58:4
68:17  75:1, 15, 25
76:1, 13  78:9  87:1
91:6  93:16  95:8
97:5  98:17  101:7
102:12  103:15
113:8  115:9  116:9
120:21, 22, 23, 24
131:1, 9  165:1
167:21, 23  168:12
172:14  174:7
178:2
**work-in-progress**
92:17  93:13, 16
**Workplace**  82:9, 20
83:1  85:20, 25
86:8

**works**  11:14, 18
15:6  17:11  23:11
72:21  162:4
165:18, 20  167:13
**worksheet**  123:20
**worse**  21:10  92:7
102:13, 14  113:1
**worth**  33:3, 5
**wreck**  4:18, 23
21:2
**wrestle**  64:12, 17
66:17
**wrestling**  64:24
65:15, 16  66:25
67:16
**wrestling-type**  66:8
**write**  172:8
**writing**  143:18
**written**  82:18
85:25  106:18
143:18  172:7
**wrong**  138:8
159:7  169:12
**wrote**  106:24
144:12, 15  145:1

< Y >
**Yeah**  15:4  16:18
19:9  20:24  23:7
26:14, 20  32:12
34:6  36:16  39:11
50:8  51:12  52:16,
16  64:8  65:12, 17
66:6, 10  67:1, 24,
25  73:2  77:21
81:18  86:6  88:5
89:13  94:25  95:3,
16, 21, 21, 21  96:1,
4, 13  99:14  107:17,
21  113:10, 18, 24
114:20  116:14
118:10  122:15, 17,
17, 23  124:6
127:22  128:23
130:24  132:23
136:9  140:2

141:20, 25  145:13,
14  149:24  150:24
153:16  155:14
160:21  161:12
163:2, 14, 23
165:13, 15, 21
167:10  173:6
175:11, 15  180:24
**year**  8:24  35:5
49:17  51:15  160:5
176:4
**years**  7:12, 12  8:1,
11  19:24  37:23
39:17, 18  43:17
50:1  64:18  65:4
66:9  69:3, 4  102:2
112:22  145:8
160:12, 25  171:11
179:13  180:5
**yell**  100:15
**yelled**  92:5
**Yes,**  133:2
**you,**  110:24
**you-all**  102:18
122:18  127:1
129:8  140:19
141:7  144:20
165:14
**younger**  152:13

< Z >
**Zach**  91:19  169:19,
20  170:22  171:6
**Zachry**  38:19
46:24  47:1, 11
50:11  51:1  52:11,
14, 20, 25  53:2
55:10, 14, 16, 18
56:16  58:3  59:4,
23  60:8  61:14, 18
62:23  67:4  165:18
166:3, 4
**Zed**  71:4  74:13
96:15
**Zednick**  71:4, 20
73:6  74:13  96:10,

12, 15  100:7
101:17

Revised 03/08



# CODE OF CONDUCT TRAINING

Employee Name: _Chris Slaughter_____
(Please Print)

Position _____

Work Location: _____

I have received, read, and understand the Code of Conduct, or have had the Code of
Conduct read to me. I understand that compliance is a condition of employment and I
also understand that GCE will take appropriate disciplinary action, including termination,
for the violation of the principles and practices set forth in the Code of Conduct
handbook.

Employee Signature: _____

Date: _11-1-11_____

EXHIBIT

_1-Slaughter_

Revised 03/08



# CREATING RESPECT IN THE WORKPLACE
## NON-HARASSMENT TRAINING

I, _Chris Slaughter_, have received training and written
     (Please Print)
materials on preventing and reporting harassment, including sexual harassment, in the

workplace.

Employee's Signature: _____

Date: _11-1-11_

EXHIBIT

2 - Slaughter



# Employee Handbook Acknowledgment

I have received a copy of the GCE Employee Handbook.  I understand that it is my responsibility to read and comply with the provisions of this handbook as well as any changes, additions, and/or deletions that are issued in writing and made part of the handbook during my employment with GCE.

I am fully aware that my supervisor, manager, and/or a Human Resource Representative of GCE are all willing to explain any portion of the handbook, which I may wish to discuss, or about which I have a question.

Employee's Name (printed):   _Chris Slaughter_

Employee's Name (signature):   _CRS Slaughter_

Date:   _11-1-11_

Org. 1/14/02
Rev. 12/02, 5/10

EXHIBIT
_3-Slaughter_



# Workplace Etiquette Training

I, __Chris Slaughter__, have received training and written
(Please Print)

materials on proper workplace behaviors and etiquette.

Employee's Signature: _____

Date: __11-1-11__

EXHIBIT

4 -Slaughter

Jun 01 12 08:41a                                                                    p.2

Attachment #1

cc k

Give my
Number to all GCE
employees if they have a
many problems

Chris Slaughter
502 428-6424

EXHIBIT
5
Slaughter