UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY

AT LOUISVILLE

CHRIS SLAUGHTER                                                    PLAINTIFF

v.                                            CIVIL ACTION NO. 3:14-CV-00281-CRS

LAKEVIEW CENTER, INC.                                     DEFENDANT

**MEMORANDUM OPINION**

        I.       Introduction

Chris Slaughter filed this disability discrimination action against Lakeview Center, Inc., d/b/a Gulf Coast Enterprises ("Gulf Coast"). Slaughter alleges that Gulf Coast violated Chapter 344 of the Kentucky Revised Statutes by illegally terminating him on the basis of his disability. Compl. ¶¶ 7 – 8, ECF No. 1-2.

For the reasons below, the Court will grant summary judgment to Lakeview Center on Slaughter's claim.

        II.      Summary judgment standard

A party moving for summary judgment must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists when "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* The Court must draw all factual inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

1

III.     Undisputed facts

Gulf Coast employs individuals with disabilities and seeks to place them with substantive jobs. Kahiapo Aff. ¶¶ 3 – 4, ECF No. 24-2. Gulf Coast contracts to provide "custodial services, food services, administrative support, facilities management and hospital housekeeping." *Id.* ¶ 3. Gulf Coast's Employee Conduct Policy prohibits employees from engaging in "violence, threats, or intimidation," and engaging in that conduct "may result in immediate termination." Emp. Handbook 24, ECF No. 24-4.

Under the federal AbilityOne Program, the federal government contracts with private companies like Gulf Coast with the goal of assisting people with disabilities in finding employment. Kahiapo Aff. ¶¶ 5 – 7. At Fort Knox, the AbilityOne Program provides a service called Total Facilities Management. *Id.* Total Facilities Management contracts with SourceAmerica, and its subcontractors, Gulf Coast and The Ginn Group. *Id.* ¶¶ 8 – 9.

In November 2011, Chris Slaughter began work for Gulf Coast as a general maintenance worker in the Structures Department. As a general maintenance worker, Slaughter performed "general grounds repair, electrical and plumbing repairs and other building repair needs." VanCleave Aff. ¶ 5, ECF No. 24-6.

Slaughter has a hearing impairment which qualified him for employment at Gulf Coast. *Id.* ¶ 3. Normally, he wears hearing aids, but he does not wear them in extreme heat as it can damage them. Slaughter Dep. 130 – 32, ECF No. 24-7. Wearing hearing aids in heat also causes high-pitched noises. *Id.* Slaughter told Bill VanCleave, Gulf Coast's Human Resources Generalist, several times that the individuals he worked with in the Structures Department would needlessly raise their voice when speaking to him. *Id.* at 91 – 92.

On April 25, 2012, Mike Johnson, an employee of The Ginn Group and Slaughter's manager, told VanCleave that he gave Slaughter a verbal warning for violating The Ginn Group's policy against wearing ear plugs and listening to music while working. VanCleave Aff. ¶ 8.

2

On April 26, 2012, Slaughter told VanCleave about his issues with Mike Clemons, another employee of The Ginn Group. *Id.* ¶ 9. Slaughter told VanCleave that Clemons had "yelled" at him for applying mud too thick to a wall. *Id.* ¶ 10. Slaughter thought Clemons believed he was "stupid" and treated him differently than other workers. *Id.* VanCleave told Johnson to make sure that The Ginn Group's supervisors knew that it was important to get close to Slaughter and make eye contact with him when trying to get his attention. *Id.* ¶ 12.

On April 27, 2012, Slaughter told VanCleave and Steve Parks of The Ginn Group that Clemons was "picking" on him, and he could no longer work with Clemons. *Id.* ¶ 13. On April 30, 2012, Parks transferred Slaughter to the Roads and Grounds Department, where he would have a different supervisor. *Id.* ¶ 14. Parks transferred Slaughter after Slaughter filed an EEOC complaint regarding Clemons' treatment. Slaughter Dep. 90. Slaughter's EEOC complaint alleged disparate treatment on the basis of his disability. *Id.* at 90 – 91.[1]

On July 2, 2012, Slaughter patched potholes with James Herr (The Ginn Group), James Rogers (The Ginn Group), and Jeremy Lowe (Gulf Coast). *Id.* at 120 – 23. He had worked with all three men previously. *Id.* at 121. At the end of the hot day, Slaughter got in the asphalt truck and began to drive. *Id.* at 126. He heard his colleagues screaming at him to stop driving, stopped the truck, and got out. *Id.*

After he got out of the truck, Slaughter approached Lowe. *Id.* at 126. The following exchange occurred between him and Lowe:

> I just heard him screaming. So I moved the truck up and stopped and got out. And I told Jeremy, I said, 'What did you want?' He said, 'I was telling you to watch the bed.' I said, 'Man,' I said, 'I heard' – I said, 'I know what I was doing.' I said, 'Man don't scream at me like that.' I said, 'I'm not' – and – and in a normal toned voice, 'I'm not deaf and dumb, man. You don't have to scream at me. I know what I'm doing.'

---

[1] Slaughter later amended his EEOC charge to include a claim of retaliatory discharge. VanCleave Aff. ¶ 25.

> 'I'm not screaming at you. You.' – and at that time, I told Jeremy these exact words. 'You've got a disability. I've got a disability. I accommodate yours. You accommodate mine.'
>
> He kept on arguing about it and arguing about it. Finally, he wasn't listening to me. I couldn't get my point across to him. I said, 'I'm not arguing with you at work.' I said, 'I'm done arguing with you at work.'
>
> He kept on. I said, 'Jeremy, I'm not arguing with you at work.' I said, 'if you want to talk about it after work, I'll stop at Dodge's and we get something to eat on the way home.' He shut up. I shut up. We went about our work and moved on.

*Id*. "Dodge's" Chicken Store is a convenience store that sells fried chicken.

Slaughter was not wearing his hearing aids at the time. *Id.* at 129. The temperature exceeded 100 degrees that day, and he did not want them to get wet. *Id.* at 131. Slaughter acknowledges that leaving the bed in the elevated position could have presented a safety concern. *Id.* at 128.

The next day, Lowe, Rogers, and Herr provided written statements to supervisor Gary Matthews during Gulf Coast's internal investigation of the events of July 2. *See* Lowe Handwritten Statement, ECF No. 24-6; Rogers Handwritten Statement, ECF No. 24-6; Hare Handwritten Statement, ECF No. 24-6. According to the statements, they yelled and waived their arms at Slaughter because they had been trying to get his attention. *Id.* The truck bed was in an elevated position, and they believed the elevated bed posed a risk of asphalt falling out of it. *Id.*

Lowe also wrote that Slaughter told him he "would be at Dodge's Chicken after work if we needed to settle this or any issue." Lowe Handwritten Statement. Rogers wrote that Slaughter said he "stopped at Dodge's gas station every afternoon and if he had anything else to say Jeremy could meet him there to tell him." Rogers Handwritten Statement.

On July 9, 2012, Gulf Coast fired Slaughter for violating company policy prohibiting violence in the workplace. Emp. Separation Notice 1, ECF No. 24-6. Gulf Coast characterizes Slaughter's statement that he will "stop at Dodge's" after work if Lowe wanted to talk further as a threat of violence. Defs.' Mem. Supp. Mot. Summ. J. 5, ECF No. 27. Slaughter testified that Gulf

4

Coast's stated reason for firing him was that the company feared he would carry out a threat of violence. Slaughter Dep. 148.

On November 27, 2012, the EEOC dismissed Slaughter's charge.[2] On February 26, 2014, Slaughter filed this suit against Gulf Coast in Hardin County Circuit Court. Compl. 1. On March 27, 2014, Gulf Coast timely removed on the basis of diversity jurisdiction. Notice of Removal 1, ECF No. 1.

IV. A prima facie case of disability discrimination

The sole count in Slaughter's complaint alleges that Gulf Coast violated the Kentucky Civil Rights Act by terminating his employment on the basis of his disability. Compl. ¶¶ 7 – 8. The complaint does not allege that Gulf Coast acted illegally by failing to accommodate Slaughter's disability. *See* Compl. 2. Nor does the complaint allege that Gulf Coast retaliated against him for filing an EEOC complaint by transferring him to the Structures Department or firing him. *See id.*

The Kentucky Civil Rights Act prohibits an employer from discharging an individual "because the person is a qualified individual with a disability." Ky. Rev. Stat. § 344.040(1)(a). Kentucky courts interpret the Kentucky Civil Rights Act consistent with federal law. *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 n.5 (Ky. 2003).

Direct evidence of discrimination is evidence that requires the conclusion that the unlawful discrimination was the "but for" cause of the employment decision. *See Scheick v. Tecumseh Pub. Schs.*, 766 F.3d 523, 530 (6th Cir. 2014). If the plaintiff does not offer direct evidence of discrimination, the Court applies the *McDonnell Douglas* burden-shifting framework. *See id.* at 529. Under the *McDonnell Douglas* burden-shifting framework, the plaintiff has the

---

[2] The determination says: "Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that [Gulf Coast] is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge." Dism'l & Notice of Rights, ECF No. 24-6.

5

burden of proving a prima facie case of discrimination. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (discussing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

    A.  <u>Prima facie standard</u>

Under Sixth Circuit precedent, a prima facie case of disability discrimination relying on indirect evidence requires the plaintiff show:

> (1) [H]e or she is disabled; (2) otherwise qualified for the position; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced.

*Whitfield v. Tenn.*, 639 F.3d 253, 258 – 59 (6th Cir. 2011).[3]

Slaughter makes no argument that this is a direct evidence case, but rather argues that he has made a prima facie case of disability discrimination. *See* Pl.'s Resp. Opp. Def.'s Mot. Summ. J. 4 – 6, ECF No. 26.

    B.  <u>Whether Slaughter was disabled, qualified, and suffered an adverse employment action</u>

Gulf Coast concedes that Slaughter was disabled, qualified, and suffered an adverse employment action. Def.'s Mem. 14. Gulf Coast also acknowledges that it knew of Slaughter's disability because the company's mission is to provide employment for people with disabilities. Indeed, much of Gulf Coast's argument focuses on why it hired Slaughter in the first place: *because* of his disability. *See, e.g.*, *id.* Although the parties did not address the fifth element, the Court assumes, for the purposes of determining whether Slaughter made a prima facie case only, that Gulf Coast replaced him.

Thus, Slaughter has made a prima facie case of disability discrimination.

    V.       <u>Whether Gulf Coast can rebut the presumption of discrimination</u>

---

[3] In September 2015, the Kentucky Supreme Court cited a three-element test as the prima facie standard. *Wagner's Pharm. Inc. v. Pennington*, 2015 WL 2266374 *1, *2 (Ky. Sept. 24, 2015) (unpublished). The Kentucky Court of Appeals opinion cited in *Pennington* applied a three-element test in a direct evidence case. *See id.* at *2 (citing *Hallahan v. The Courier-Journal*, 138 S.W.3d 699, 706 (Ky. Ct. App. 2004)).

The burden shifts to Gulf Coast to demonstrate a legitimate, non-discriminatory reason for his firing. *See Burdine*, 450 U.S. at 253. The defendant's explanation "must be legally sufficient to justify a judgment for the defendant." *Id.* at 255. "The defendant need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254.

Gulf Coast argues that it had a legitimate, nondiscriminatory reason for firing Slaughter—"threat[en]ing violence in the workplace." Def.'s Mem. 3.

Slaughter does not dispute that he told Lowe that he would not argue with him at work, but if he wanted to talk about it, to "stop at Dodge's." Slaughter Dep. 126. He used a "normal toned voice," *id.* at 126, though it was possible that he "cussed" at Lowe. *Id.* at 134.

Viewing the evidence in the light most favorable to Slaughter, Gulf Coast presented a legitimate, nondiscriminatory reason for his firing. *Blackshear* provides guidance. *See Blackshear v. Interstate Brands Corp.*, 495 F.App'x 613, 618 (6th Cir. 2012). The employer asserted that its legitimate, nondiscriminatory reason for firing the plaintiff was that she violated the policy prohibiting workplace violence. *Id.* The employer "presented evidence that it terminated Blackshear because her conduct violated the Workplace Violence Policy; the Policy dictates that any employee found to be in violation of the Policy will be terminated." *Id.* The employer also presented evidence that "in all cases where employees were found to be in violation of the Policy, the employees were discharged." *Id.* The employer's explanation and evidence satisfied its burden. *Id.*

Here, Gulf Coast presented evidence that it terminated Slaughter because his conduct violated the Employee Conduct Policy prohibiting employees from engaging in "violence, threats, or intimidation." Emp. Handbook 24. Although Gulf Coast did not present evidence that "in all cases" employees who violated the policy would be terminated, *see Blackshear*, 495 F.App'x at 618, the Employee Conduct Policy does say that an employee who engages in violence, threats, or intimidation may be immediately terminated. Emp. Handbook 24.

7

Assuming that Slaughter used a "normal toned voice" and did not curse at Lowe, the words he admits he spoke could be perceived as a threat of violence. Lowe did not speak to Slaughter after Slaughter said to stop at Dodge's if he wanted to talk more. Stopping at Dodge's to "settle this or any issue" resembles a statement of "let's take it outside," where disputes are sometimes handled with violence. Gulf Coast's explanation and evidence satisfy its burden of presenting a legitimate, nondiscriminatory reason for discharging Slaughter.

Thus, Gulf Coast has offered a legitimate, nondiscriminatory reason for firing Slaughter.

VI.     Whether Slaughter can show that Gulf Coast's reason is pretextual

Slaughter has the burden to prove that Gulf Coast's reason for firing him, threatening violence in the workplace, is pretext for unlawful discrimination. *See Burdine*, 450 U.S. at 253. Slaughter can "demonstrate pretext by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Martinez v. Cracker Barrel Old Country Store, Inc.*, 703 F.3d 911, 915 (6th Cir. 2013).

Slaughter argues that Gulf Coast's reason for firing him, threatening violence in the workplace, is pretext for unlawful discrimination. Pl.'s Resp. 5. He argues,

> First, the reason has no basis in fact. Mr. Slaughter did not threaten anyone. Further, no threat was ever made so there is nothing to motivate the employer's actions. Third, since a threat was not made there was no sufficient reason to motivate the action. Further, since the conduct of Mr. Lowe was directly contrary to the accommodation requested by Mr. Slaughter that he not be yelled at or screamed at because of his hearing impairment and because management was aware of the requested accommodation and because management terminated Mr. Slaughter while not disciplining the individual who violated the requested accommodation and violated the company policies, is further demonstration of pretext.

*Id.* at 5 – 6.

Slaughter also submitted an unsigned affidavit in support of his response in opposition to Gulf Coast's motion for summary judgment. He says he "never threatened violence." Slaughter Aff. 2, ECF No. 26-1. In his response, Slaughter relies on this affidavit, and the only other record citation

8

he makes is to Gulf Coast's memorandum in support of its motion for summary judgment. *See* Pl.'s Resp. 1 – 2. Gulf Coast moved to strike this affidavit. Def.'s Reply 2, ECF No. 27.

The Court need not decide whether Slaughter's affidavit directly contradicts his sworn deposition testimony and thus should be stricken. *See Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d at 899, 908 (6th Cir. 2006) (discussing whether the district court should admit a post-deposition affidavit at the summary judgment stage). Even if Slaughter never threatened violence, Gulf Coast argues that it honestly believed he had threatened violence when it decided to fire him.

"The honest-belief rule provides that an employer is entitled to 'summary judgment on pretext even if its conclusion is later shown to be mistaken, foolish, trivial, or baseless.'" *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 – 91 (6th Cir. 2014). An employer may avoid a finding of pretext by establishing its honest belief in its proffered reason: "its reasonable reliance on the particularized facts that were before it at the time the decision was made." *Martinez*, 703 F.3d at 915 (internal quotation marks omitted). The "key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Id.*

Viewing the evidence in the light most favorable to Slaughter, Slaughter has not shown that Gulf coast's proffered reason for firing him is pretext for unlawful discrimination. First, Gulf Coast's proffered reason for firing Slaughter, threatening violence in the workplace, has a basis in fact. Slaughter told Lowe that he would not argue with him at work but to stop at Dodge's if he wanted to talk after work. It is reasonable to conclude from this statement that Slaughter was threatening Lowe, similar to a statement like "let's take it outside." Even if Slaughter did not intend to threaten violence, a reasonable person in Lowe's position could have reasonably concluded that "stop at Dodge's" meant that Slaughter may engage in physical violence against Lowe.

Second, Slaughter has not offered any evidence to show that what Gulf Coast perceived as a threat was not what actually motivated Gulf Coast to fire him. In *Blackshear*, the plaintiff conceded that her "alleged violation of the Policy is at least one of the reasons upon which Interstate Brands

9

based its decision to terminate her." 495 F.App'x at 619. Here, Slaughter said in his deposition that Gulf Coast told him the reason it terminated him was "because [it] was afraid I was going to carry out my threats." Slaughter Dep. 176.

Third, Gulf Coast's response in firing Slaughter for threatening violence in the workplace was certainly sufficient to warrant his firing. Workplace violence pervades. Employers must take action against employees who threaten violence in the workplace. Firing an employee for making a threat, or what a reasonable person could perceive as a threat, is absolutely appropriate.

Even if the Court concluded that Gulf Coast's erred in concluding that Slaughter's statement was a threat of physical violence, Gulf Coast would still be entitled to summary judgment under the honest belief rule. Again, *Blackshear* provides guidance. *See* 495 F.App'x at 618. Although the plaintiff disputed that "she made a verbal threat of physical violence against [her domestic partner], Interstate Brands—relying on facts the company gathered in its investigation—discharged Blackshear based on its honest belief that Blackshear had made such threats." *Id.*

Here, Gary Matthews conducted an internal investigation and interviewed all witnesses to the July 2 events. Lowe and Rogers both wrote in their initial statements that Slaughter had told Lowe to "stop at Dodge's." All four witnesses wrote statements as a part of the investigation, and Matthews wrote an initial report which referred to the argument between Lowe and Slaughter. Based on the investigation, Gulf Coast reasonably relied on an honest belief that Slaughter had threatened violence at the time it fired Slaughter. As a result of that honest belief, Gulf Coast has shown that a finding of pretext is inappropriate, and it is entitled to summary judgment.

VII. Conclusion

The Court will grant summary judgment to Lakeview Center on Slaughter's claim. The Court will dismiss Slaughter's claim. The Court will enter an order in accordance with this opinion.

January 7, 2016

Charles R. Simpson III, Senior Judge
United States District Court

10